UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HASBRO, INC. and<br>HASBRO INTERNATIONAL, INC.,<br>Plaintiffs, | 05 106 ML |
| v. | Civil Action No. : |
| MIKOHN GAMING CORPORATION,<br>Defendant. | |

## COMPLAINT

1. Plaintiff, Hasbro, Inc. ("Hasbro") is a corporation with a principal place of business in Pawtucket, Rhode Island.

2. Plaintiff, Hasbro International, Inc. ("International") is a corporation with a principal place of business in Pawtucket, Rhode Island.

3. Defendant, Mikohn Gaming Corporation ("Mikohn") is a corporation with a principal place of business in Las Vegas, Nevada.

4. Pursuant to 28 U.S.C.A. §1332, this Court has jurisdiction over the parties in the matter as they are citizens of different states and the amount in controversy exceeds the statutory minimum of $75,000.00.

## FACTUAL BACKGROUND

5. Between the fall of 1998 and 2000, Hasbro/International and Mikohn entered into several License Agreements.

6. Each of these License Agreements contained an opening section entitled "Worldwide Merchandizing Agreement License Agreement Summary."

7. Under the applicable License Agreements, Hasbro/International licensed Mikohn to utilize the trademarks and other intellectual property associated with certain Hasbro games.

8. The games properties covered by the License Agreements entered into between the parties included: "Yahtzee," "Battleship," "Clue," "Monopoly" and "Trivial Pursuit".

9. Under four (4) of the License Agreements between the parties – those for "Yahtzee," "Battleship," "Clue," and "Trivial Pursuit" -- Mikohn was granted a license by Hasbro/International for the use of each of the respective game property for certain "gaming goods or products" or "casino slot machines" as specified in each License Agreement, that allowed Mikohn to use the game property for slot machines.

10. The License Agreement between the parties for "Monopoly" granted Mikohn a license to use the "Monopoly" game property for "live casino table games" as specified in that License Agreement.

11. The terms of the royalty payments to be made by Mikohn to Hasbro/International for the license of the aforementioned games properties are set forth in Section 2 of each respective License Agreement.

12. Pursuant to the four slot machine-related License Agreements (that is, those for "Battleship," "Yahtzee," "Clue," and "Trivial Pursuit"), Mikohn was to pay a royalty to Hasbro/International in which the "Royalty Per Game Per Day" payable to Hasbro/International varied on a sliding scale dependent on the "Lease Revenue to Licensee [Mikohn]" from the licensed gaming devices.

13. Under each of these four respective License Agreements, the minimum royalty payable to Hasbro/International was $4.00 per game per day when the revenue to Mikohn per day was under $40.00 per day.

14. Additionally, pursuant to each of these respective License Agreements, Hasbro/International could receive a maximum of $46.66 in royalty per game per day when the revenue to Mikohn was over $140.00 per day.

15. Between these minimum and maximum royalty payments there existed a sliding scale as to what royalty would be paid to Hasbro/International from Mikohn, predicated on the lease revenue obtained by Mikohn.

16. The "Monopoly" License Agreement for "live casino table games" had a different royalty structure in which Mikohn would pay Hasbro/International a royalty calculated as a percentage of gross revenue to Mikohn from the sale or lease of the games as follows:

Years 1 through 3: 10%

Years 4 through 6: 15%

Years 7 through 8: 30%

17. Pursuant to Section 2(c) of each License Agreement, Mikohn was to furnish Hasbro/International complete and accurate statements as to royalties due Hasbro/International, certified to be accurate by Mikohn.

18. Pursuant to Section 11 of each applicable License Agreement, Mikohn agreed to keep accurate books of accounts and records for at least two years after the termination of the license, with regard to the royalties owed under the agreement, and to make those records available to Hasbro/International and their duly authorized certified public accountants.

19. Pursuant to Section 11 of each applicable License Agreement, in the event that Hasbro/International discovered a royalty payment discrepancy of five (5%) percent or more pursuant to any examination of Mikohn's books and records, Mikohn is to pay

Hasbro/International the fee for such examination, plus reasonable out-of-pocket costs, with Mikohn charged no more than $4,000.00 for any individual examination.

