UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

—————————————————
                                      )
HASBRO, INC., and HASBRO              )
INTERNATIONAL, INC.,                  )
                                      )
              Plaintiffs,             )
        ,                             )
                                      )
        v.                            )    C.A. No. 05-106 S
                                      )
MIKOHN GAMING CORPORATION,            )
                                      )
              Defendant.              )
—————————————————     )

### MEMORANDUM AND DECISION

WILLIAM E. SMITH, United States District Judge.

Plaintiffs Hasbro, Inc. and Hasbro International, Inc. (collectively, "Hasbro") entered into several license agreements ("agreements") with Defendant Mikohn Gaming Corporation ("Mikohn"). Under each agreement, Hasbro granted Mikohn a license to use one of its games in Mikohn's "gaming goods" or products, including slot machines. The agreements that governed the use of Hasbro's Battleship, Yahtzee, and Clue[1] games each contained a royalty payment provision that required Mikohn to pay a royalty to Hasbro based upon the revenue Mikohn generated from the sale or lease of the licensed game, on a per game, per day basis. Hasbro maintains that Mikohn did not compensate it according to the terms of the

---

[1] Although this Court is concerned only with the Yahtzee and Battleship agreements, the Clue agreement is relevant because it contained the same royalty payment provision as the Yahtzee and Battleship agreements.

Battleship and Yahtzee agreements, resulting in a shortfall in excess of six million dollars.

On March 7, 2005, Hasbro filed a three count Complaint, sounding in breach of contract, unjust enrichment, and fraud and misrepresentation. This Court has jurisdiction pursuant to 28 U.S.C. § 1332: Hasbro, Inc. and Hasbro, International, Inc. have principal places of business in Rhode Island; Mikohn's principle place of business is Nevada; and the amount in controversy exceeds seventy five thousand dollars.

Mikohn moved to dismiss Hasbro's claims, arguing primarily that the agreements were illegal and therefore cannot be enforced. At oral argument, Mikohn argued that count three of the Complaint, captioned fraud and misrepresentation, was not pled with the requisite particularity. See Fed. R. Civ. P. 9(b). Hasbro's counsel informed this Court that discovery had yielded more specific information regarding count three and that an amended complaint had been on his desk for six months. From the bench, this Court invited Hasbro to file an amended complaint addressing the fraud and misrepresentation count.

On February 16, 2006, Hasbro filed an Amended Complaint that not only supplemented the factual allegations of count three, but also made changes to counts one and two. Mikohn did not move to strike, or otherwise object to the additional changes; therefore, the Amended Complaint now governs this action. Because the

2

critical issue in the Motion to Dismiss is a purely legal one, which is unaffected by Hasbro's changes to the Complaint, this Court will consider the Motion to Dismiss as directed to the Amended Complaint.

I.   Factual Background[2]

Hasbro makes children's and family entertainment products, including games and toys.  Mikohn is a provider of gambling products, including branded slot machines and gaming products. Hasbro and Mikohn entered into several agreements between the fall of 1998 and 2000, including agreements governing the use of themes derived from Hasbro's Yahtzee, Battleship, and Clue games.  All three agreements contained the same royalty payment provision and remained in effect until April of 2000.

Hasbro's royalty payment was based on "a percentage of gross revenue to Mikohn generated from the sale or lease of the games."[3] Agreements § 2. The dollar amount Hasbro was entitled to was determined by a tripartite formula:  (1) if Mikohn's lease revenue was less than forty dollars per day, then Hasbro's "royalty per

_____

[2] The background information is limited to that necessary for disposition of the pending motion.  For purposes of this motion, this Court takes the facts as set forth in the Amended Complaint, and from materials that this Court may consider at the motion to dismiss stage.  See section II.

