UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

HASBRO, INC., et al., )
Plaintiffs )
) C.A. No. 05-0106/S
v. )
)
MIKOHN GAMING CORP., )
Defendant )

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT MIKOHN GAMING CORPORATION'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

**<u>Table of Contents</u>**

Introduction ........ 1

Facts ........ 4

Standard of Review ........ 15

Argument ........ 16
I. Introduction of the Arguments ........ 16
II. Illegality ........ 18
III. Fraud ........ 26
IV. Damages ........ 30
V. Breach of Contract ........ 35
VI. Unjust Enrichment ........ 52

Conclusion ........ 55

## <u>Introduction</u>

This case focuses on the proper interpretation of identical royalty provisions appearing in two slot machine licensing agreements between plaintiffs Hasbro Inc. and Hasbro

International, Inc. (together "Hasbro") and defendant Mikohn Gaming Corp.[1] ("Mikohn"). The relevant contract language provides that Mikohn "**will pay a royalty to [Hasbro] calculated as a percentage of gross revenue to Mikohn generated from the sale or lease of the games**…." The contract goes on to identify the specific percentage rate in terms of dollars, rather than percentages, using the following tiered royalty schedule:

| **Lease Revenue to Licensee** | **Royalty Per Game Per Day** |
|---|---|
| **Under $40.00 per day** | **$4.00** |
| **$40.00 - $49.00 per day** | **$6.95** |
| **$50.00 - $59.00 per day** | **$9.90** |
| **$60.00 - $69.00 per day** | **$12.85** |
| **$70.00 - $79.00 per day** | **$15.80** |
| **$80.00 - $89.00 per day** | **$18.85** |
| **$90.00 - $99.00 per day** | **$21.70** |
| **$100.00 - $109.00 per day** | **$24.65** |
| **$110.00 - $119.00 per day** | **$27.60** |
| **$120.00 - $129.00 per day** | **$30.55** |
| **$130.00 - $139.00 per day** | **$33.50** |
| **Over $140.00 per day** | **$36.40** |

Resolution of this motion may be assisted by a description of the three contract interpretations that Hasbro has asserted at one time or another: 1) the "**Gross Revenue Interpretation**," which Mikohn and Hasbro applied consistently and without question while the now disputed royalty provisions were in force; 2) Hasbro's "**Litigation Interpretation**," which Hasbro announced for the first time during this litigation **after purchasing the interpretation from a third party who stands to gain hundreds of thousands of dollars if Hasbro prevails** in this matter; and 3) Hasbro's "**Damages Interpretation**," which Hasbro hopes to use to calculate its alleged damages because it lacks data necessary to ascertain actual damages based on its Litigation Interpretation. These three interpretations may be summarized as follows.

[1] Mikohn Gaming Corporation has since changed its name to Progressive Gaming International, Inc., but for purposes of this motion, shall be referred to as "Mikohn."

1) "**Gross Revenue Interpretation**" - Hasbro's own auditors described the Gross Revenue Interpretation in a 2002 audit strategy memorandum:

**Hasbro is entitled to a share of slot machine profits based on the cash received by Mikohn for each licensed product. For example, if the average cash receipts for "Yahtzee Video" machines is between $0 and $40 per machine day (number of machines times the number of days of use) Hasbro receives a share of $4 per machine day for that licensed product.** Mikohn Audit Strategy Memo, Mikohn Gaming, IAD #01035, PK 12/14/01.

2) Hasbro's "**Litigation Interpretation**" – This is the interpretation that Hasbro espoused for the first time during this litigation, after the license agreements had been in place for more than four years. Under its Litigation Interpretation, which Hasbro obtained under a 7.5% Finder's Fee Agreement, Hasbro claims that the parties agreed to calculate and pay a machine specific royalty each day for every machine in operation pursuant to the license agreements. In essence, Hasbro disavows the application of the tiered royalty schedule based on – as Hasbro's auditor's described - the "average cash receipts" for the licensed games.

3) Hasbro's "**Damages Interpretation**" – This is the interpretation of the license agreements that Hasbro asserted in its demand letter to Mikohn shortly before it filed this lawsuit and asserted its Litigation Interpretation. Hasbro now retreats to the Damages Interpretation because it lacks data to calculate its alleged actual damages based on its Litigation Interpretation. Under its Damages Interpretation, which appears to be an amalgamation of its Gross Revenue Interpretation and its Litigation Interpretation, Hasbro attempts to calculate damages based on the average monthly performance of machines located at each casino (as opposed to a daily, machine specific royalty as would be required under its Litigation Interpretation).

Settling on its Litigation Interpretation for purposes of liability and its Damages Interpretation for purposes of calculating damages, Hasbro asserts claims against Mikohn for breach of contract, unjust enrichment and fraud and misrepresentation. Mikohn moves pursuant

to Fed. R. Civ. P. 56, and on the basis of its Statement of Undisputed Facts for summary judgment dismissing Hasbro's Amended Complaint in its entirety, because:

1) The license agreements' royalty provisions violate Nevada law and are therefore unenforceable;

2) Hasbro's fraud and misrepresentation claim fails as a matter of law because Hasbro can show neither a misrepresentation nor reasonable reliance;

3) Even if Hasbro's Litigation Interpretation were accepted, Hasbro's Damages Interpretation does not yield a fair estimate of actual damages;

4) The clear language and structure of the agreements, as well as the overwhelming majority of extrinsic evidence, reveals that the Gross Revenue Interpretation used by the parties is correct; and

5) Hasbro's unjust enrichment claim cannot be sustained as a matter of law because it is simply a repackaged contract claim.

## FACTS

In the late 1990's Hasbro, the $3.3 billion toy and game manufacturer, entered the gaming industry. Hasbro licensed trademarked and copyrighted game names and themes to companies, like Mikohn, who would sell or lease slot branded machines to casinos. Slot machines developed around game names and themes that appeal to customers are called "branded" slot machines.

Mikohn, based in Las Vegas, Nevada, among its other lines of business, develops and markets branded slot machines to casinos. Mikohn's contracts to lease branded slot machines to casinos include participation agreements, under which Mikohn typically receives a percentage of the casino's earnings from the slot machine. SUF, ¶ 1. Mikohn also enters contracts under which it receives a set fee from the casino for each day the machine was

operated. Set fee agreements are used generally only in those states that prohibit participation agreements. SUF, ¶ 2.

**Hasbro Enters the Gaming Industry and Encounters Nevada Regulation**

Even before entering the license agreements with Mikohn, Hasbro was involved in the gaming industry. SUF, ¶ 3. In September 1997, Hasbro licensed its trademarked Monopoly game name to WMS Gaming, a slot machine company that is one of Mikohn's chief competitors. The WMS agreement, executed September 1, 1997, provided that Hasbro would receive royalties in the form of a percentage of WMS's gross revenue from Monopoly slot machines. The WMS agreement contained a provision covering the possibility that it might be illegal for WMS to pay Hasbro. SUF, ¶¶ 4-5.

In 1998, Hasbro and WMS amended the Monopoly license agreement to provide that in jurisdictions such as Nevada, where it is unlawful for Hasbro to receive royalty payments based on gaming revenues without Hasbro being licensed, Hasbro would be paid a flat fee as a royalty. SUF, ¶ 6. The following year, 1999, the Hasbro-WMS agreement was amended again to add a flat fee royalty for jurisdictions in addition to Nevada that prohibit license agreements calling for payment of gaming revenues. SUF, ¶ 8.

**The Hasbro-Mikohn Negotiations**

Early in 1998, Hasbro and Mikohn began discussing Mikohn licensing Hasbro trademarks and games for casino table games and slot machines. Initial discussions between Charles McCrea, Mikohn's General Counsel, and Lloyd Mintz, Hasbro's Director of Domestic Corporate Licensing, centered on Hasbro's desire to receive a percentage of Mikohn's gross revenue for the games as a royalty. SUF, ¶ 9.

In June 1998, Mikohn prepared a Term Sheet, a fairly early embodiment of the negotiations, setting out a basic architecture for a potential license agreement. The royalty provision in the term sheet was a schedule of percentages Hasbro would be paid from gross revenue "per Game received by [Mikohn] from leases [and] . . . revenue participation agreements . . . with Casino operators of the Games." The royalty schedule was premised on a base royalty of 10% covering gross revenue under $50 per day, with 1.6% increases for each succeeding ten dollars of gross revenue above $50 per day. The Term Sheet Royalty Schedule was:

| Revenue Generation | Royalty |
|---|---|
| Under $50 per day | 10.00% |
| $50 - $59 per day | 11.60% |
| $60 - $69 per day | 13.20% |
| $70 - $79 per day | 14.80% |
| $80 - $89 per day | 16.40% |
| $90 - $99 per day | 18.00% |
| $100 - $109 per day | 19.60% |
| $110 - $119 per day | 21.20% |
| $120 - $129 per day | 22.80% |
| $130 - $139 per day | 24.40% |
| Over $140 per day | 26.00% |

SUF, ¶ 10.

In August 1998, approximately one year after the Hasbro-WMS license agreement was executed, Hasbro and Mikohn executed two license agreements for branded slot machines Mikohn would place in casinos. The agreements covered Mikohn's use of the trademarks and game concepts "Yahtzee" and "Battleship," and are the agreements at issue in this case. SUF, ¶¶ 11-12.

The agreements provided that Mikohn would have slot machines, bearing the names Yahtzee and Battleship, manufactured and tested in accordance with regulations of the Nevada Gaming Control Board ("NGCB") and agencies in other jurisdictions. SUF, ¶ 12. Once

approved by the NGCB[2], Mikohn would distribute the games to various casinos and commence paying royalties to Hasbro. SUF, ¶ 13.

The original Yahtzee and Battleship license agreements had royalty provisions that tracked the basic architecture of the Term Sheet: one royalty rate for revenues up to a set dollar amount ($50 in the Term Sheet, $40 in the license agreements); an increasing scale of royalty rates for each additional $10 increment of revenue up to $139; and one royalty rate for revenue over $140. The royalty rates were expressed as percentages in the Term Sheet, and as dollar amounts in the license agreements. The **License Agreements' Royalty Schedule** was:

> (a) Royalty Rate. Licensee [Mikohn] will pay a royalty to Licensor [Hasbro] calculated as a percentage of gross revenue to Mikohn generated from the sale or lease of the games as follows:
>
> **Until Licensee's Costs are Recovered:**
>
> Lease Revenue to Licensee

| | |
|---|---|
| Under $40.00 per day | $4.00 |
| $40.00 - $49.00 per day | $6.95 |
| $50.00 - $59.00 per day | $9.90 |
| $60.00 - $69.00 per day | $12.85 |
| $70.00 - $79.00 per day | $15.80 |
| $80.00 - $89.00 per day | $18.85 |
| $90.00 - $99.00 per day | $21.70 |
| $100.00 - $109.00 per day | $24.65 |
| $110.00 - $119.00 per day | $27.60 |
| $120.00 - $129.00 per day | $30.55 |
| $130.00 - $139.00 per day | $33.50 |
| Over $140.00 per day | $36.40 |

[2] The NGCB's Electronic Services Division (the "Lab") reviews the technical aspects of the proposed slot machine. Also, after the Yahtzee game approval, but before Battleship was approved, the Nevada Gaming Regulation 14.025 was adopted and prohibited use of a gaming device theme that "[i]s derived from or based on a product that is currently and primarily intended or marketed for use by persons under 21 years of age …" Nev. Gaming Comm'n Reg. 14.025(1)(2006).

**After Licensee's Costs are Recovered:**

| Lease Revenue to Licensee | Royalty Per Game Per Day |
|---|---|
| Under $40.00 per day | $4.00 |
| $40.00 - 49.00 per day | $7.88 |
| $50.00 - 59.00 per day | $11.76 |
| $60.00 - $69.00 per day | $15.64 |
| $70.00 - 79.00 per day | $19.52 |
| $80.00 - 89.00 per day | $23.40 |
| $90.00 - 99.00 per day | $27.28 |
| $100.00 - 109.00 per day | $31.16 |
| $110.00 - 119.00 per day | $35.04 |
| $120.00 - 129.00 per day | $38.92 |
| $130.00 - 139.00 per day | $42.80 |
| Over $140.00 per day | $46.66 |

SUF, ¶ 14.