20. Further pursuant to Section 11 of each applicable License Agreement, royalties found to be due as a result of examination of Mikohn's books and records are to be paid with interest at an interest rate of 1.75% per month or the highest rate permitted by law, whichever is lower, from the date the royalty amount should have been paid to Hasbro/International until paid.

21. Pursuant to Section 22 of each applicable License Agreement, the agreement is to be construed in accordance with the internal laws of the State of Rhode Island and any dispute arising thereunder is subject to the exclusive jurisdiction of the courts of the State of Rhode Island, including the United States District Court for the District of Rhode Island.

22. On or about March 20, 2002, Mikohn received a letter from the State of Nevada Gaming Control Board, concerning whether the License Agreement for "Clue" and similar license agreements between Mikohn and Hasbro/International provided for payments that were not a fixed sum determined in advance on a bona fide basis. The letter indicated that Mikohn was not to make any payments to Hasbro under the Licensing Agreement until Hasbro was found suitable under Nevada gaming regulations or the agreement was amended to comply with Nevada laws and regulations concerning payments.

23. Upon receipt of that letter, Mikohn's General Counsel, Charles H. McCrea, Jr., sent Pat Schmidt, at that time Vice President, Licensing & Promotions, a fax calling her attention to the Nevada Gaming Control Board letter and stating "I am confident we can structure a royalty that places Hasbro in essentially the same position economically as it is in now."

24. On or about March 22, 2002, Charles H. McCrea, Jr., wrote to Pat Schmidt outlining a proposed new royalty structure.

25. The new royalty structure proposed by Mikohn would be "unit-based." Under this proposal, Hasbro's daily rate per unit for royalties would vary depending on the number of units of the game that were installed.

26. General Counsel McCrea's March 22, 2002 letter also stated that "I have attached an analysis showing that this new structure would generate essentially the same royalties to Hasbro as the existing structure."

27. The analysis attached to General Counsel McCrea's March 22, 2002 letter used figures that assumed that Hasbro should only be getting paid at the minimum rate under the existing royalty structure, that is, $4.00 per game per day.

28. For each of the four slot machine-related License Agreements, Mikohn and Hasbro entered into amendment to the License Agreement, dated as of April 1, 2002.

29. Under each of the amendments, dated as of April 1, 2002, the royalty provisions were amended so that the royalty rate was calculated based on the number of game units in operation and generating recurring revenues to Mikohn. Once again, the calculations were made on a "royalty per game per day" basis.

30. The rates in the amendments, dated as of April 1, 2002, were the same rates as those proposed in the March 22, 2002 letter from Mikohn's General Counsel Charles H. McCrea, Jr.

31. The rates in the amendments started at a daily rate per unit of $3.50 "before costs recovered" or $4.02 "after costs recovered" for games 1 through 500, with the rate increasing to a top daily per rate per unit of $7.50 "before costs recovered" or $8.63 "after costs recovered" which was to be applied if there were over 2000 games.

32. In late 2004, Hasbro had reason to believe that Mikohn had improperly and incorrectly determined and reported the per game per day royalties owed to Hasbro/International under the "Battleship" and "Yahtzee" License Agreements prior to the 2002 amendments, as well as used this incorrect reporting as the basis for the revised royalties rates in those amendments.

33. Hasbro believes that Mikohn improperly and incorrectly determined and reported royalties owed to Hasbro/International by aggregating the gross revenue during the reporting period for all the gaming machines in use under the applicable License Agreement at all casinos or other locations, with the result that Mikohn always reported gross revenue of less than $40.00 per day and thereby paid royalties at the lowest possible rate of $4.00 per game per day.

34. Many of the casino locations were regularly producing greater revenue than $40.00 per day, and so under the royalty schedule Hasbro/International should have been paid royalties at a higher rate per game per day for the games at these locations.

35. The aforementioned actions undertaken by Mikohn minimized the royalties payable to Hasbro/International causing a significant underpayment to Hasbro/International.

36. Pursuant to its right, Hasbro conducted an audit of Mikohn's books and records pertaining to the License Agreements between Hasbro/International and Mikohn for use of the "Yahtzee," "Battleship," "Monopoly," "Clue," and "Trivial Pursuit" properties.