[3] Although the agreements refer to Mikohn's revenue "generated from the sale or lease," the list of amounts for Hasbro's "royalty per game per day" is contingent on lease revenue, without any mention of sales revenue.

game per day" was set at a minimum amount; (2) if Mikohn's lease revenue was between forty dollars and one hundred thirty nine dollars per day, then Hasbro's "royalty per game per day" was set at one of ten specified amounts, predicated on Mikohn's actual per diem lease revenue; and (3) if Mikohn's lease revenue was greater than one hundred forty dollars per game per day, then Hasbro's "royalty per game per day" was set at a maximum amount.[4] Id. After the agreements were executed and slot machines were placed in casinos, Mikohn began making royalty payments to Hasbro under the Yahtzee and Battleship agreements.

In addition to setting forth the royalty payment provisions, the agreements required Mikohn to furnish Hasbro with "complete and accurate statements" of the royalties due to Hasbro. Id. at § 2(c). Mikohn was also required "to keep accurate books of account and records" regarding Hasbro's royalty payments, and to keep these books for at least two years after the termination of the agreements. Id. at § 11. Hasbro and its authorized certified public accountants retained the right to inspect Mikohn's books once per calendar year. Id. If an inspection revealed a royalty payment discrepancy of five percent or more, then Mikohn was required to pay the unpaid royalties, plus a specified interest

---

[4] The royalty payment provision is set forth in detail in section III. D. 1.

4

rate, and reimburse Hasbro for the cost the examination, up to four thousand dollars per inspection.  <u>Id.</u>

The agreements also contained a section entitled "governing law," which specified that the agreements "shall be construed in accordance with the internal laws of the State of Rhode Island" and "that any dispute arising hereunder shall be subject to the exclusive jurisdiction of the courts of such State, including the United States District Court for the District of Rhode Island." <u>Id.</u> at § 22.

On March 20, 2002, Mikohn's associate general counsel, Mike Dreitzer, received a one page letter, dated March 20, 2002, from Scott Scherer ("the Scherer Letter"), a member of the State of Nevada Gaming Control Board ("NGCB").  The NGCB is a three member board, <u>see</u> N.R.S. 463.030, that "investigates and prosecutes violations of the gaming laws." <u>Romano v. Bible</u>, 169 F.3d 1182, 1184 (9th Cir. 1999).  The NGCB's powers and duties include examining premises where gaming is conducted, reviewing books and records of licensees, and investigating suspected criminal violations of N.R.S. chapter 463.  <u>See</u> N.R.S. 463.140.  After an investigation, if the NGCB is satisfied that a "prior approval by the [Nevada gaming commission] of any transaction for which the approval was required or permitted . . . should be limited, conditioned, suspended or revoked, [then the NGCB] shall initiate a hearing before the [Nevada gaming commission]."  N.R.S.

5

463.310(2).  To initiate the hearing, the NGCB files "a complaint with the [Nevada gaming commission] . . . and transmit[s] therewith a summary of evidence in its possession bearing on the matter and the transcript of testimony at any investigative hearing conducted by or on behalf of the board."  Id.

The Scherer Letter explained that a recently received letter from Assistant Chief Deputy Attorney General Mike Wilson "determined that the payments contemplated in the Mikohn-Hasbro [Clue] licensing agreement are not 'a fixed sum determined in advance on a bona fide basis,' because the increments in the agreement essentially mimic a percentage of revenue."  The Scherer Letter instructed Mikohn that it "may not make any payments to Hasbro" under the Clue licensing agreement, or any "similar licensing agreements covering other game themes."[5]

Shortly thereafter, Mikohn's general counsel, Charles H. McCrea, Jr., transmitted a one page facsimile cover sheet (the "cover sheet") and the Scherer Letter to Pat Schmidt at Hasbro.  In the cover sheet, McCrea noted the recent receipt of the Scherer Letter, commented that the Scherer Letter "represents a departure from past policy of the Board," and said that Mikohn was confident it "can structure a royalty that places Hasbro in essentially the same position economically as it is in now."