The change from the Term Sheet percentage royalty to the license agreement dollar rate royalty resulted from the same constraint that prompted the Hasbro-WMS amendment – Nevada law. Nevada law does not permit providers of property such as Hasbro to receive gaming revenues unless Hasbro holds a gaming license issued by Nevada authorities. Mikohn's Charles McCrea, Jr. told Hasbro's Lloyd Mintz that Hasbro could not participate on a percentage basis without being licensed, but that, in McCrea's opinion, a "tiered" structure, with a number of dollar amount royalties, might satisfy Nevada gaming authorities. SUF, ¶ 15. McCrea cautioned his opinion was not a guarantee. SUF, ¶ 15. The Hasbro-Mikohn agreements contained an "illegality" clause, providing that should it be illegal for Mikohn to pay Hasbro, then Mikohn would hold onto Hasbro royalties until it was lawful for Mikohn to pay, or Mikohn and Hasbro would negotiate an alternate, legal royalty agreement.[3] SUF, ¶ 16. The same "illegality" clause, word for word, appeared in Hasbro's contract with WMS. SUF, ¶ 16.

[3] The actual text of the Agreements stated:

> The parties acknowledge that in certain instances it may be unlawful for Licensee to remit to Licensor the royalties described in this Agreement (e.g. because Licensee would require a license

**Mikohn's Royalty Reporting**

Commencing in the 4th Quarter of 1999, Mikohn paid Hasbro royalties quarterly, and sent monthly royalty reports to Hasbro with each payment. Separate reports were provided for the Yahtzee video slot, the Yahtzee Stepper slot (which used revolving reels) and Battleship. SUF, ¶ 17. First and last pages of examplar reports are attached to the Statement of Undisputed Facts as Tab 35.

In each royalty report, Mikohn provided information specific to a particular class of licensed game, such as Yahtzee video slot machines. The report provided casino specific data, such as the number of machines in operation in any particular casino,[4] the number of machine days at the casino,[5] the total revenue to Mikohn from all the machines at the casino during the reporting period,[6] and the average daily revenue per machine to Mikohn.[7] The royalty reports provided no information concerning any specific machine, either on a daily or monthly basis. The royalty reports concluded by providing cumulative figures from all casinos and applying the Gross Revenue Interpretation to calculate royalties owed. SUF, ¶ 18,

Below is a truncated excerpt from the "Yahtzee Video July 15 to August 14, 2000" Mikohn royalty report submitted to Hasbro (omitting casino financial information). SUF, ¶ 19, "Mikohn Share Period," of $566,054.20, is Mikohn's Yahtzee video gross revenue for the

---

from the relevant gaming authorities, but that license has not been granted). In such instances, (1) Licensee shall notify Licensor until such time as it is lawful to pay such royalties to Licensor, or (2) the parties shall negotiate in good faith an alternate royalty or other payment which may lawfully be paid to Licensor, with the intention that, to the extent legally permitted, Licensee shall be given substantially the benefits of the original royalty.

[4] Labeled on the report as "Number of Machines."
[5] Labeled on the report as "Machine Days Period." Machine days refers to the product of the numbers of machines, times the number of days the machines were in operation. For example, if two machines were operated at one casino for 30 days, the machine days reported by the casino would be 60. The machine days formula accounts for the possibility that a particular slot machine may be non-functional on any given day. for example, if one of the machines in the above example were out of commission for two of the 30 days, the machine days would be 58.
[6] Labeled on the report as "Mikohn Share Period."
[7] Labeled on the report as "Period Daily Average."

period from all casinos. "Av per day" ($31.84) is the gross revenue divided by 17,777, the "Number of Machine Days." From the license agreement royalty schedule, the 31.84 "Av per day" earned a $4.00 royalty, as indicated next to the "Hasbro" entry.[8] The "Hasbro Share," of $71,106, results from multiplying the $4.00 royalty by the Number of Machine Days (17,777). SUF, ¶ 19,

| Net Win | | Net Win A/T | | Mikohn Share | | Number of | Machine Days | |
|---|---|---|---|---|---|---|---|---|
| Period | LTD | Period | LTD | Period | LTD | Machines | Period | LTD |
| 7,002.60 | 64,895.75 | 6,930.75 | 56,537.60 | 1,368.15 | 11,707.52 | 2 | 60 | 594 |
| | | | | 566,054.20 | | 951 | 17,777 | |
| | | | Av per day | 31.84 | | | | |
| | | | Hasbro | (4.00) | | | | |
| | | | Net | 27.84 | | | | |
| | | | Sigma % | 0.06 | | | | |
| | | | Sigma/day | 1.67 | | | | |
| | | | Sigma Share | 29,694.70 | | | | |
| | | | Hasbro Share | 71,108.00 | | | | |

In short, the royalty reports showed that royalties were calculated using the Gross Revenue Interpretation. The royalty rate used was based on the average revenue to Mikohn per game for each month during the reporting period (Mikohn Share Period / Machine Days Period). The final royalty payment for the period equaled the royalty rate, as dictated by the Royalty Schedule, multiplied by the total Machine Days Period. Hasbro concedes the information provided in the royalty reports would permit it to "undertake mathematical calculations" to see that royalties were predicated on the average per game revenue to Mikohn. SUF, ¶ 20.

**Hasbro Accepts and Applies Mikohn's Royalty Formula**

Hasbro's Financial Analyst, Kristie Lebreche, who was "hired to make sure payments were made correctly," testified that Hasbro requested royalty reports "to see if

---

[8] According to the license agreement royalty schedule, Hasbro is due $4.00 if per machine gross revenue is $40.00 or less.

[Mikohn] was reporting the correct royalty rate on the sales number." SUF, ¶ 21. In addition, Hasbro had a computer system it used "to verify the royalty rate reported on [Mikohn's] … reports matche[d] the royalty rate per the contract, and the royalty due is calculated correctly from the royalty rate." SUF, ¶ 22. If there were a problem with Mikohn's royalty payment, Hasbro would inform Mikohn. SUF, ¶ 23. From the time the License Agreements were executed in 1998 until February 2005, Hasbro never informed Mikohn that it believed the Gross Revenue Interpretation was incorrect.

In October 2001, Hasbro's audit team arrived at Mikohn's principal offices to "determine whether there had been material violations of the licensing agreements . . . and that all necessary royalty payments had been made in the proper amounts." The auditors were on the premises for a number of days. SUF, ¶¶ 25, 28 .

Before the Hasbro audit team traveled to Mikohn, they obtained and reviewed the Yahtzee and Battleship license agreements, collected and assessed all royalty reports Mikohn sent to Hasbro showing how Mikohn calculated royalty payments to Hasbro, and spoke with various managers, including the Hasbro's Licensing Department's Account Manager responsible for the Mikohn relationship. SUF, ¶ 27.

In addition, the audit team put together a "Mikohn Audit Strategy Memo," based on Hasbro's "Royalty Review Program." The Audit Strategy Memo reveals that Hasbro was well aware that royalties were paid and accepted under the Gross Revenue Interpretation:

> **Hasbro is entitled to a share of slot machine profits based on the cash received by Mikohn for each licensed product. For example, if the average cash receipts for "Yahtzee Video" machines is between $0 and $40 per machine day (number of machines times the number of days of use) Hasbro receives a share of $4 per machine day for that licensed product. Mikohn sends a separate royalty statement each period for each Hasbro licensed**

> **product, which includes both participation contracts and lease contracts.**

SUF, ¶ 29.

The Hasbro audit team conducted detailed tests of Mikohn's books and records according to Hasbro's "Royalty Review Program." Fifteen participation contracts between Mikohn and casinos using the Hasbro branded slots were randomly selected. For each test selection, the audit team recalculated Mikohn's share of the net win from the casino games, and recalculated Hasbro's share of Mikohn's share, to verify the royalties Mikohn reported and paid to Hasbro. SUF, ¶ 30. In a report signed by Hasbro's Vice President of Internal Audit, the audit team concluded:

> **Based on the audit procedures performed, we conclude, except for the comments noted herein, it appears the Licensee [Mikohn] has complied with the terms and conditions of the License Agreements and royalties have been property reported and remitted to Hasbro.**

SUF, ¶¶ 31, 32.

In February 2002, the Mikohn Audit Report, signed by the audit team and the Vice President of Internal Audit, was distributed for comment to at least seven Hasbro executives, including Hasbro's General Counsel, Chief Financial Officer and the head of Hasbro's Royalty Department. SUF, ¶ 33. About a month later, on March 10, 2002, Hasbro's Vice President of Internal Audit wrote Mikohn: "As you are aware, the primary objective of our visit was to verify that royalties have been properly computed, reported and remitted to Hasbro." The letter concluded that Mikohn's $2.5 million royalties reported and remitted to Hasbro were off by $13,532, and stated no objection to Mikohn paying royalties based on the Gross Revenue Interpretation. SUF, ¶¶ 34-36.

Following the audit, Mikohn continued to send Hasbro royalty reports with each royalty payment it made. Each statement consistently showed revenues from the casinos, and that Mikohn paid royalties using the Gross Revenue Interpretation. Mikohn showed this calculation on its royalty reports to Hasbro, without exception, each time it paid royalties to Hasbro until the royalty provisions were amended in mid-2002. SUF, ¶ 37.

In addition to the numerous audit reports, Mikohn provided additional documentation clarifying that royalties were being calculated based on the Gross Revenue Interpretation. While the license agreements were in effect, Mikohn provided Hasbro with royalty projections for upcoming years. In a 2000 royalty projection for 2001, Mikohn specifically informed Hasbro that "[t]he current royalty rate … is based on actual receipts that average less than $40 per day per unit in Mikohn revenue." SUF, ¶ 38. Hasbro did not question this statement.

**The Nevada Gaming Control Board Directive**

In late 2001, Mikohn petitioned the Nevada Gaming Control Board ("NGCB") to approve the Hasbro game "Clue" as a theme for a slot machine pursuant to Nevada Gaming Regulation 14/025 [9] During a December 6, 2001 hearing on Mikohn's petition, NGCB Chair Dennis Neilander and NGCB Member Scott Scherer questioned Mikohn Associate General Counsel Michael Dreitzer about the nature of Mikohn's royalty payments to Hasbro. SUF, ¶ 39.

After that hearing, Chairman Neilander asked Member Scherer to work with the Attorney General's office to determine whether the royalty terms of Hasbro's and Mikohn's

[9] "A manufacturer, licensee or other person holding the intellectual property rights to a theme for a gaming device may, concurrently with or independent of an application for approval of or modification to a gaming device, file a request with the board, in such manner and using such forms as the chairman may prescribe, for a determination as to whether subsection 1 prohibits use of the theme in connection with a gaming device." Nev. Gaming Comm'n Reg. 14.025(4)(2006).

"Clue" agreement violated section 463.162 pf the Nevada Revised Statutes ("N.R.S."). SUF, ¶ 40. That statute prohibits any person from furnishing "services or property, real or personal, on the basis of a contract, lease or license, pursuant to which that person receives payments based on earnings or profits from any gambling game, including any slot machine, without first having procured a state gaming license." The statute contains an exception where payments "are a fixed sum determined in advance on a bona fide basis for the furnishing of services or property other than a slot machine." During his term at the NGCB, Member Scherer reviewed at least three other, non-Hasbro slot machine license agreements, all with "tiered" royalty provisions. In each of those three cases, the parties were directed to amend the agreements, or the party providing intellectual property was required to secure a gaming license. SUF, ¶ 46.

Member Scherer subsequently sent a copy of the Clue agreement to the Nevada Attorney General's Office with a request for a legal opinion on whether the Clue agreement violated N.R.S. 463.162. SUF, ¶ 41. In a March 7, 2002 memorandum, Nevada Chief Deputy Attorney General Mike Wilson "determined that the payments contemplated in a Mikohn-Hasbro licensing agreement were not 'a fixed sum determined in advance on a bona fide basis' because the increments in the agreement essentially mimic a percentage of revenue." SUF, ¶ 42.

On March 20, 2002, NGCB Member Scherer wrote Mikohn's Michael Dreitzer, reciting the findings of the Attorney General's memorandum opinion and directed Mikohn to stop paying Hasbro under the Clue license agreement. Member Scherer's letter also notified Mikohn that the Attorney General's memorandum opinion "would be equally applicable to other licensing agreements utilizing substantially similar payout provisions." SUF, ¶ 44.