37. Hasbro's audit revealed that Mikohn had underpaid Hasbro in royalties and interest for under the "Battleship" and "Yahtzee" License Agreements in excess of $6,000,000.

38. Hasbro's audit also revealed that Mikohn owed Hasbro/International additional amounts as a result of utilizing an incorrect royalty rate under the "Monopoly" License Agreement, failing to make royalty guarantee payments when due under the "Monopoly"

License Agreement, not making royalty payments when due under each of the applicable License Agreements, and triggering a provision for Mikohn to pay Hasbro an audit fee because royalties were underpaid by more than five percent (5%).

**(COUNT I)**
**(BREACH OF CONTRACT)**

39. Plaintiffs hereby re-alleges Paragraphs 1 through 38, as if fully set forth herein.

40. Mikohn has failed to pay Hasbro/International the full amount owed to Hasbro/International under the applicable royalty fee arrangement.

41. In failing to properly pay Hasbro/International under the royalty arrangement in each agreement, Mikohn breached a contractual obligation that it had with Hasbro/International, and owes Hasbro/International in excess of $6,000,000.00 in principal, interest and other contractual fees.

42. In failing to properly pay Hasbro/International under the royalty arrangement in each agreement, Mikohn breached its obligation of good faith and fair dealing it had with Hasbro/International, and owes Hasbro/International in excess of $6,000,000.00 in principal, interest and other contractual fees.

WHEREFORE, Hasbro/International prays for judgment on its own behalf, including attorneys fees, costs and interest pursuant to the contractual obligation, and any and all other relief which this Court may deem just in this matter.

**(COUNT II)**
**(UNJUST ENRICHMENT)**

43. Plaintiffs hereby re-alleges Paragraphs 1 through 38, as if fully set forth herein.

44. Mikohn has improperly and incorrectly calculated and reported the royalty payments owed to Hasbro/International by either negligently utilizing an incorrect formula, or knowingly utilizing an incorrect formula under the applicable License Agreements.

45. Mikohn used the improper and incorrect calculations and royalty reporting as the basis for 2002 amendments to the applicable License Agreements.

46. As a result of Mikohn's course of conduct, it has been enriched in an amount in excess of $6,000,000 through royalty payments which it owes Hasbro/International.

WHEREFORE, Hasbro/International prays for judgment on its own behalf, and requests that this Court disgorge from Mikohn and order paid to Hasbro/International the unjust enrichment Mikohn has obtained through its action, as well as attorneys' fees, costs, interest and any and all other relief which this Court may deem just in this matter.

## (COUNT III)
## (FRAUD AND MISREPRESENTATION)

47. Plaintiffs hereby re-alleges Paragraphs 1 through 38, as if fully set forth herein.

48. Mikohn intentionally miscalculated the royalty payments owed to Hasbro/International by utilizing a formula that it knew was not set forth or contemplated in any of each of the respective agreements governing the royalty payments.

49. Mikohn engaged in fraudulent conduct relative to the contractual obligations that it had with Hasbro/International in minimizing the royalty payments owed to Hasbro/International.

50. Mikohn intentionally misrepresented its obligations to Hasbro/International and falsified royalties under a fraudulent accounting scheme, so as to minimize its financial obligations to Hasbro/International.

51. Mikohn intentionally used the improper and incorrect calculations and royalty reporting as the basis for 2002 amendments to the applicable License Agreements, so as to minimize its financial obligations to Hasbro/International.

52. Mikohn's willful fraud and intentional misrepresentation warrants the application of punitive or exemplary damages.

WHEREFORE, Hasbro/International prays for judgment on its own behalf, including punitive or exemplary damages, attorneys' fees, costs, interest, both pursuant to the contractual obligation and pursuant to the statutory obligation and any and all other relief which this Court may deem just in this matter

**PLAINTIFFS HEREBY DEMANDS A JURY TRIAL ON ALL COUNTS.**

HASBRO, INC. and HASBRO INTERNATIONAL, INC.

By their Attorneys,

Todd D. White

Todd D. White (# 5943)
Linda A. Mayer (#6482)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607

Date: 3/7/05

*324269_1.doc*