---

[5] The Clue licensing agreement contained the same tripartite royalty payment formula as the Yahtzee and Battleship agreements.

On March 22, 2002, McCrea wrote to Schmidt, outlining a new proposed royalty structure. This new royalty structure was "unit-based," meaning that Hasbro would receive increased revenue when an increased number of games were installed. Specifically, Hasbro was to receive a minimum specified amount if 500 games or less were installed, a maximum specified amount if over 2000 games were installed, and if there were between 501 and 2000 games installed, then Hasbro received proportional increases. The proposed rates were later adopted as amendments to the agreements, effective April 1, 2002.[6]

In late 2004, Hasbro began to suspect that Mikohn had miscalculated its royalty payments under the agreements that were in effect until April of 2002.[7] Pursuant to section 11 of the agreements, Hasbro audited Mikohn's books and records pertaining to several games, including Yahtzee and Battleship. According to Hasbro, the audit revealed that Mikohn had in fact underpaid Hasbro on the Battleship and Yahtzee agreements. In total, the royalties and contractually specified interest for the two games equaled more than six million dollars.

---

[6] Although the text of the amendments contain the April 1, 2002 date, "AUG - 5 2002" appears stamped below the signature of Jane Ritson-Parsons, President of Hasbro Properties Group.

[7] If this allegation proves true, then Hasbro agreed to a lower rate when it signed the amendments, because the new structure would have been based on incorrect figures. See Am. Compl. ¶¶ 25, 29, 31, 35, 39, 52 & 53.

Hasbro maintains that Mikohn knowingly utilized an incorrect formula to determine Hasbro's royalty payments under the agreements in effect until April 2002 and also utilized that incorrect formula as a basis for the "unit-based" rates in the amendments.  Seeking to recover its royalties, interest, and other relief, Hasbro filed suit in this Court.

II.  Standard of Review

Mikohn alleges that Hasbro has failed "to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).  This Court must "accept the well-pleaded facts as true and indulge all reasonable inferences therefrom" in Hasbro's favor.  Jorge v. Rumsfeld, 404 F.3d 556, 559 (1st Cir. 2005).  If, "under any theory," Hasbro's allegations "are sufficient to state a cause of action in accordance with the law, [this Court] must deny the motion to dismiss." Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir. 1994).

The First Circuit has adopted a "practical, common sense approach" for determining what materials may be properly considered on a motion to dismiss. Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16 (1st Cir. 1998).  This Court may consider not only the complaint, but also "the facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice." Jorge, 404 F.3d at 559 (emphasis added).  In addition, when a "complaint's factual

allegations are expressly linked to — and admittedly dependent upon — a document (the authenticity of which is not challenged), that document effectively merges into the pleadings." Beddall, 137 F.3d at 17.  "Moreover, the district court appropriately may consider the whole of a document integral to or explicitly relied upon in a complaint, even if that document is not annexed to the complaint." Jorge, 404 F.3d at 559 (emphasis added).

Although Hasbro's Amended Complaint referenced several documents, none were attached.  Mikohn, however, appended several documents to its Rule 12(b)(6) motion:  exhibit A includes documents pertaining to the Battleship agreement; exhibit B contains Yahtzee documents; and exhibit C consists of the Scherer Letter.  Hasbro attached to its opposition both the cover sheet sent with the Scherer Letter and an excerpt from the Yahtzee agreement.  Mikohn's reply did not contain any attachments.

This Court may consider the agreements pertaining to Yahtzee and Battleship.  The Amended Complaint is replete with references to them, see, e.g., ¶¶ 8-16, their authenticity has not been questioned, and allegations in the Complaint are expressly linked to and dependant upon them.  See Beddall, 137 F.3d at 17 (agreement properly before the court on a Rule 12(b)(6) motion where the agreement was not attached to the complaint, but the complaint discussed the agreement at length, the agreement's authenticity was

not challenged, and the agreement was appended to the 12(b)(6) motion).