Member Scherer's March 20, 2002 letter was an official NGCB position. After the Clue hearing, NGCB Chairman Neilander asked Member Scherer to work with the Attorney

General's office on the Hasbro-Mikohn royalty issue. Copies of Member Scherer's March 20, 2002 letter were sent to Member Siller, the third member of the NGCB, Deputy Attorney General Mike Wilson, and Marc McDermott, head of the NGCB Electronic Services Division. SUF, ¶ 45. None of them voiced any objection to Member Scherer's conclusions.

The Scherer letter caused Mikohn and Hasbro to rework their license agreements by amendments signed by Hasbro on August 5, 2002. The amended agreements provide for royalties based on the number of slot machines in the field at the time of reporting, rather than the gross revenues to Mikohn realized from the machines. SUF, ¶ 47.

## STANDARD OF REVIEW

Summary judgment "allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money, and permitting courts to husband scarce judicial resources." McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

"For the purposes of summary judgment, 'genuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'" Seaboard Sur. Co. v. Town of Greenfield, 370 F.3d 215, 218-19 (1st Cir.2004) (internal quotation marks and citation omitted). In considering whether there is a genuine issue of material fact, "the inquiry . . . is . . . whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 251-52 (1986); Mulloy v. Acushnet Co., 460 F.3d 141, 145, 150 (1st Cir. 2006) (holding that an employee's "self-serving testimony . . . is insufficient under Fed. R. Civ. P. 56(c) to create a 'genuine' issue of material fact . . ."); Lipsett v. Univ. of P.R., 864 F.2d 881, 895 (1st Cir. 1988) ("the court must ask 'whether a fairminded jury could return a verdict for the plaintiff on the evidence presented.'").

Common sense is no stranger to the summary judgment calculus. "[I]f the factual context renders [the non-moving party's] claim implausible – if the claim is one that simply makes no economic sense – [the non-moving party] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." Matsushita Elec. Industries Co., Ltd v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[I]f the plaintiff's theory is economically senseless, no reasonable jury could find in its favor and summary judgment should be granted." Eastman Kodak v. Image Technical Svc., Inc., 504 U.S. 451, 468-69 (1992).

## ARGUMENT

### I. INTRODUCTION OF THE ARGUMENTS

Hasbro cannot recover because its Litigation Interpretation is predicated on an illegal royalty provision. Nevada law prohibits unlicensed entities, such as Hasbro, from contracting for a share of gaming revenues. Although the final license agreements couch the royalty rate in terms of dollars (rather than percentages of gaming revenues, as in the Term Sheet), the "tiered" royalty provision is based on earnings or profits from a gambling game - including a slot machine - which the NGCB pronounced illegal.

Hasbro's fraud and misrepresentation ("fraud") claim is equally flawed. The essence of its fraud count is the allegation that Mikohn intentionally used an improper method of calculating and paying royalties as the basis for amended license agreements. Even if Mikohn's

alleged conduct could be construed as a "misrepresentation," Hasbro could not, as a matter of law, have justifiably relied on the alleged "misrepresentation" because Hasbro possessed actual knowledge that Mikohn calculated and paid royalties using the Gross Revenue Interpretation, and employed the Gross Revenue Interpretation itself.

Hasbro's contract claim fails because, even were its Litigation Interpretation accepted, Hasbro cannot calculate damages with any level of reasonable certainty. Rather than attempting to calculate allegedly underpaid royalties based on its Litigation Interpretation, Hasbro seeks to use its Damage Interpretation, which has no support in the license agreements, and which fails to account for factors bearing directly on actual damages. In addition to being an inadequate measure of damages, Hasbro's Damage Interpretation likely yields a damages figure that exceeds damages based on its Litigation Interpretation. Thus, Hasbro cannot meet its burden of establishing damages with the requisite level of certainty.

Hasbro's contract claim also fails because its Litigation Interpretation does not fit the license agreements. Read as a whole, the language and structure of the license agreements unambiguously reveal that the Gross Revenue Interpretation, which Hasbro and Mikohn used for years without question, is correct. Moreover, the contract negotiations, the parties' performance and industry usage all overwhelmingly support the Gross Revenue Interpretation. If it is necessary to consider the extrinsic evidence, the only reasonable conclusion that follows is that the Gross Revenue Interpretation is correct.

Finally, Hasbro's unjust enrichment claim is nothing more than a repackaged contract claim. The only basis for the claim of unjust enrichment is the alleged breach of contract. Because the license agreements have not been breached, Mikohn has not been unjustly

enriched. Hasbro's unjust enrichment claim is duplicative, legally improper and unsupported by evidence.

## II. HASBRO'S CONTRACT INTERPRETATION VIOLATES NEVADA LAW

### A. <u>The Controlling Nevada Statute</u>

Nevada Revised Statute § 463.162 is entitled "State gaming license required where equipment, services or property delivered or furnished for gaming interest or revenue; exemptions." N.R.S. § 463.162 controls the relationship between Hasbro and Mikohn. Memorandum and Decision, July 17, 2006, p. 18.

Subsection 1(c) of N.R.S. 463.162 makes it unlawful for a person who provides "services or property . . . on the basis of a contract . . . [to receive] payments based on earnings or profits from any . . . slot machine . . . without first having procured a state gaming license."

As this Court previously observed on Mikohn's motion to dismiss, Hasbro furnished Mikohn intellectual property and trademarks under license agreements permitting Mikohn to use Hasbro game names and associated artwork. Hasbro received payments under those license agreements, and did not possess a Nevada gaming license. Because Hasbro's payments came from Mikohn's gross revenue from the lease of slot machines, Hasbro's payments were based on "earnings or profits" from slot machines. For that reason, Hasbro was obligated to obtain a Nevada gaming license unless it qualified under the licensing statute's exemptions. Memorandum and Decision, July 17, 2006, pp. 17-19.

Subsection 2(a) of N.R.S. 463.162 exempts from the licensing requirement an entity "[w]hose payments are a fixed sum determined in advance on a bona fide basis for the furnishing of services or property other than a slot machine." This is the only licensing exemption that could apply to Hasbro in these circumstances.

**B. Nevada Gaming Policy**

Nevada's effective regulation of the gaming industry rests largely on its comprehensive licensing process. Nevada's "concept of pre-approval by the licensing authority is fundamental to its system of gaming control, and has been copied by virtually every other American jurisdiction that has legalized gaming activities." A.J. "Bud" Hicks, Common Mistakes Lawyers Make in Gaming Matters, 3 Feb. Nev. Law. 14, 15 (February, 1995). Nevada's state interest in thorough licensing is so strong that a gaming license issued under the Nevada statutes is merely "a revocable privilege, and no holder acquires any vested right therein or thereunder." N.R.S. 463.0129(2).

The overriding public policy invested in Nevada gaming regulation is "public confidence and trust that licensed gaming . . . and gaming devises are conducted honestly and competitively . . . free from criminal and corruptive elements." N.R.S. 463.012(1)(b). The mechanism for establishing public confidence and trust is . . . "strict regulation of all persons . . . practices . . . and activities related to . . . gaming devices." 463.012g(1)(c). States patterning their gaming laws on Nevada's have pronounced the scope of gaming regulation laws as "extraordinary, pervasive and intensive," State v. Gonzalez, 667 A.2d 684, 689 (N.J. 1995), and intended to "strictly regulate" persons involved in the gaming industry. Mastro v. Illinois Dept. Revenue, 667 N.E.2d 594, 597-98 (Ill. App. 1996).

Nevada's gaming regulation laws are equally extraordinary, pervasive and intensive, and strictly regulate persons involved in the gaming industry. As former NGCB member Scott Scherer has observed, no one suggests that Hasbro or Mikohn are fronts for nefarious interests, and Mikohn would be justified, in 1999, in believing the Hasbro-Mikohn royalty provision was acceptable to the NGCB. SUF, ¶ 48. But, the Nevada gaming statutes and

regulations must be applied strictly and "equally to major corporations like Hasbro, on one end of the spectrum, and to lesser-known businesses with questionable backgrounds or sources of funding, on the other end of the spectrum." SUF, ¶ 48.

Thus, in considering the legality of the Hasbro-Mikohn royalty license agreement royalty provisions, consistency with Nevada gaming policy requires that the Nevada licensing statute be given its broadest scope, and exemptions from licensing statute be construed strictly against Hasbro, the party seeking to invoke the exemption.

### C. The Hasbro-Mikohn License Agreements Are Based on Earnings or Profits from Slot Machines

The "sliding scale" component of the Hasbro-Mikohn royalty structure is, in economic reality, a percentage royalty that, as former NGCB member Scherer's Report concludes, "violate[d] N.R.S. 463.162." SUF, ¶ 49. Hasbro's expert, Steve DuCharme, admitted at his deposition that he could not identify any portion of the Scherer Report where he disagreed with what former NGCB Member Scherer said. SUF, ¶ 50. Both the genesis and the mathematics of the sliding scale royalty demonstrate the Hasbro-Mikohn royalty provisions are illegal contracts based pm earnings or profits from slot machines..

The Hasbro-Mikohn license agreement negotiations proceeded on the basis of a percentage royalty. When negotiations began, the parties talked in terms of percentage of revenue royalty. When it came time for written proposals to be exchanged, the basic royalty structure of the license agreements took shape, with royalties all expressed in terms of percentage of Mikohn revenue. SUF, ¶ 10.

Indeed, the percentage basis of Hasbro's royalties was so central to the parties' expectations that the final agreements, with what Hasbro calls "minimum, maximum, and

'sliding scale' royalty payments" [Memorandum and Decision, July 17, 2006, p. 15], couched the entire royalty structure in terms of a percentage of Mikohn's revenues:

> "Licensee will pay a royalty rate to Licensor calculated as a percentage of gross revenue to Mikohn generated from the sale or lease of the games as follow:" (emphasis added). SUF, ¶ 14.

This language is found in all of the Hasbro-Mikohn license agreements until the contracts were amended in mid-2002, and is actually quite consistent with the essence of the royalty provisions.

When the economic substance of the royalty provisions is analyzed, the percentage basis of the structure is clearly revealed. The percentage increase in royalties due Hasbro with each additional revenue step is remarkably consistent:

| **Lease Revenue to Mikohn** | **Royalty** | **Increase** | **Percentage** |
|---|---|---|---|
| $40.00-$49.00 per day ($10 increase) | $6.95 | $2.95 | 29.50% |
| $50.00-$59.00 per day ($10) | $9.90 | $2.95 | 29.50% |
| $60.00-$69.00 per day ($10) | $12.85 | $2.95 | 29.50% |
| $70.00-$79.00 per day ($10) | $15.80 | $2.95 | 29.50% |
| $80.00-89.00 per day ($10) | $18.85 | $3.05 | 30.50% |
| $90.00-$99.00 per day ($10) | $21.70 | $2.85 | 28.50% |
| $100.00-$109.00 per day ($10) | $24.65 | $2.95 | 29.50% |
| $110.00-$119.00 per day ($10) | $27.60 | $2.95 | 29.50% |
| $120.00-$129.00 per day ($10) | $30.55 | $2.95 | 29.50% |
| $130.00-$139.00 per day ($10) | $33.50 | $2.95 | 29.50% |

The royalty schedule applicable after Mikohn recovers its costs shows the same percentage relationship between increasing revenue and royalty amounts:

| **Lease Revenue to Mikohn** | **Royalty** | **Increase** | **Percentage** |
|---|---|---|---|
| $40.00-$49.00 per day ($10 increase) | $7.88 | $3.88 | 38.80% |
| $50.00-$5.00 per day ($10) | $11.76 | $3.88 | 38.80% |
| $60.00-$69.00 per day ($10) | $15.64 | $3.88 | 38.80% |
| $70.00-$79.00 per day ($10) | $19.52 | $3.88 | 38.80% |
| $80.00-89.00 per day ($10) | $23.40 | $3.88 | 38.80% |
| $90.00-$99.00 per day ($10) | $27.28 | $3.88 | 38.80% |
| $100.00-$109.00 per day ($10) | $31.16 | $3.88 | 38.80% |

| | | | |
|---|---|---|---|
| $110.00-$119.00 per day ($10) | $35.04 | $3.88 | 38.80% |
| $120.00-$129.00 per day ($10) | $38.92 | $3.88 | 38.80% |
| $130.00-$139.00 per day ($10) | $42.80 | $3.88 | 38.80% |

SUF, ¶ 51.