This Court may also consider the cover sheet and the Scherer Letter. Like the agreements, they are explicitly relied on by the Amended Complaint, see ¶¶ 18-19, and neither document's authenticity has been questioned. See Jorge, 404 F.3d at 559. Because factual allegations in the Compliant are "expressly linked to" the cover sheet and the Scherer Letter, they have merged into the pleadings and may be considered. Beddall, 137 F.3d at 17.

III. Analysis

A.   March 7, 2002 Memorandum from Michael E. Wilson

At oral argument, this Court inquired whether either party possessed a copy of the "opinion" of the Assistant Attorney General that was referenced in the Scherer Letter. At that time, neither party had a copy. This Court directed the parties to obtain the document, and Mikohn eventually (after considerable effort) did so.

Although the Scherer Letter calls the document an "Attorney General's opinion," this Court does not consider the document to be an official opinion of the Nevada Attorney General. See http://ag.state.nv.us/menu/top/publications.htm (last visited July 14, 2006) (containing "Official Attorney General Opinions" and a link to "Archived Opinions"). The document does not contain an "Opinion No.," nor is it formatted like the "Official Attorney General Opinions." The document is actually captioned "MEMORANDUM"

10

(hereinafter, the "memorandum"), and above the text it states "CONFIDENTIAL ATTORNEY/CLIENT COMMUNICATION."  According to the first paragraph of the Scherer Letter, the memorandum's existence stems from a discussion that "ensued concerning whether Hasbro was required to be found suitable pursuant to NRS 473.162 in order to receive the payments contemplated in your licensing agreement." Subsequently, Scherer contacted the Attorney General's office for advice on that issue.  It appears that the memorandum was produced by Assistant Chief Deputy Attorney General Michael E. Wilson in his statutory capacity as a "legal adviser" to the NGCB.  See N.R.S. 463.0199.

If the memorandum were an "Official Attorney General Opinion," then this Court could consider it as a type of legal authority, keeping in mind that under Nevada law, Nevada Attorney General Opinions "do not constitute binding legal authority or precedent." Goldman v. Bryan, 787 P.2d 372, 380 (Nev. 1990); see also Blackjack Bonding v. City of Las Vegas Mun. Court, 14 P.3d 1275, 1279 (Nev. 2000).  However, the memorandum is not an "Official Attorney General Opinion," but rather an attorney-client communication containing legal advice.  Although the memorandum undoubtably will be relevant to the matter at issue in the future, it cannot be considered at the motion to dismiss stage.

B.   The Scherer Letter

The parties argue at length about the import of the Scherer Letter.  On one extreme, Mikohn exhorts that this Court "should not overturn the determination of the Nevada Attorney General and the NGCB that Mikohn 'may not make any payments to Hasbro under the' illegal contracts," Mikohn's Mem. at 15, while on the other extreme, Hasbro maintains that "the letter is at best hearsay." Hasbro's Mem. at 4.   This Court has already determined that the Scherer Letter can be considered at this juncture; however, the value of the Scherer Letter as a statement of law or as the position of the NGCB is minimal for three reasons.

First, the Scherer Letter is based on a memorandum that has neither precedential force nor legal authority.   Thus, it has no value to this Court as legal authority.

Second, the NGCB does not possess judicial power or authority. See Romano, 169 F.3d at 1184 (NGCB "investigates and prosecutes violations of the gaming laws").   Rather, "the members of the State Gaming Control Board . . . have roles similar to prosecutors," while "the members of the . . . Nevada Gaming Commission have roles similar to . . . judges." Rosenthal v. Nevada, 514 F. Supp. 907, 913 (D. Nev. 1981).   There is no evidence before this Court of any hearings regarding the Mikohn-Hasbro agreements, nor is there

evidence that the NGCB ever contacted Hasbro, or filed a complaint with the Nevada Gaming Commission. See N.R.S. 463.310(2).[8]