Obviously, the essence of the Hasbro-Mikohn license agreements was a fixed rate contract for revenue up to $40, a 29.50% royalty on each additional $10 of revenue per day between $40 and $139 before cost recovery, and 38.80% royalty on each additional $10 of revenue per day after cost recovery. The "under paid" royalties Hasbro seeks to recover in this suit are all generated from the percentage component of the royalty schedule. It also bears noting that both Hasbro's gaming expert and Mikohn's gaming expert say the fixed rate component of the royalty schedule does not salvage the contract in the eyes of Nevada law: it is all illegal.

Hasbro's expert DuCharme concedes that even if an unlicensed entity is receiving a percentage of gaming revenue only as one component of consideration, that entity should still be licensed. SUF, ¶ 52. And, according to Mikohn's expert, former NGCB member Scott Scherer, the statute says "a fixed sum determined in advance" and "if you have a flat fee plus a percentage, you still have a percentage. That has to be determined in advance, not by looking backwards." SUF, ¶ 53.

The percentage pattern found in the dollar amounts assigned to each step of the royalty scale is most certainly not a matter of chance. And, whatever the particulars of how the pattern came to be, the royalty schedule is most certainly a violation of N.R.S. 463.162, because no exemption from licensing applies to Hasbro.

**D. The Exemption for Payments "Determined in Advance on a Bona Fide" Basis Does Not Apply**

With licensing the keystone of Nevada's gaming regulation structure, the overarching intent of the licensing statute is that parties who have a direct stake in the performance of slot machines on the casino floor must be licensed. Hasbro had such a direct stake, but had no license. SUF, ¶ 55.

And, there is no license exemption that can save the royalty provision. The only conceivable exemption that could apply is the exemption is for persons "[w]hose payments are a fixed sum determined in advance on a bona fide basis for the furnishing of services or property other than a slot machine." N.R.S. 463.162(2)(a). The Hasbro-Mikohn license agreements fail to satisfy any one of the specific elements of this exemption.

Consider first the "fixed sum" element, bearing in mind especially that Hasbro's Litigation Interpretation would require royalties to be determined based on the individual earnings of each slot machine on each day each slot machine was in operation.

There are at least two reasons why the language of the statute should be literally construed, and contracts with only one "fixed sum" be permitted. First, insistence on one fixed sum decreases the possibility that a percentage contract, with an unlicensed person as a contracting party, would escape regulation. As seen in the Scherer Report at page 3, the NGCB's initial tolerance of "sliding-scale" contracts led to increased use of such contracts, with aggressively narrowed gaps between the steps on the sliding scale. Over time, royalty payments came to mimic, and actually operate as, payments of a percentage of gaming revenue without a license. SUF, ¶ 54. In short, the sliding-scale step royalty payment became the economic equivalent of the percentage royalty payment, but kept the superficial visage of a "fixed sum" royalty. A strict construction of "a fixed <u>sum</u>", indeed a literal reading of the term, avoids that.

Second, a strict "fixed sum" requirement makes determination of the "bona fide basis" element a simpler regulatory task. The "bona fide basis" requirement is a means to ensure that there is some rational, objective relationship between the value of property furnished and the royalty charged, not a relationship that allows excessive compensation for modest consideration as the stand-in for unlicensed participation in gaming revenues. Allowing numerous "fixed sums" that need to be determined individually for each slot machine, on each day, complicates the regulatory task exponentially.

Consider next the "determined in advance" requirement. The question is: determined in advance of what? Considering the overall policy of Nevada's regulation – persons with a stake in financial performance should be licensed – the fixed sum must be determined in advance of the machine being placed on the floor of the casino. Only if the fixed sum is determined at that point in time does the licensee relinquish interest in how the slot machine actually performs. Hasbro's expert DuCharme agrees, saying "determined in advance" means "a fixed sum [is] agreed upon prior to . . . putting the device on the floor, deploying it for play." SUF, ¶ 56.

The amended Hasbro-Mikohn license agreements satisfy the "determined in advance" requirement because the royalties are based on the number of units in the casinos, not on the earnings those units may generate. The original Hasbro-Mikohn license agreements, particularly under Hasbro's Litigation Interpretation, fail this requirement, because the Hasbro royalty is not known until after the financial performance of the slot machine on the casino floor. Under the license agreements in suit, Hasbro has a direct interest in financial performance over time and a direct stake in the machine's winnings. SUF, ¶ 55. It is no less a gambler than the patrons on the casino floor.

Consider last the "bona fide basis" requirement. This requirement, as noted, goes to a relationship between the property furnished and payment received in consideration. But here, the sums making up the Hasbro "sliding-scale" royalty are not a function of the property furnished, but a function of the percentage of gaming revenue Hasbro wants to receive. It is self-evident that if percentage compensation is a trigger for the licensing requirement, percentage compensation cannot be "the bona fide basis for the furnishing of property" that triggers the exemption from licensing. Member Scherer's letter to Mikohn's Michael Drietzer emphasized the words "on a bona fide" basis and concluded that the payments "are not 'a fixed sum determined in advance *on a bona fide basis'* because the increments in the agreement essentially mimic a percentage of revenue." SUF, ¶ 44. (Emphasis in original). Clearly, the NGCB, as the agency charged with strictly regulating the gaming industry on a day-to-day basis, has the authority and administrative expertise to decide whether the payments are "determined in advance on a bona fide basis." In the circumstances, the NGCB determination should be accorded deference.

**E. <u>Rhode Island Law Leaves The Parties As They Are Found</u>**

Where a statute expressly prohibits the making of a certain kind of contract, it is clear that any agreement in violation of that statute is unenforceable. <u>MCA Television Ltd. v. Public Interest Corp.</u>, 171 F.3d 1265, 1280 n. 19 (11th Cir. 1999). "It is well established under Rhode Island law that when a plaintiff is <u>in pari delicto</u>, the law will not aid either party, but instead it leaves the parties where it finds them." <u>Sheehan v. Richardson</u>, 315 B.R. 226, 240 (D.R.I. 2004), citing <u>Sullivan v. Horgan</u>, 17 R.I. 109, 110, 20 A. 232, 233 (1890). The *in pari delicto* doctrine applies where – as here – "the action of the plaintiff [is] directly prohibited by statute." <u>Sheehan</u>, 315 B.R. at 240.

Judicial refusal to involve itself in a dispute centering on an illegal contract is not because the courts endeavor to bestow a benefit on a defendant. Rather, as a matter of policy, Rhode Island courts refuse to "lend [] aid to such a plaintiff." Sullivan, 20 A. at 233.

> In such cases the aid of the court is denied, not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of individual parties. It is of no consequence that the present defendant company had knowledge of the alleged illegal combination and its plans or was directly or indirectly a party thereto. Its interests must be put out of view altogether when it is sought to have the assistance of the court in accomplishing ends forbidden by the law. Id.

See, also G.W. McNear, Inc. v. American & British Mfg. Co., 42 R.I. 302, 317, 107 A. 242, 248 (1919) (quoting McMullen v. Hoffman, 174 U. S. 639 (1899)).

The predicate of the Nevada licensing statute is the receipt of gaming revenues under a contract, in circumstances where no exemption applies. Hasbro is the only recipient of royalties under the Hasbro-Mikohn license agreements. And, in 1998, before receiving any royalties from Mikohn, Hasbro was forced to amend its WMS agreement, because of the Nevada licensing statute. Thus, Hasbro and Mikohn at worst, are in pari delicto with respect to royalties payable before the 2002 amendments. Therefore, the law will not "lend its aid" to award any recovery to Hasbro for that period. Sullivan, 20 A. at 233.

## III. HASBRO'S FRAUD CLAIM FAILS FOR LACK OF JUSTIFIABLE RELIANCE

Under Rhode Island law, "[t]o establish a prima facie damages claim in a fraud case, the plaintiff must prove that the defendant 'made a false representation intending thereby to induce plaintiff to rely thereon' and that the plaintiff justifiably relied thereon to his or her damage." Kooloian v. Suburban Land Co., 873 A.2d 95, 99 (R.I. 2005) (quoting Travers v. Spidell, 682 A.2d 471, 472-73 (R.I. 1996)). Hasbro cannot show justifiable reliance and its fraud claim must fail.

According to Hasbro's Amended Complaint, Mikohn represented to Hasbro that Mikohn would pay royalties "on a [sic] the basis of gross revenue per day, per slot machine," intentionally miscalculated royalty payments, and then used the miscalculated payments as the basis for negotiating royalties set in the second amended license agreement.[10] Yet, according to Hasbro's Rule 30(b)(6) designee and President of Hasbro Properties Group, Mikohn's fraudulent conduct consisted solely of calculating and paying royalties based on the "averaging of gross revenues rather than the actual gross revenues per game per day . . . . They had been paying an average not an actual." SUF, ¶ 57. Hasbro's Rule 30(b)(6) designee could not identify a single statement that Mikohn made to Hasbro that Hasbro believes was false. SUF, ¶ 58.

Even were the Court to disregard Hasbro's deposition testimony and evaluate its fraud claim based on the theory and unsupported allegations of the Amended Complaint, summary judgment still is appropriate. Justifiable reliance is measured objectively, and therefore is capable of determination on a motion for summary judgment. Stanley Weiss Associates, LLC v. Energy Management Inc., 2004 WL 877540, *4 (R.I. Super. 2004).

Rhode Island law is clear that the claimed reliance of a sophisticated corporation, with actual notice of a fact it claims was fraudulently misrepresented or concealed, is unjustifiable as a matter of law. Fleet National Bank v. Anchor Media Television, Inc., 831 F.Supp. 16, 42-43 (D.R.I. 1993), aff'd, 45 F.3d 541, 555 (1st Cir. 1995). Other courts offer variations of the same rule. See, e.g., Schlaifer, Nance & Company v. Estate of Warhol, 194 F.3d 323, 336-37 (2nd Cir. 1999) (party who has means of knowing, by exercise of ordinary intelligence, the truth or real quality of the subject of the representation, must make use of those

---

[10] Hasbro claims punitive damages under its fraud count, but does not claim compensatory damages related to the amended agreement royalties, or otherwise.

means or not be heard to complain of misrepresentations); Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc., 250 F.3d 570, 574 (7th Cir. 2001) (a party "may not enter into a transaction with [its] eyes closed to available information and then charge that [it] has been deceived by another").

Here, the misdeed alleged by Hasbro – using the "intentionally miscalculated" royalties as the basis for renegotiating the Second Amended License Agreements – occurred in mid-2002. Amended Complaint at ¶ 52. As of that time, SUF, ¶ 59. :

1. Hasbro had signed not just the Battleship and Yahtzee agreements involved in this suit, but additional license agreements with Mikohn using the same per game per day language Hasbro says controls the proper calculation of royalties. Yet, Hasbro made not a peep about receiving royalties under the Gross Revenue Interpretation.

2. Hasbro had received from Mikohn at least thirty-eight separate monthly royalty reports for Battleship, Yahtzee Video and Yahtzee Stepper, showing how Mikohn calculated Hasbro's royalty using the Gross Revenue Interpretation, what Hasbro claims is the "intentional miscalculation."

3. The monthly royalty accountings showed revenues from all casinos, and showed Mikohn's "miscalculation" of Hasbro's royalty on the last page of each accounting.

4. In October 2000, Mikohn told Hasbro's account manager for Mikohn that "[t]he current royalty rate of $4 per unit per day is based on actual receipts that average less than $40.00 per day per unit in Mikohn revenue."

5. Nearly a year before the Second Amended License Agreement was negotiated, Hasbro had audited Mikohn for compliance with the License Agreement.

6. The Hasbro auditor, in his "Audit Strategy Memorandum," reviewed by Hasbro's Vice President of Internal Audits, stated:

   > Hasbro is entitled to a share of slot machine profits based on the cash received by Mikohn for each licensed product. **For example, if the average cash receipts for "Yahtzee**

> **Video" machines is between $0 and $40 per machine day (number of machines times the number of days of use)** Hasbro receives a share of $4 per machine day for that licensed product. Mikohn sends a separate royalty statement each period for each Hasbro licensed product, which includes both participation contracts and lease contracts. (Emphasis added).

> 7. Hasbro's Vice President of Internal Audits issued a report of the 2001 audit, stating: "Based on the audit procedures performed, we conclude, except for the comments noted herein, it appears the Licensee [Mikohn] has complied with the terms and conditions of the License Agreements and royalties have been properly reported and remitted to Hasbro."