Finally, the Scherer Letter was sent by one member of the NGCB, and does not, on its face, appear to represent any type of official action of the NGCB.[9] Drawing all reasonable inferences in Hasbro's favor, as this Court must, the Scherer Letter cannot be considered as definitively stating the position of the NGCB; thus, this Court will consider the Scherer Letter for what it is: evidence of the viewpoint of one member of the NGCB.[10]

_____

[8] Mikohn's reliance on Providence Hosp. v. NLRB, 93 F.3d 1012, 1016 (1st Cir. 1996), is of no avail because that case involved deference to a decision of the National Labor Relations Board ("NLRB") where the NLRB adopted the findings of an administrative law judge who had held a hearing, taken evidence, and "published his findings and a proposed order." The facts here are entirely different, as there is only a letter from one member of a board whose function is prosecutorial rather than judicial.

[9] If the NGCB had initiated an action or proceeding to enforce a provision of Chapter 462 or 463, or requested the prosecution of an offense, then the NGCB would have "immediately notif[ied] the [Nevada Gaming] commission." N.R.S. 463.141. There is no evidence that the Nevada Gaming Commission was notified.

[10] Furthermore, this Court remains puzzled as to why neither Hasbro nor Mikohn sought any review of the instruction in the Scherer letter, followed up with anyone at the NGCB about the Scherer letter, or obtained a copy of the Attorney General's "opinion" referred to in the Scherer letter. The total inaction is especially odd on Mikohn's part because Mikohn's McCrea characterized the letter as "a departure from past policy." In addition, there is no evidence that the parties looked to § 2(d) of the agreements, which anticipated an instance in which "it may be unlawful for Licensee to remit to Licensor the royalties described in this Agreement (e.g. because Licensee would require a license from the relevant gaming authorities, but such license has not been granted)." Section 2(d) goes on to set forth a process by which the parties would handle a finding that the agreements were

C.    Choice of Law

The parties selected Rhode Island law as the governing law for resolving disputes related to the agreements.  See Agreements ¶ 22. Both Hasbro, Inc. and Hasbro International, Inc. have principal places of business is in Rhode Island, and communications regarding the agreements were sent to Rhode Island.  Because "there is at least a reasonable relation between the dispute and the forum whose law has been selected by the parties," this Court will "forego an independent analysis of the choice-of-law issue and apply the state substantive law selected by the parties."  Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 127 n.5 (1st Cir. 2006) (internal quotation marks and citations omitted).  Therefore, Rhode Island law, as selected in paragraph twenty-two of the agreements, governs.

D.    Count One:  Breach of Contract

Hasbro's breach of contract claim alleges that Mikohn failed to pay Hasbro in full under the agreements in effect until April 2002 and further used that underpayment to negotiate amendments to the agreements.  See Am. Compl. ¶¶ 30-33.  Mikohn argues that the agreements were illegal under Nevada law, and Rhode Island law does not permit recovery under illegal agreements, so the breach of contract count should be dismissed.  Hasbro, of course, disputes

---

unlawful.

that the agreements were illegal.   Hasbro contends that the
agreements were not illegal because it was not "participating in
the net win," but rather "just getting paid on whatever it's leased
out for."  Hr'g Tr. at 24.   Moreover, Hasbro points out that no
authoritative entity has yet decided the legality of the
agreements.

Under Rhode Island law, the determination of whether or not an
agreement is in violation of a statute is a question of law.  Power
v. City of Providence, 582 A.2d 895, 900 (R.I. 1990).   Thus, this
Court must determine whether the agreements' royalty payment
provisions violated N.R.S. 463.162.[11]

1.   The Royalty Payment Provisions

Hasbro describes the royalty payment provisions in the Yahtzee
and Battleship agreements as containing minimum, maximum, and
"sliding scale" royalty payments, dependant upon Mikohn's lease