In Stanley Weiss Associates, LLC v. Energy Management Inc., 2004 WL 877540, *4 (R.I. Super. 2004), a corporation headed by an experienced businessman sued, claiming defendant had fraudulently misrepresented its financial resources. The defendant moved for summary judgment, arguing that as a matter of law, the business man could not have reasonably relied on defendant's alleged misrepresentations in entering the agreement.

The court noted that reasonable reliance is measured objectively, yet consideration is given to certain subjective attributes of the individual, such as his or her sophistication. "[O]ne who has special knowledge, experience and competence may not be permitted to rely on statements for which the ordinary man might recover, and that one who has acquired expert knowledge concerning the matter dealt with may be required to form his own judgment, rather than take the word of the defendant." Id. at *4 (quoting W. Page Keeton, *Prosser and Keeton on Torts* §108, at 751 (5th ed. 1984)). Given the plaintiff's extensive business experience, his substantial educational background and the fact that the parties had legal representation throughout the negotiations, the court held that "[b]ased on [plaintiff's] sophistication, as a matter of law, he could not have reasonably relied on the alleged misstatements." Id. at *5.

Hasbro, similarly, is a $3.3 billion international corporation armed with a team of in-house and outside attorneys and accountants. Even assuming Mikohn had been paying royalties incorrectly for two years or more, Hasbro should have and easily could have discovered the discrepancy when it came time to renegotiate the multi-million dollar licensing agreements at the direction of the NGCB.

Moreover, Hasbro cannot predicate its fraud claim on any claimed variance between the terms of the original royalty provision and any subsequent statements or conduct by Mikohn. Even assuming Mikohn made a statement that contradicted its contractual obligations (it did not), "[i]t is well-settled that Plaintiff may not justifiably rely on an oral assertion directly in conflict with a contractual provision." Stanley Weiss Associates, LLC., 2004 WL 877540, *4 (quoting LaFazia v. Howe, 575 A.2d 182, 185 (R.I. 1990).

As the Estate of Warhol court observed, "[t]he parties involved in this case are not widows or orphans." Schlaifer, Nance & Company v. Estate of Warhol, 119 F.3d 91, 98 (2nd Cir. 1997). Hasbro had no need to conduct an investigation to uncover the "misrepresentation" it alleges Mikohn made. The license agreements, years of Mikohn's royalty accountings and Mikohn correspondence were all in its hands. Based on Hasbro's sophistication, and the level of disclosure Mikohn made, as a matter of law Hasbro could not have justifiably relied on the alleged "misrepresentation."

## IV. HASBRO'S CLAIM OF DAMAGES IS IMPERMISSABLY SPECULATIVE

It is elementary that a party cannot recover in contract unless it can prove damages with a reasonable degree of certainty. See, e.g., National Chain Co. v. Campbell, 487 A.2d 132, 134-35 (R.I. 1985). "[T]he plaintiff must establish reasonably precise figures and cannot rely upon speculation." Id. (citing Restatement, Contracts § 331(1) (1932)). The plaintiff bears the burden

of proving, "by competent evidence, the amount of damages that it suffered because of defendant's failure to perform." Id.

Difficulty in quantifying damages does not justify use of a mathematical formula that does not produce a fair estimate of actual damages. So recognizing, the court in Berley Industries, Inc. v. City of New York, 385 N.E.2d 281 (N.Y. 1978), held that the plaintiff contractor could not use a particular formula to quantify contract damages (additional overhead) caused by a breach by the defendant city. Acknowledging that "recovery will not necessarily be denied a plaintiff when it is apparent that the quantum of damage is unavoidably uncertain, beset by complexity or difficult to ascertain," the court held that "there must be a logical connection between what is proved and the damages a jury is asked to find." Id. at 283. The formula suggested by plaintiff, however, "did not fill the void" left by the lack of evidence of actual damages. Id. Thus, the court vacated the jury award, which was predicated on the improper formula.

In striking the damages award, the Berley Industries court recognized that plaintiff failed "to prove that the formula was logically calculated to produce a fair estimate of actual damages." Id. A fundamental problem with the application of the formula was that it did not account for "many … important factors bearing on actual damages…. [Thus,] the mathematical computations under the [] formula produce a figure with, at best, a chance relationship to actual damages, and at worst, no relationship at all." Id. at 284 (quoting J. Murphy "in his dissent below"). Moreover, the formula could result in a hypothetical damage award that far exceeded actual damages. Id. As the court explained, use of the formula in this circumstance "would completely ignore the safeguards against overreaching and arbitrariness to which the law of evidence has long been committed." Id.

Hasbro's claim of damages suffers from many of the same defects recognized in Berley Industries. Hasbro does not have the data necessary to calculate actual damages based on Hasbro's Litigation Interpretation. Neither does Mikohn. In order to ascertain a damages figure using Hasbro's Litigation Interpretation, information from each of approximately one hundred fifty casinos would be needed to establish the financial performance of every specific machine, every day, at every location.

Recognizing that it lacks data necessary to calculate damages based on its Litigation Interpretation, Hasbro offers an unacceptable substitute. Hasbro intends to get around the absence of data by having its expert, Michael Tousignant, apply what he perceives to be an appropriate Damages Interpretation. Under this interpretation, Tousignant would identify the average daily revenue earned by all machines at a particular casino during each reporting period. SUF, ¶ 60.

This average revenue figure would be plugged into the rate schedule to determine a uniform royalty rate for all machines at the casino during the reporting period. This process would be repeated for each casino reporting revenues to Mikohn. The end result of Hasbro's Damages Interpretation is that it would receive a casino-specific royalty – rather than machine specific royalty as Hasbro contends is contractually required, for each reporting period.

Hasbro's Damages Interpretation is not "logically calculated to produce a fair estimate of actual damages," however. Berley Industries, 385 N.E.2d at 283. There is a fundamental disconnect between Hasbro's Litigation Interpretation (machine specific royalties) and its Damages Interpretation (casino-specific royalties). And the variation between Hasbro's Litigation Interpretation and Damages Interpretation is more than academic.

Hasbro's Damages Interpretation fails to account for several factors bearing on individual slot machine performance and, thus, is not an accurate or logical indicator of actual damages (based on Hasbro's Litigation Interpretation). SUF, ¶ 72. First, Hasbro's damages formula does not account for days when a specific machine would earn no revenue or have negative earnings. This is significant because, after analyzing six days of slot machine data from one casino, Mikohn's expert, Ralph Piercy, found that "[e]ach day approximately 20% to 23% of the devices reflected a loss." SUF, ¶ 73. Discussing the slot machines licensed under the agreements here, Piercy "expect[s] that a significant number of devices incurred a loss (no, or negative, revenue)." SUF, ¶ 74. This expert evidence is undisputed. Thus, it must be accepted that there are a significant number of days for which, under Hasbro's Litigation Interpretation, Hasbro would be owed no royalties for any given machine.

Further, the Damages Interpretation does not account for the fact that slot machines earn more money on weekends, holidays and during vacation periods. SUF, ¶ 75. By applying the monthly casino average to all machines every day, Hasbro's Damages Interpretation yields a number that likely is far higher than what would be required even under its Litigation Interpretation.

This problem can be illustrated best using hypothetical figures considering daily fluctuations in individual machine earnings. Assume machine A actually earns $35 each day, Sunday through Thursday; and $90 each day, Friday and Saturday, for gross weekly earnings of $355. The average earnings of machine A over the week would be $50.71 per day. Applying Hasbro's suggested Damages Interpretation, royalties for that period would be $69.30 ($9.90 * 7 days). Applying Hasbro's Litigation Interpretation, however, royalties for that same period would be $63.40 ([$21.70 * 2 days] + [$4.00 * 5 days]). After subtracting the $28.00 ($4.00 * 7

days) that both parties concede Mikohn has already paid, Hasbro's damages under its Litigation Interpretation would be $35.40, whereas damages under its Damages Interpretation would be $41.30. In other words, with this one machine in this one week, Hasbro would have increased its alleged damages by $5.90, or roughly 16.66% over its Litigation Interpretation. Expanding the miscalculation over the universe of Hasbro's claim, Hasbro has alleged unpaid royalties of $3,755,542 under its Damages Interpretation. SUF, ¶ 76. If that figure overstates damages by 16.66%, Hasbro demands approximately $536,322 more than it contends Mikohn is actually liable for under its Litigation Interpretation. And that error may be compounded by the 21% contractual interest Hasbro also demands.

Mikohn cannot be faulted for Hasbro's lack of data. The overwhelming majority of casinos that reported slot machine earnings to Mikohn disclosed only the average earnings of each machine over a given period of time. SUF, ¶ 77. Piercy's review of the casinos that reported to Mikohn show only two, out of approximately 150 casinos, the data necessary to apply Hasbro's Litigation Interpretation. SUF, ¶ 78.

Moreover, Hasbro knew that Mikohn did not receive data necessary to calculate royalties using its contract interpretation. During its 2001 audit of Mikohn, Hasbro thoroughly reviewed reports that Mikohn received from casinos to "ensure the accuracy of the information included [by Mikohn] on the royalty schedule…." SUF, ¶ 79. Even the exemplar casino reports attached to Hasbro's "Participation tie-out" report, SUF, ¶ 80, clearly indicate that Mikohn did not receive daily, machine-specific data necessary to calculate royalties under Hasbro's

Litigation Interpretation. Yet Hasbro did not question this lack of information or otherwise request that Mikohn attempt to obtain it.[11]

Basic arithmetic reveals that there can be a wide variation between the damages calculated under Hasbro's Damages Interpretation versus its Litigation Interpretation. Indeed, Hasbro's Damages Interpretation poses a significant potential for an impermissible windfall to Hasbro. See e.g., State ex rel. Stovall v. Reliance Ins. Co., 107 P.3d 1219, 1229 (Kan. 2005) ("the basic purpose of contract damages is to make a party whole, not recover a windfall"). Simply calling the Damages Interpretation an acceptable accounting or audit practice does not justify its use as a means of reasonably identifying actual contract damages in a judicial proceeding. Hasbro's Damages Interpretation lacks sufficient foundation because it does not account for "many … important variables bearing on actual damages." Berley Industries, 385 N.E.2d at 284. Thus, even if Hasbro's Litigation Interpretation were accepted, its Damages Interpretation cannot be used to calculate a damages figure to any reasonable degree of accuracy or certainty. Id.

## V. THE GROSS REVENUE INTERPRETATION

### A. The Language of the Agreements and the Circumstances Surrounding Their Execution Demonstrate the Gross Revenue Interpretation was Intended

It is a "bedrock" principal that "[c]ourts look to the apparent intentions of the contracting parties when interpreting contracts." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 17 (1st Cir. 1996); Retirement Bd. of Employees' Retirement System of State v. DiPrete, 845 A.2d 270, 283 (R.I. 2004); D.T.P., Inc. v. Red Bridge Properties, Inc., 576 A.2d 1377, 1381 (R.I. 1990). "The secret intent of one party to a contract is not binding on the other

[11] In reality, Mikohn could not have obtained the data necessary to calculate royalties consistent with Hasbro's interpretation because casinos typically refused to disclose daily machine specific information even to companies from whom they leased slot machines, including Mikohn. SUF, ¶ 70.

party." DiPrete, 845 A.2d at 284 (citing 3 Corbin on Contracts § 538 (1960 and Supp. 1992)). Thus, Hasbro must come forward with some evidence of an objective manifestation made to Mikohn that Hasbro intended its new interpretation of the agreements.

**1. The Language of the Agreements Support Mikohn**

The interpretive process begins with the Court's assessment of the contract language. "Contract interpretation presents, in the first instance, a question of law, and is therefore the court's responsibility." Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989). "As a first step, the court must determine whether the contract's terms are clear or ambiguous as a matter of law." URI Cogeneration Partners, L.P. v. Board of Governors for Higher Education, 915 F. Supp. 1267, 1281-82 (D. R.I. 1996). "In assessing the claimed ambiguity of a contractual term, the court must view the agreement in its entirety, giving its terms their plain, ordinary, and usual meaning." URI Cogeneration Partners, 915 F. Supp. at 1281-82. "When ascertaining the usual and ordinary meaning of contractual language, every word of the contract should be given meaning and effect; an interpretation that reduces certain words to the status of surplusage should be rejected." Andrukiewicz v. Andrukiewicz, 860 A.2d 235, 239 (R.I. 2004). "If only one interpretation is reasonable, the contract is deemed unambiguous and the intent of the parties as it is clearly expressed governs according to the plain meaning of the contractual terms." URI Cogeneration Partners, 915 F. Supp. at 1281.