---

[11] At oral argument, this Court asked the parties for their
views on whether this question should be certified to the Nevada
Supreme Court.   Mikohn's counsel stated that certifying the
question was "something that could be considered," while Hasbro's
counsel pointed out that "Mikohn did make a determination that they
would allow lawsuits to take place in this jurisdiction, and the
laws of this jurisdiction would govern any of the disputes."  Hr'g
Tr. at 20, 30.   This Court has determined that referral is neither
necessary nor appropriate.

revenue.[12]   See Am. Compl. ¶¶ 12-14.   The section of the agreements setting forth the royalty payments provided:

2. TERMS OF PAYMENT

(a) Royalty Rate.  Licensee will pay a royalty rate to Licensor calculated as a percentage of gross revenue to Mikohn generated from the sale or lease of the games as follows:

**Until Licensee's Costs are Recovered:**

| Lease Revenue to Licensee | Royalty Per Game Per Day |
|---|---|
| Under $40.00 per day | $4.00 |
| $40.00 - $49.00 per day | $6.95 |
| $50.00 - $59.00 per day | $9.90 |
| $60.00 - $69.00 per day | $12.85 |
| $70.00 - $79.00 per day | $15.80 |
| $80.00 - $89.00 per day | $18.85 |
| $90.00 - $99.00 per day | $21.70 |
| $100.00 - $109.00 per day | $24.65 |
| $110.00 - $119.00 per day | $27.60 |
| $120.00 - $129.00 per day | $30.55 |
| $130.00 - $139.00 per day | $33.50 |
| Over $140.00 per day | $36.40 |

**After Licensee's Costs are Recovered:**

| Lease Revenue to Licensee | Royalty Per Game Per Day |
|---|---|
| Under $40.00 per day | $4.00 |
| $40.00 - $49.00 per day | $7.88 |
| $50.00 - $59.00 per day | $11.76 |
| $60.00 - $69.00 per day | $15.64 |
| $70.00 - $79.00 per day | $19.52 |
| $80.00 - $89.00 per day | $23.40 |
| $90.00 - $99.00 per day | $27.28 |
| $100.00 - $109.00 per day | $31.16 |
| $110.00 - $119.00 per day | $35.04 |
| $120.00 - $129.00 per day | $38.92 |
| $130.00 - $139.00 per day | $42.80 |
| Over $140.00 per day | $46.66 |

---

[12] Although section 2 of the agreements referred to revenue generated "from the sale or lease of the games," section 2 did not include figures governing Hasbro's royalty payment when Mikohn sold games; it only contained figures based on lease revenue.

Under the royalty provisions, Hasbro was entitled to receive a set amount where Mikohn's gross lease revenue was under forty dollars per day and a set amount where Mikohn's gross lease revenue was more than one hundred forty dollars per day. But when Mikohn made between forty and one hundred thirty-nine dollars per day in gross lease revenue, then Hasbro received one of ten specified payment amounts, depending on the amount of Mikohn's lease revenue.

2.   Nevada Revised Statute 463.162.

Mikohn argues that the aforementioned royalty provision violated Nevada law, specifically N.R.S. 463.162, entitled "State gaming license required where equipment, services or property delivered or furnished for gaming interest or revenue; exemptions." The first section of N.R.S. 463.162 makes it unlawful for persons who do not possess a state gaming license to enter into three different types of contracts, save for exemptions set forth in the second section of the statute. The prohibition contained in N.R.S. 463.162(1)(c) is relevant here: it is unlawful for any person to "[f]urnish services or property, real or personal, on the basis of a contract, lease or license, pursuant to which that person receives payments based on earnings or profits from any gambling game, including any slot machine, without having first procured a state gaming license."[13]

---

[13] "Slot machine" is defined as "any mechanical, electrical or other device, contrivance or machine which, upon insertion of a

Here, it is beyond dispute that Hasbro furnished intellectual property and trademarks to Mikohn by granting Mikohn licences to use Hasbro game themes.  The relationship between Hasbro and Mikohn was governed by the license agreements, Hasbro received payments under those agreements, and Hasbro did not possess a state gaming license.  The only question, then, is whether Hasbro's payments were "based on earnings or profits from . . . slot machine[s]."[14]