A disciplined review of the contracts reveals that the parties contemplated that royalty payments would be based on the average earnings of the licensed games. The royalty payment summary begins by giving a general description of the royalty calculation scheme ("rate description"). SUF, ¶ 14. The rate description provides that the "Royalty **Rate**" will be "calculated as a percentage of **gross revenue** to Mikohn generated from the sale or lease of the

**games**…." SUF, ¶ 14 (emphasis added). The payment provision goes on to state that as Mikohn's gross revenues increase, the royalty rate increases in accordance with the tiered rate schedule ("rate schedule"). The rate schedule correlates the proper royalty rate with the "Royalty Per Game Per Day." SUF, ¶ 14.

The only way to give full effect to the entire payment provision is to calculate royalties based on the average revenues generated by the licensed machines. There can be no dispute that the agreements were executed with the expectation that more than a thousand machines would be operated. SUF, ¶ 81. The rate description, however, speaks in terms of a single "royalty rate."

Moreover, each royalty payment is to be determined as a percentage of Mikohn's "**gross revenue** from the **games."** SUF, ¶ 14 (emphasis added). Mikohn's gross revenues come from more than one thousand games in operation pursuant to each agreement. In this circumstance, the only way to ascertain the proper "royalty rate" is to apply the rate schedule based on the average performance of the games.

Other provisions of the license agreements also shed light on the proper interpretation of the royalty provisions. For example, § 2(c) of the agreements requires Mikohn to provide Hasbro with "periodic statements" using a form prescribed by Hasbro. SUF, ¶ 82. Rather than requesting machine specific information, Hasbro's form focused on the country in which the Game was distributed, seeking information on **all** units distributed in a given country, not each individual machine. SUF, ¶¶ 83-84. The terms of the form provide for the calculation of the "Gross Sales" and finally the "Royalty Amount" based not upon the daily performance of individual machines, but the number of "Units Sold." Id. This suggests that, at the time the contracts were executed, Hasbro had no intention of basing royalties on actual daily performance

of every specific machine. Otherwise, the "periodic statement" would have been drafted to elicit the daily revenue of each specific unit.

Section 2(c) also gave Hasbro the right to demand that Mikohn provide more detailed information than what is required by its "periodic statement" form. In order to make doubly sure it received proper royalties, under Section 2(c) Hasbro had the right to obtain a:

> detailed statement by an independent certified public accountant or an officer of [Mikohn] showing the number, country in which manufactured, country in which sold or to which shipped and description of the Licensed Articles distributed and/or sold or otherwise provided by [Mikohn] and, where the royalty described in the [Royalty Provision] applies, the applicable gross revenue received by [Mikohn] and deductible fees paid to third parties…." SUF, ¶ 85.

The "detailed statement" contemplated by § 2(c) requires data concerning groups of machines – "the Licensed Articles." Upon request, Hasbro could obtain the "number … of Licensed Articles distributed and/or sold" and "the applicable gross revenue." This combination – gross revenue and number of machines – is useful only to determine the average revenue of the machines. The fact that § 2(c) does not request machine specific data is another demonstration that the license agreement is not a contract for machine specific royalties.

The testing provisions of the agreements also support Mikohn's interpretation. Pursuant to § 1(c)(1), whether the games were deemed "economically feasible" depended on the average earnings of the machines during the testing period. SUF, ¶ 86. If the average earnings of the machines "enabled [Mikohn] to obtain gross revenue of approximately thirty dollars per day per Licensed Article" and other conditions were met, then matters could proceed. Id. This language clearly reveals that the royalties would be based on average earnings of the games. The obvious purpose of the testing provision was to determine whether it made economic sense to move forward under the agreements. The testing provisions are meaningless if, during the years-

long term of the agreements, royalties were based on an earnings metric not tested.

Rather than basing its interpretation on a reading of the twenty-six page agreement as a whole, Hasbro's interpretation of the royalty provision focuses exclusively on the single five word phrase "Royalty Per Game Per Day." Hasbro's interpretation ignores the rate description's reference to a single royalty **rate** based on Mikohn's **gross revenue** from the **games**, thereby reducing the rate description "to the status of surplusage [and] should be rejected." Andrukiewicz, 860 A.2d at 239; Woonsocket Teachers' Guild, Local 951 v. School Committee of City of Woonsocket, 367 A.2d 203, 205 (R.I. 1976) ("we must look at the instrument as a whole and not at some detached portion thereof.").

**2. Hasbro's Litigation Interpretation of the Agreements is Economically Senseless Under the Circumstances in which They Were Executed**

The Rhode Island Supreme Court has recognized that "the situation of the parties and the circumstances attending the speaking of the words used in a contract [] are relevant to a determination of their intended meaning." Diprete, 845 A.2d at 283. More broadly, it has been stated that when "[i]n [ ] context … the plaintiff's theory [makes] no practical sense… a reasonable jury could not return a verdict for the plaintiffs…." Eastman Kodak, 504 U.S. at 468.

It beggars credulity for Hasbro to claim that the parties agreed to calculate royalties based on the daily earnings of each specific slot machine operated under the licensing agreements. Aside from being impossible, see Part II(B)(3) supra, application of the royalty provisions consistent with Hasbro's interpretation would be farcical.

Consider, for example, the March 31, 2002 Battleship royalty report. This report is found at Tab 35 attached to Mikohn's Statement of Undisputed Facts. This report shows revenues based on 25,985 machine days for this one reporting period. Following through with Hasbro's Litigation Interpretation, the parties literally would have to calculate 25,985 different

royalty rates for this one report and payment. Even if the data had been available, which it was not, this 26,000 step exercise would have to have been repeated for every report and payment. Thus, for the Battleship machines only, the parties would have been obligated to make well over half a million separate royalty calculations between December 2000 and November 2002. Adding the Yahtzee machines to the mix would bring the number of required calculations to approximately 1.4 million. Even were the data were available to perform such calculations, which it is not, it is unlikely either of the parties would have time for anything other than calculating royalties.

Hasbro's Litigation Interpretation is absurd and economically senseless. Thus, "summary judgment should be granted." Eastman Kodak, 504 U.S. at 468-69. At a minimum, Hasbro must "come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." Matsushita Elec. Industries Co., 475 U.S. at 586. This, Hasbro cannot do.

**A. Extrinsic Evidence Overwhelmingly Supports the Gross Revenue Interpretation**

The best Hasbro can hope for is that the Yahtzee and Battleship license agreements are deemed ambiguous, thereby creating a potential factual question.[12] See Casco Indem. Co. v. Gonsalves, 839 A.2d 546, 549 (R.I. 2004) ("A question of fact arises when the terms of a contract are ambiguous"). Even were the royalty provisions deemed ambiguous, however, Hasbro could not avoid summary judgment because the only reasonable conclusion, based on the extrinsic evidence, is that Mikohn's interpretation is correct.

---

[12] Indeed, Hasbro cannot now credibly claim its Litigation Interpretation is clearly supported in the contract language. For years, numerous Hasbro executives and employees, on numerous occasions, accepted the Gross Revenue Interpretation. Then, Hasbro adopted another interpretation of the royalty provision, claiming it meant royalties were based on average results of all the machines at individual casinos. Finally, in this litigation, Hasbro adopted a third interpretation, this one claiming royalties are based on the earnings of each particular machine on each particular day (regardless of casino). Hasbro's three interpretations of the same contract provision would seem the definition of ambiguous.

Although courts "ordinarily" hesitate to grant summary judgment once a contract is deemed ambiguous, summary judgment remains appropriate if, even when viewed in the light most favorable to the non-moving party, the evidence still could not "be resolved in a manner consistent with the non-moving party's claim…. Only if the ambiguity could be so resolved would summary judgment be denied." San Diego Gas & Elec. Co. v. Canadian Hunter Marketing Ltd., 132 F.3d 1303, 1307 (9th Cir. 1997) (affirming summary judgment on a claim based on an ambiguous contract) (citing International Bhd. of Elec. Workers Local 47 v. Southern Cal. Edison Co., 880 F.2d 104, 107 (9th Cir.1989)). See, also, Farmland Indus., Inc. v. Grain Bd. of Iraq, 904 F.2d 732, 736 (D.C. Cir. 1990) ("[I]f [extrinsic] evidence demonstrates that only one view is reasonable – notwithstanding the facial ambiguity – the court must decide the contract interpretation as a matter of law."); Moncrief v. Williston Basin Interstate Pipeline Co., 174 F.3d 1150, 1173 (10th Cir. 1999) (holding that a trial court's erroneous determination that a contract is unambiguous did not require remand for fact finding because, despite contract ambiguity, "all the extrinsic evidence is in, and where that evidence so clearly weighs in one direction that there is no genuine issue of material fact…"); Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 137 (3d Cir.1993) (same); Superior Boiler Works, Inc. v. R.J. Sanders, Inc., 711 A.2d 628, 637 (R.I. 1998).

If the agreement is ambiguous, then extrinsic evidence will be used to discern the true intention of the contracting parties. Ritter v. Mantissa Inv. Corp., 864 A.2d 601, 607 (R.I. 2005). "Extrinsic evidence is admissible to assist the factfinder in resolving the ambiguity, including evidence of, in descending order of importance: (1) the parties' negotiations concerning the contract at issue; (2) their course of performance; and (3) trade usage in the relevant industry." Lanier Professional Services, Inc. v. Ricci, 192 F.3d 1, 4 (1st Cir. 1999); see

also DiBattista v. Butera, 244 A.2d 857, 859 (R.I. 1968) (considering contract negotiations); In re Dissolution of Anderson, Zangari & Bossian, 888 A.2d 973, 977 n.3 (R.I. 2006) ("the parties' subsequent course of performance may be instructive in contract"); Superior Boiler Works, Inc. v. R.J. Sanders, Inc., 711 A.2d 628, 636 (R.I. 1998) (recognizing the relevance of "usages of trade"). Also relevant, under Rhode Island law, is whether the party claiming breach has taken any steps to mitigate damages consistently with its proffered interpretation. Rhode Island Hospital v. Kapner, Wolfberg & Assoc., No. PC 94-4660, 2000 WL 815873, *9 (R.I. Super., June 1, 2000) (unpublished opinion) ("This failure [to mitigate] suggests that no such [interpretation] was contemplated under the Agreement…."). Even when viewing all extrinsic evidence in the light most favorable to Hasbro, it is patent that there is no "genuine" issue of material fact that could support Hasbro's interpretation.

**1. Contract Negotiations**

McCrea (for Mikohn) and Mintz (for Hasbro) spearheaded the negotiations of the licensing agreements. SUF, ¶ 9. Of these two, only McCrea has described the substance of the negotiations. Hasbro's Rule 30(b)(6) deponent confirms Hasbro is unable to relate the substance of the Yahtzee and Battleship negotiations. SUF, ¶ 87. Thus, McCrea's description of the negotiation discussions is unopposed.

What is clear from negotiations is that, while the words in the agreements evolved, the meaning given to those words remained the same. In June 1998, right at the beginning of the negotiations of these agreements, McCrea sent Mintz a non-binding Term Sheet. SUF, ¶ 88. The term sheet stated that

> "Revenue Generation" means the gross revenue per game received by MIKN/SIGMA from leases, revenue participation agreements or similar arrangements with casino operators of the Games.

and that

> "Royalty" means percentage of gross revenue received by MIKN/SIGMA from leases, revenue participation agreements or similar arrangements with casino operators of the Games.

As negotiations progressed, a later draft changed the words "Revenue Generation" to "Gross Revenue", but the definition remained the same. SUF, ¶ 89. Later still, in a letter from McCrea to Mintz, the words "Gross Revenue" were replaced again, this time with "Revenue Per Game Per Day." SUF, ¶ 90. The financial projections in the letter showed that revenues were gross revenue from all machines, and that Hasbro's per game per day payment was based on the prorated game revenue. SUF, ¶ 90.

What never changed through the course of negotiations was the concept that royalty payments would be based on gross revenue from all leases, revenue participation agreements and other similar arrangements. So, when the final agreements were drafted to include the term "Royalty Per Game Per Day" that figure was (as throughout negotiations) intended to be determined based on "gross revenue to Mikohn from the sale or lease of the games…."

The only way to achieve a per game per day figure from the gross revenue from all slot machines – indeed the way in which every projection and communication during negotiations achieved such a figure – was to average by game-day from that figure.