Although there is no information regarding how much Mikohn earned from the lease or sale of any slot machines, nor is there information regarding how much Mikohn actually paid Hasbro, the payment provisions indicated that Hasbro's royalty payments were contingent upon the amount of Mikohn's gross revenue.  Mikohn's gross revenue constituted "earnings or profits" and it was derived from the sale or lease of slot machines.  Because Hasbro's payments

---

coin, token or similar object, or upon payment of any consideration, is available to play or operate, the play or operation of which, whether by reason of the skill of the operator in playing a gambling game which is presented for play by the machine or application of the element of chance, or both, may deliver or entitle the person playing or operating the machine to receive cash, premiums, merchandise, tokens or any thing of value, whether the payoff is made automatically from the machine or in any other manner."  N.R.S. 463.0191.  A similar definition appears in Regulation 29.020 of the Regulations of the Nevada Gaming Commission and the NCGB.

[14] Black's Law Dictionary defines "earnings" as "[r]evenue gained from labor or services, from the investment of capitol, or from assets," and "profit" as "[t]he excess revenue over expenditures in a business transaction." 414, 983 (7th ed. 2000).

were based on Mikohn's earnings or profits from slot machines, the agreements' payment provisions violated N.R.S. 463.162(1)(c).

Even though Hasbro received "payments based on earnings or profits from . . . slot machine[s]," the agreements nevertheless may have been legal if they fell within an exemption to N.R.S. 463.162(1).   Five exemptions are contained in N.R.S. 463.162(2). Relevant here is section 2(a), which exempts any person "[w]hose payments are a fixed sum determined in advance on a bona fide basis for the furnishing of services or property other than a slot machine."   Here, Hasbro furnished trademarks and intellectual property, not slot machines, so the arrangement met the "furnishing of services or property other than a slot machine" part of the exemption.   The critical question is whether the royalty payments in the agreements were "a fixed sum determined in advance on a bona fide basis."[15]

Mikohn argues that the payments were not "a fixed sum determined in advance."   This Court disagrees.   Hasbro's payments fell within the exemption set forth in N.R.S. 463.162(2)(a) because they set forth fixed (not variable) sums.   While it is no doubt true that the payment provisions in the agreements set forth multiple "fixed sums" for Hasbro's payments, the fact that the scale was sliding, rather than static, did not convert the

---

[15] Bona fide is defined as "[m]ade in good faith; without fraud or deceit"; "[s]incere; genuine." <u>Black's Law Dictionary</u> 137 (7th ed. 2000).

19

arrangement into one that would appear to lend itself to the type of fraud or misconduct that the statute seems designed to prevent. The actual amount Hasbro should have received per game per day is a matter for trial, but an example may make the point:  if Mikohn leased a machine for fifty dollars per day, then Hasbro's "fixed sum" payment would be $9.90 per day if Mikohn had not recovered its costs, and $11.76 per day if Mikohn had recovered its costs.  The fact that the statute contains the singular term "fixed sum," while the agreements contained multiple "fixed sums," does not place the agreements outside the scope of the exemption.  Only one fixed sum could apply at a time under the agreements.[16]

Finally, there seems to be little question but that the fixed sums were determined in advance.  Accordingly, the royalty payment provisions were "fixed sum[s] determined in advance on a bona fide basis" and therefore did not violate N.R.S. 463.162(1).[17]

---

[16] This Court assumes that Mikohn will take the position that the sliding scale is a cleverly designed artifice that hides a percentage compensation scheme.  Whatever merit there may be to this argument (and this Court takes no position on this issue), this is a matter better suited for trial or summary judgment.

[17] Because this Court finds that the agreements on their face did not violate N.R.S. 463.162(1), Mikohn's in pari delicto argument need not be addressed.