**2. <u>Course of Performance</u>**

The parties' course of performance under the agreements reveals that both parties applied the Gross Revenue Interpretation. Courts and commentators alike agree that repeated performance pursuant to a contractual provision is compelling evidence of what the parties' intended the provision to mean.

> Where an agreement involves repeated occasions of performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, **any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement**. Restatement (Second) Contracts § 202. Given that the purpose of judicial interpretation is to ascertain the parties' intentions, the parties own practical interpretation of the contract--how they actually acted, thereby giving meaning to their contract during the course of performing it--can be important aid to the Court ... Courts give great weight to the parties practical interpretation. 11 Williston, *Contracts* § 32:14 (4th ed.1999). (Emphasis added).

Elena Carcieri Trust-1988 v. Enterprise Rent-A-Car Co., 2004 WL 603498, *2 (R.I. Super. 2004); see also Navarro-Ayala v. Hernandez-Colon, 951 F.2d 1325, 1354 (1st Cir. 1991) (Cyr, J. concurring in part, dissenting in part) ("Through the performance rendered by the parties, the court gains invaluable insight into the practical interpretation mutually intended by the contract language."). As one eminent treatise explains, the parties' performance under a contract "is merely a further expression by the parties of the meaning that they give and have given to the terms of their contract previously made. There is no good reason why the courts should not give great weight to these further expressions by the parties, in view of the fact that they still have the same freedom of contract that they had originally." See 3 Arthur L. Corbin, Corbin on Contracts § 558, at 249-253 (1960).

Both parties' performance under the license agreements supports the Gross Revenue Interpretation. Between July 2000 and November 2002, Mikohn made, and Hasbro accepted royalty payments accompanied by at least thirty-eight reports calculating royalties on based on average revenue from licensed games. SUF, ¶ 91. Not one royalty payment was made in the manner Hasbro now clams was mandated.

Hasbro had full "knowledge of the nature of [Mikohn's] performance and opportunity for objection." Elena Carcieri Trust-1988, 2004 WL 603498, *2. Based on its

extensive audit of Mikohn, as well as the detailed royalty reports Mikohn provided, Hasbro cannot credibly claim that it lacked knowledge of the way in which Mikohn applied the royalty provisions.

The royalty reports provided by Mikohn are notable for their level of detail. The body of each report provided a casino-by-casino breakdown of revenue Mikohn received during the reporting period. The report listed the number of machines leased to each casino, the number of machine days for the casino, the total amount each casino paid to Mikohn, as well as the average revenue earned by the machines in each casino. The end of the report revealed that Mikohn determined the proper royalty rate with reference to the average revenue of the machines at all casinos. SUF, ¶ 92.

The royalty reports reveal three simple mathematical operations: addition; multiplication; and, division. Indeed, Hasbro concedes that, using only the information set out on the royalty reports, it could have "undertak[en] mathematical calculation[s]" and seen that Mikohn paid royalties based on the average income of the slot machines during the reporting period. SUF, ¶ 20.

The royalty reports clearly showed that Mikohn made each royalty payment based on a **single** royalty rate for the particular period. SUF, ¶ 93. This is important because the royalty reports also showed that machines located at some casinos outperformed machines located at other casinos. SUF, ¶ 93. Under Hasbro's interpretation of the license agreements, multiple royalty rates would have been required for every royalty payment.[13] Yet, Hasbro never

[13] For example, the February 2002 Battleship report showed that the machines at the Alhambra Casino had a "Current Period Win" of $27.32 during the reporting period. During the same timeframe, machines at the Turtle Creek Casino had a "Current Period Win" of $54.90. Even with this information, however, Hasbro still could not calculate royalties using its formula because there is no information concerning the daily revenue earned by each individual machine in these casinos.

questioned why royalties were always paid at one rate.[14] Hasbro's acceptance of royalties in this manner is compelling evidence of the meaning of the royalty provision. Elena Carcieri Trust-1988, 2004 WL 603498, *2.s

Moreover, Mikohn openly told Hasbro precisely how it was calculating royalties. In an October 20, 2000 fax from Charles McCrea to Patricia Schmidt, Hasbro's account manager for Mikohn, McCrea stated "The current royalty rate of $4 per unit per day is based on actual receipts that average less than $40.00 per day per unit in Mikohn revenue." SUF, ¶ 38. (emphasis added).

Patricia Schmidt, Hasbro's Account Manager for Mikohn, admitted that she had received and read the fax, and admitted that she understood the "current royalty rate of $4 per unit per day" language to mean that the games were averaging less than $40 per day in Mikohn revenue and that Hasbro's royalties were being calculated at the $4 level as a result. SUF, ¶ 94. In light of Schmidt's admissions, Hasbro cannot posture that it did not know how Mikohn was calculating royalties.

Whatever ignorance Hasbro may claim is further belied by its extensive audits of Mikohn. Hasbro was not a passive recipient of royalty payments. Rather, it negotiated for a right to audit Mikohn to confirm that royalties were properly paid. Hasbro first exercised its contractual audit rights in October 2001. The purpose of the audit was to "determine whether there had been material violations of the licensing agreements … and that all royalty payments had been made in the proper amounts." SUF, ¶28.

---

[14] As noted at page ___, a proper royalty report based on Hasbro's Litigation Interpretation would be immense. For example, the March 31, 2002 Battleship royalty report reveals that royalties during that period were based on 25,985 machine days. Under Hasbro's Litigation Interpretation (a separate rate for each day for each machine), this report would have to identify and support 25,985 separate royalty rates.

In anticipation of the audit, Hasbro's team of auditors reviewed the contracts, the royalty reports, payment history and developed a comprehensive audit strategy. In discussing the central financial activity that was being audited, Hasbro's audit team said:

> Hasbro is entitled to a share of slot machine profits based on the cash received by Mikohn for each licensed product**. For example, if the average cash receipts for "Yahtzee Video" machines is between $0 and $40 per machine day (number of machines times the number of days of use) Hasbro receives a share of $4 per machine day for that licensed product.** Mikohn sends a separate royalty statement each period for each Hasbro licensed product, which includes both participation contracts and lease contracts. (Emphasis added).

SUF, ¶<u>29</u>.

After analyzing Mikohn's books and applying the Gross Revenue Interpretation, Hasbro concluded that:

> Based on the audit procedures performed, we conclude, except for the comments noted herein, it appears the Licensee **[Mikohn] has complied with the terms and conditions of the License Agreements and royalties have been properly reported and remitted to Hasbro**. (Emphasis added).

SUF, ¶<u>31</u>**.**

There can be no question that Hasbro had the opportunity to object to Mikohn's application of the royalty provision. Indeed, following the 2001 audit, Hasbro reported that Mikohn had inadvertently underpaid **$13,532** in royalties. SUF, ¶<u>34</u>. Further, on at one occasion, Hasbro requested that Mikohn make payments additional money because of a perceived underpayment. SUF, ¶ 95. In making these demands, Hasbro never claimed royalties were being paid based on a misapplication of the royalty provisions.

Tellingly, Hasbro's second audit of Mikohn – conducted less than a year before this law suit was filed – was proceeding in much the same fashion as the 2001 audit. At the September 2004 exit conference, which was conducted after a thorough review of Mikohn's

records from Q3 2001 through Q2 2004, the audit team noted a few matters that it felt had to be corrected. The Gross Revenue Interpretation was not one of those matters. SUF, ¶¶ 96-99.

Hasbro's Litigation Interpretation does not spring from the language of the license agreements or the performance of the parties. Rather it is the result of an October of 2004, "Finders' Fee Agreement" under which Hasbro promised to pay 7.5 percent of whatever it recovers from this lawsuit to one John Ferl in exchange for information "involving millions of dollars in royalties that [Hasbro] did not receive…." SUF, ¶¶ 100-101. John Ferl is the cohort of a number of disgruntled former Mikohn employees.

Hasbro's course of conduct under the agreements invariably communicated approval of Mikohn's method of calculating royalties through the September 2004 audit exit interview. The only conceivable reason for Hasbro's shift away from its practical, long-held interpretation of the license agreements is Hasbro's October 2004 Finder's Fee Agreement with Ferl.

**3. Trade Usage**

"Where … the contract language is ambiguous, evidence of custom and trade practice may be admitted to arrive at an interpretation 'which appears to be in accord with justice and common sense and the probable intention of the parties.'" Affiliated FM Ins. Co. v. Constitution Reinsurance Corp., 626 N.E. 2d 878, 882 (Mass. 1994) (quoting Keating v. Stadium Management Corp., 508 N.E.2d 121 (1987)). "Generally, when there is a custom in a certain industry, those engaged in that industry are deemed to have contracted in reference to that practice unless the contrary appears." Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc., 205 Cal. App.3d 442, 451 (1988). "It is standard contract law … that a party may be bound by a custom or usage even though he is unaware of it, and indeed even if he positively

intended the contrary." Sun Oil Co. v. Wortman, 486 U.S. 717, 733 n. 4 (1988). Agreements between parties engaged in the same industry "are to be read on the assumption that . . . the usages of trade were taken for granted when the document was phrased." Heggblade-Marguleas-Tenneco, Inc. v. Sunshine Biscuit, Inc., 59 Cal. App.3d 948, 954-55 (1976).

Hasbro was involved in the gaming industry before entering the licensing agreements with Mikohn. SUF, ¶ 3. As an active member of the gaming industry at the time the agreements were entered, Hasbro is presumed to have known of that industry's customs and usages and Mikohn was entitled to negotiate under that assumption. See, e.g., Midwest Television, Inc., 205 Cal. App.3d at 451; 12 Williston on Contracts § 34:14 (4th Ed.) (recognizing that the inquiry is on what the "other party would understand him to intend").

Basic knowledge within the gaming industry lends support to the Gross Revenue Interpretation. The only gaming industry expert presented in this case is L. Ralph Piercy. Piercy is a certified public accountant with extensive experience in the gaming industry. SUF, ¶ 61. Looking at the agreement as a whole, and drawing on his years of experience and expertise within the gaming industry, Piercy opines that the interpretation of the royalty provisions consistent with gaming industry practices is that the royalty rate was to be determined based on the average revenue of the licensed slot machines; i.e., the Gross Revenue Interpretation. SUF, ¶ 62.

Piercy explains that "[t]he phrase 'per game per day' is a frequently used metric in the gaming industry. It means to measure the performance of a particular type of game or device for a particular period of time." SUF, ¶ 63. Also, within the gaming industry, the term "game" typically refers to a class of game, rather than a specific slot machine. SUF, ¶ 64. Thus, even if one were to focus exclusively on the "per game per day" phrase and ignore the remaining

language and structure of the agreement, royalties would be based on the profitability of a brand of game, i.e. Yahtzee, rather than a specific slot machine. Looking beyond the face of the agreements, Piercy commented that typical "revenue-sharing arrangements within the gaming industry… [are] based on an average result[] for some period of time." SUF, ¶ 65.

Piercy's testimony is corroborated entirely by that of Mikohn's Executive Vice President Robert Parente, who testified that the method Mikohn used to calculate royalties was entirely in line with industry standard. "What was well accepted for all operators was that on a monthly basis they would provide us the average of those games. Typically as a bank of games. And they would calculate that average based on those – that net win performance. And that's a standard across the industry, even today for participation games." SUF, ¶ 67.

Perhaps the most compelling information drawn from industry custom and knowledge is that Hasbro's Litigation Interpretation would have been impossible to perform. In order for Mikohn to pay royalties the way Hasbro now demands, Mikohn would need to obtain a daily income report for every single machine from every casino that leased one of the licensed slot machines. It was "common knowledge" that casinos typically did not provide reporting with that level of detail at the time the agreements were entered. SUF, ¶ 68. Piercy testified that casinos typically would report only the average monthly income of leased machines. SUF, ¶ 69. Indeed, of the 150 casinos that reported to Mikohn, only two provided income data on a daily basis. SUF, ¶ 69. Parente testified that when he had attempted to obtain daily casino reports on Yahtzee and Battleship for marketing purposes he was rebuked. SUF, ¶ 70. Casinos "hold very close to the vest any sort of information correlated to individual event processes because of confidentiality and competitiveness with other casinos on any given day or any given promotion." SUF, ¶ 71.

Mikohn and Hasbro having both been engaged in the gaming industry, the royalty provision must be "read on the assumption that" the parties knew it would be impossible to calculate royalties in the manner Hasbro now demands. Heggblade-Marguleas-Tenneco, Inc., 59 Cal. App.3d at 955. It was not necessary for the agreements to specifically say that royalties would be based on the average income of the slot machines because this was "taken for granted when the document was phrased." Id.