E.    Count Two:  Unjust Enrichment

Hasbro's unjust enrichment claim alleges that "Mikohn has miscalculated the royalty payments owed to [Hasbro] by knowingly utilizing an incorrect formula under the original applicable agreements and utilizing this improper formula as the basis upon which it created a revised rate within" the amendments to the agreements.  Am. Compl. ¶ 35.  Mikohn argues that Hasbro cannot prevail on a theory of unjust enrichment or implied contract because the dispute is governed by an express contract.   In response, Hasbro argues first that if Mikohn prevails with its argument that the agreements were illegal, then an unjust enrichment claim would be permissible; and second, that even under the authority cited by Mikohn, the unjust enrichment claim may proceed.

Although Mikohn is correct that there is a general rule prohibiting recovery under an unjust enrichment theory where an express contract covers the dispute, the four Rhode Island cases that Mikohn relies on for this proposition are distinguishable on their facts.  In both Cochran v. Lorraine Mfg. Co., 155 A. 572, 575 (R.I. 1931) and Fondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 97 (R.I. 1992), plaintiffs sought equitable remedies (implied contract and quasi-contract, respectively) even though they had been paid in full under the terms of their express contracts. Here, that is not the case, because Hasbro argues that it was paid

millions less than the amount provided by the terms of the contract. In Marshall Contractors, Inc. v. Brown Univ., 692 A.2d 665, 669 (R.I. 1997), the Rhode Island Supreme Court overturned a trial justice's determination that an implied-in-fact contract existed because it found that the parties participated in negotiations of a contract, but never reached an agreement on the scope of the project. Here, Hasbro does not assert the existence of an implied contract, but rather seeks recovery under multiple theories, including unjust enrichment. Finally, in Mehan v. Gershkoff, 230 A.2d 867, 869 (R.I. 1967), the Rhode Island Supreme Court found that the plaintiff had breached and abandoned the oral contract when he refused to perform under its terms; therefore, the plaintiff was "without any legal right to enforce the provisions of the contract." In this case, there is no allegation that Hasbro breached the agreements.

More recently, the Rhode Island Supreme Court has approved of parties proceeding to trial with alternate claims for breach of contract and unjust enrichment. In Richmond Square Capital Corp. v. Ins. House, 744 A.2d 401, 402 (R.I. 1999), the court reviewed a matter where a party "proceeded at trial on two alternate theories: breach of contract and unjust enrichment or quantum meruit." The court found that the "trial justice gave proper instructions on both theories." Id. Similarly, in K&K Const. Inc. v. City of Warwick, 693 A.2d 1038, 1039 (R.I. 1997), the Rhode Island Supreme

Court affirmed a trial justice's denial of a motion for new trial where "the trial justice instructed the jury on the elements of express and implied contracts <u>and</u> on a possible alternative theory of recovery . . . under quasi-contract or unjust-enrichment principles." (Emphasis added.)

Furthermore, the Federal Rules of Civil Procedure permit a party to "set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses." Fed. R. Civ. P. 8(e)(2). When pleading in the alternative, a party may even state inconsistent claims. See <u>id.</u> Thus, Hasbro may plead both unjust enrichment and breach of contract.

At this juncture, Mikohn has not met its burden of demonstrating that Hasbro cannot prove its unjust enrichment count. Therefore, count two survives.

F. Count Three:  Fraud and Misrepresentation

Mikohn originally argued for dismissal of count three on the grounds that it was not pled with the requisite particularity. As discussed above, Hasbro was permitted to file an Amended Complaint addressing count three and Hasbro promptly did so. Mikohn informed this Court, at a subsequent hearing on a separate motion, that it did not wish to press its particularity against the amended count three.

IV.   <u>Conclusion</u>

For all of the foregoing reasons, Mikohn's Motion to Dismiss is DENIED.

IT IS SO ORDERED.


_____

William E. Smith
United States District Judge
Date: 7/17/06