**4. Failure to Mitigate**

The mitigation doctrine most often is regarded as a rule of damages. See e.g., E. Allan Farnsworth, Contracts, § 12.12 (3rd Ed. 1999). In Rhode Island, however, mitigation also is pertinent to the interpretative process. See Rhode Island Hospital v. Kapner, Wolfberg & Assoc., No. PC 94-4660, 2000 WL 815873 (R.I. Super., June 1, 2000) (unpublished opinion) ("This failure [to mitigate] suggests that no such [interpretation] was contemplated under the Agreement…."). Although a party's failure to mitigate may properly be considered to be a species of course of performance, Mikohn, consistent with Rhode Island Hospital v. Kapner, Wolfberg & Assoc., 2000 WL 815873, at *9, addresses it separately.

The mitigation doctrine requires a plaintiff claiming injury in contract or in tort to exercise reasonable diligence and ordinary care in attempting to minimize damage where he or she knew or reasonably should have known about the harm. Bibby's Refrigeration Heating & Air Conditioning, Inc. v. Salisbury, 603 A.2d 726, 729 (R.I. 1992); Lund v. Chemical Bank, 797 F. Supp. 259, 271 (S.D.N.Y. 1992). This rule prevents the injured party from sitting silent while damages accumulate. Bibby's Heating, 603 A.2d at 729. A plaintiff "is simply prohibited from recovering the amount of damages he or she could reasonably have avoided." Tomaino v. Concord Oil of Newport, Inc., 709 A.2d 1016, 1027 (R.I. 1998).

Here, Hasbro knew, or at a minimum should have known, that it never received royalties based on the Litigation Interpretation. The purpose of its 2001 (and 2004) audit was to determine whether there had been material violations of the licensing agreements, and that all royalty payments had been made in the proper amounts. In conducting that audit, Hasbro reviewed all of Mikohn's royalty payments and reports. Hasbro also reviewed reports that Mikohn received from casinos that showed how much money the licensed machines were earning. These reports show that only two of more than one hundred fifty casinos were providing Mikohn with the day-by-day breakdown of revenue earned by each slot machine necessary to calculate royalties under Hasbro's Litigation Interpretation. Hasbro neither questioned this absence of data, nor informed Mikohn that it believed such information should have been obtained.[15] This, combined with the fact that Hasbro took no steps to recover the additional millions of dollars in royalties it now claims were due, "suggests that no such [interpretation] was contemplated under the Agreement…." Rhode Island Hospital v. Kapner, Wolfberg & Assoc., 2000 WL 815873, at *9.

## VI. HASBRO HAS NO CLAIM FOR UNJUST ENRICHMENT

Earlier in this case, this Court concluded that that Hasbro's unjust enrichment claim could withstand scrutiny under Fed. R. Civ. P. 12(b)(6).[16] The summary judgment inquiry

[15] In reality, casinos would not make such information available to Mikohn. SUF¶___.

[16] In denying Mikohn's motion, this Court concluded that Hasbro's contract and unjust enrichment claims could coexist under Rhode Island law. This result rested largely on distinctions drawn between this case and Cochran v. Lorraine Mfg. Co., 52 R.I. 17, 155 A. 572, 575 (1931) and Fondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 98 (R.I. 1992). This Court distinguished the cases on the basis that here, Mikohn claims it did not receive full payment under the contract, whereas the plaintiffs in Cochran and Fondedile "sought equitable remedies … even though [plaintiffs] had been paid in full under the terms of their express contracts." Memorandum and Decision filed 7/18/06, at 21-22. Mikhon respectfully submits that this distinction is not applicable in the specific context of this case because if Hasbro prevails on its contract claim, it will receive contract damages. If, on the other hand, Mikohn's interpretation is accepted, then Hasbro has received all royalties to which it is contractually entitled. Thus, as in Cochran and Fondedile, Hasbro cannot rely on an equitable claim to recover more money than what is required under the contract.

demands much more of Hasbro, however. See Collier v. City of Chicopee, 158 F.3d 601, 603 (1st Cir. 1998). Unlike a Rule 12(b)(6) motion, in opposing a summary judgment motion a party '"can shut down the machinery only by showing that a trialworthy issue exists."' Id. (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir.1995)). In short, "[t]he standards applicable at the summary judgment stage are far more demanding." Cochran v. Quest Software, Inc., 328 F.3d 1, 8 n.2 (1st Cir. 2003).

To avoid summary judgment, Hasbro must present evidence sufficient to "prove three elements: (1) a benefit must be conferred upon [Mikohn] by [Hasbro], (2) there must be appreciation by [Mikohn] of such benefit, and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for [Mikohn] to retain the benefit without paying the value thereof.'" Narragansett Elec. Co. v. Carbone, 898 A.2d 87, 99 (R.I. 2006) (quoting Bouchard v. Price, 694 A.2d 670, 673 (R.I. 1997)). After conducting more than a year of discovery, Hasbro's unjust enrichment claim remains nothing more than a repackaged contract claim; it alleges that Mikohn has been unjustly enriched simply because it paid less money to Hasbro than what Hasbro now claims was payable under the licensing agreements. See generally, Amended Complaint, at Count II.

---

Mikohn further respectfully submits that the Rhode Island Supreme Court's orders in Richmond Square Capital Corp. v. Insurance House, 744 A.2d 401, 402 (R.I. 1999) and K&K Const. Inc. v. City of Warwick, 693 A.2d 1038, 1039 (R.I. 1997) do not squarely address whether it is permissible to prosecute entirely overlapping contract and unjust enrichment claims simultaneously. First, although both Richmond Square and K&K Const. state that the trial justice's instructions properly stated the laws of contracts and unjust enrichment, neither order addresses the specific issue raised by Mikohn and addressed in Cochran and Fondedile, which is whether an equitable claim is legally permissible when the subject is governed by an express contract. Second, in K&K Const. Inc., the plaintiff only argued that an implied or quasi-contract governed. 693 A.2d at 1039 and n. 2. Here, in contrast, there is no dispute that royalty payments are governed by an express agreement. Therefore, Richmond and K&K Const. are factually distinguishable and analytically inapplicable.

To the extent this Court may reconsider the propriety of Hasbro's overlapping contract and unjust enrichment claims, Mikohn hereby incorporates by reference Section III of its Memorandum in Support of its Motion to Dismiss Pursuant to Rule 12(b)(6).

By predicating its unjust enrichment claim exclusively on allegedly underpaid royalties, Hasbro inextricably intertwines its contract and unjust enrichment claims. Mikohn's obligation to pay royalties is defined, and limited, by the language of the royalty agreements. In other words, Hasbro's claims for royalty payments can be evaluated only by reference to the applicable contracts. Either the licensing agreements require additional royalty payments, or they do not. If not, Mikohn has not been unjustly enriched. See Fondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 98 (R.I. 1992). Therefore, any attempt to recover royalties must begin and end with the agreements.

For the reasons set forth in Part V, supra, Hasbro's contract claim is meritless. Mikohn paid all royalties that it agreed to pay. As such, Mikohn has not been unjustly enriched. As the Rhode Island Supreme Court explained, if a party is "enriched because it made a good deal for itself, the enrichment is not unjust." Fondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 98 (R.I. 1992). See also, Elliott Industries Ltd. Partnership v. BP America Production Co., 407 F.3d 1091, 1117 (10th Cir. 2005) ("because the claim for underpayment of royalties is grounded in the parties' contractual relationship…[plaintiff's] unjust enrichment claim fails" as a matter of law).

Moreover, other than the agreements themselves, Hasbro has no evidence capable of establishing the "value" of the benefit conferred upon Mikohn. Indeed, the agreements are the only indicator of value of the intellectual property rights licensed to Mikohn. "The attempt to identify unjust enrichment in a contractual context inevitably dissolves into contract interpretation… because [the court has] no standard by which to measure either justice or injustice in a contractual exchange apart from the parties' agreement, actual or imputed." Andrew Kull, Rationalizing Restitution, 83 Cal. L. Rev. 1191, 1209 n.54 (1995). Thus, at a

minimum, Mikohn would respectfully request that the Court enter judgment confirming that Hasbro could not recover for unjust enrichment an amount in addition to or greater than contract damages. See Fondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 98 (R.I. 1992) (holding that a party cannot obtain equitable relief after being paid in full under an express contract); Cochran v. Lorraine Mfg. Co., 52 R.I. 17, 155 A. 572, 575 (1931) (same).

One potential caveat that could arise by virtue of this Court's ruling on the illegality issue is whether Hasbro could recover for unjust enrichment if the contract is deemed illegal, in which case the contracts are unenforceable regardless of their interpretation. Rhode Island law already has answered this question; a party to an illegal contract cannot get around the problem of illegality simply by seeking relief in equity. See New England Retail Properties, Inc. v. Commerce Park Assoc. 11, LLC, 824 A.2d 504, 508 (R.I. 2003) (holding that a party cannot recover illegal commissions by couching a contract claim in terms of unjust enrichment or quantum meruit); Sullivan v. Horgan, 17 R.I. 109, 111-12, 20 A. 232, 233 (1890) (denying an employee's claim for quantum meruit when the employment contract was illegal); Chambers Bros. v. Joseph Church & Co., 14 R.I. 398 (1884) (denying an equitable claim for an accounting because "the relief sought for is the right to share in profits as stated in the [illegal] contract"). '"It is well settled that when a contract is illegal and prohibited by law no action can be maintained upon it in law or equity, either to enforce its obligations or to secure its fruits to either party…." Id. (quoting Snell v. Dwight, 120 Mass. 9 (1874)). Thus, the illegality of the royalty provisions cannot breathe life into Hasbro's unjust enrichment claim.

## CONCLUSION

Nevada law prohibited Hasbro from contracting to share in gaming revenues. The license agreements cannot, under law, be enforced and Hasbro and Mikohn should be left as they

are found. The law of contracts and damages provide independent grounds for dismissing Hasbro's claims, including its unjust enrichment claim. The language of the agreements, and the speculation inherent in Hasbro's damage claim, provide no valid basis for recovery. Finally, even if Mikohn's alleged conduct could be construed as a "fraud" or "misrepresentation," Hasbro knew of, joined in and embraced the Gross Revenue Interpretation by which Mikohn calculated royalties. If Hasbro was deceived, it was self-deception.

For all of the reasons advanced above, Mikohn respectfully requests that summary judgment dismissing Hasbro's claims be granted.

/s/ Gordon P. Cleary
Brooks R. Magratten, Esq., No.3585
Gordon P. Cleary, Esq., No.1948
Michael J. Daly, Esq., No.6729
VETTER & WHITE
Attorneys for Defendant
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060
(401) 272-6803 FAX
bmagratten@vetterandwhite.com
gcleary@vetterandwhite.com
mdaly@vetterandwhite.com

Dated: October 20, 2006

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

HASBRO, INC., et al., Plaintiffs
v.
MIKOHN GAMING CORP., Defendant

C.A. No. 05-0106/S

**DEFENDANT MIKOHN GAMING CORPORATION'S**
**MOTION FOR SUMMARY JUDGMENT**

Defendant Mikohn Gaming Corp. moves pursuant to Fed. R. Civ. P. 56, on the basis of its Statement of Undisputed Facts (filed separately), for summary judgment dismissing Hasbro's Amended Complaint in its entirety. Mikohn files herewith a supporting memorandum of law.

Mikohn respectfully requests hearing on this motion and expects that such hearing would last approximately 60 minutes.

Respectfully submitted,

/s/ Michael J. Daly
Brooks R. Magratten, Esq., No.3585
Gordon P. Cleary, Esq., No.1948
Michael J. Daly, Esq., No.6729
VETTER & WHITE
Attorneys for Defendant
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060
(401) 272-6803 FAX
bmagratten@vetterandwhite.com
gcleary@vetterandwhite.com
mdaly@vetterandwhite.com

Dated: October 20, 2006

CERTIFICATE OF SERVICE

To:

Todd D. White, Esq.
Adler, Pollock & Sheehan, P.C.
One Citizens Plaza - 8th Floor
Providence, RI 02903

I hereby certify that I electronically filed this memorandum and motion on October 20, 2006. The motion and memorandum are available for viewing and downloading from the Court's Electronic Case Filing System. Service on the above-identified counsel has been effectuated by electronic means.

/s/ Michael J. Daly