UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| HASBRO, INC., et al. | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | C.A. No. 05-0106/S |
| | ) | |
| MIKOHN GAMING CORP., | ) | |
| Defendant | ) | |

## STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 56(a) and in support of its Motion for Summary Judgment, defendant Mikohn Gaming Corp. ("Mikohn") submits the following Statement of Undisputed Facts. Tab exhibits referenced herein have been filed separately by conventional means.

1. Mikohn's lease contracts with casinos are called "participation" agreements, under which Mikohn typically receives a percentage of the casino's earnings from the slot machine. Robert Parente Depo. Tr. at 34 ln 13-16 (attached hereto as Tab 1).

2. Mikohn also enters contracts under which Mikohn receives a set fee from the casino for each day a slot machine is was operated. Set fee agreements are used generally only in those states that prohibit participation agreements. R. Parente Depo. Tr. at 34 ln 13-16 (attached hereto as Tab 1).

3. Hasbro was involved in the gaming industry before entering the licensing agreements with Mikohn. Response 11 in Plaintiffs' Responses to Defendant's Third Request For Admission (Tab 25).

4. In September 1997, Hasbro licensed its trademarked Monopoly name to WMS Gaming, a slot machine company that is one of Mikohn's chief competitors. The WMS agreement, executed September 1, 1997, provided that Hasbro would receive as royalties a

certain percentage of WMS's gross revenue from Monopoly slot machines. P. Schmidt Depo. Tr., Ex. B (attached hereto as Tab 2).

5. The WMS agreement contained a provision covering the possibility that it might be illegal for WMS to pay Hasbro a percentage of WMS's gross revenue. P. Schmidt Depo. Tr. Ex. B (attached hereto as Tab 2).

6. In 1998 the WMS agreement was amended to provide for flat-fee royalty payments in Nevada, where percentage payments are illegal absent a gaming license. P. Schmidt Depo. Tr., Ex. C (attached hereto as Tab 4).

7. Mikohn was not a party to the Hasbro-WMS agreement. Schmidt Tr., ex C at HA 9285 (attached hereto as Tab 4)

8. The following year, 1999, the Hasbro-WMS agreement was amended again to add a flat fee royalty for jurisdictions other than Nevada which prohibit unlicensed receipt of gaming revenue royalties. P. Schmidt Depo. Tr. Ex. D (attached hereto as Tab 5).

9. Early in 1998, Hasbro and Mikohn began discussing Mikohn licensing Hasbro trademarks and games for casino table games and slot machines. Initial discussions between Charles McCrea, Mikohn's General Counsel, and Lloyd Mintz, Hasbro's Director of Domestic Corporate Licensing, led to an understanding in principle that Hasbro would receive what amounted to a percentage of Mikohn's gross revenue for the games as a royalty. C. McCrea Depo. Tr. at 33 ln. 23 – 34 ln. 18 (attached hereto as Tab 7).

10. In June of 1998, Mikohn prepared a Term Sheet. The royalty provision in the term sheet was a schedule of percentages Hasbro would be paid from gross revenue “per Game received by [Mikohn] from leases [and] ... revenue participation agreements ... with Casino operators of the Games.” The royalty schedule was premised on a basic royalty of 10% covering

gross revenue under $50 per day, with 1.6% increases for each succeeding ten dollars of gross revenue above $50 per day:

Term Sheet Royalty Schedule

| Revenue Generation | Royalty |
|---|---|
| Under $50 per day | 10.00% |
| $50 - $59 per day | 11.60% |
| $60 - $69 per day | 13.20% |
| $70 - $79 per day | 14.80% |
| $80 - $89 per day | 16.40% |
| $90 - $99 per day | 18.00% |
| $100 - $109 per day | 19.60% |
| $110 - $119 per day | 21.20% |
| $120 - $129 per day | 22.80% |
| $130 - $139 per day | 24.40% |
| Over $140 per day | 26.00% |

C. McCrea Depo. Tr., Ex. C (attached hereto as Tab 6).

11. Approximately one year after the Hasbro-WMS license agreement was executed, Hasbro and Mikohn entered into two license agreements for branded slot machines Mikohn would place in casinos. R. Parente Depo. Tr. at 15 ln. 6-14 (attached hereto as Tab 1).

12. The two agreements covered Mikohn's use of the trademarks and game concepts "Yahtzee" and "Battleship." The agreements, each executed on August 18, 1998, provided that Mikohn would have slot machines, bearing the names Yahtzee and Battleship, manufactured and tested in accordance with Nevada Gaming Control Board ("NGCB") regulations, and other jurisdictions' regulations. Jane Ritson-Parsons Depo. Tr. Exs. B and C (attached hereto as Tabs 10 and 11).

13. The NGCB's Electronic Services Division (a/k/a the "lab") reviews the technical aspects of the proposed slot machine. Pursuant to Nevada Gaming Regulation 14, the Board also reviewed the Battleship name to ensure it was not primarily intended or marketed for

persons under 21 years of age. Scherer Depo. Tr. at 32 ln 12 – 33 ln. 4; 87 ln. 8-10 (attached hereto as Tab 12).

14. The terms of the royalty payments to be made to Hasbro were set forth in Section 2 of the respective licensing agreements:

> **2. TERMS OF PAYMENT**
>
> (a) Royalty Rate. Licensee [Mikohn] will pay a royalty to Licensor [Hasbro] calculated as a percentage of gross revenue to Mikohn generated from the sale or lease of the games as follows:
>
> **Until Licensee's costs are Recovered:**

| Lease Revenue to Licensee | Royalty Per Game Per Day |
|---|---|
| Under $40.00 per day | $4.00 |
| $40.00 - $49.00 per day | $6.95 |
| $50.00 - $59.00 per day | $9.90 |
| $60.00 - $69.00 per day | $12.85 |
| $70.00 - $79.00 per day | $15.80 |
| $80.00 - $89.00 per day | $18.85 |
| $90.00 - $99.00 per day | $21.70 |
| $100.00 - $109.00 per day | $24.65 |
| $110.00 - $119.00 per day | $27.60 |
| $120.00 - $129.00 per day | $30.55 |
| $130.00 - $139.00 per day | $33.50 |
| Over $140.00 per day | $36.40 |

> **After Licensee’s Costs are Recovered:**

| Lease Revenue to Licensee | Royalty Per Game Per Day |
|---|---|
| Under $40.00 per day | $4.00 |
| $40.00 – 49.00 per day | $7.88 |
| $50.00 – 59.00 per day | $11.76 |
| $60.00 - $69.00 per day | $15.64 |
| $70.00 – 79.00 per day | $19.52 |
| $80.00 – 89.00 per day | $23.40 |
| $90.00 - 99.00 per day | $27.28 |
| $100.00 -109.00 per day | $31.16 |
| $110.00 – 119.00 per day | $35.04 |
| $120.00 – 129.00 per day | $38.92 |
| $130.00 – 139.00 per day | $42.80 |
| Over $140.00 per day | $46.66 |

Jane Ritson-Parsons Depo. Tr. Exs. B and C (attached hereto as Tabs 10 and 11).

15. The change from the Term Sheet percentage royalty to the license agreement dollar rate royalty resulted from the same constraint that caused the Hasbro-WMS amendment, Nevada law. Nevada law does not permit providers of property such as Mikohn to receive a percentage of slot machine earnings unless Hasbro held a gaming license issued by Nevada authorities. Mikohn's McCrea told Hasbro's Mintz that Hasbro could not participate on a percentage basis but that, in McCrea's opinion, a "tiered" structure, with a number of dollar amount royalties, would pass muster with Nevada gaming authorities. McCrea cautioned his opinion was not a guarantee, and the parties provided for the contingency that the royalty provision might not hold up under Nevada law. C. McCrea Depo. Tr. at 41 ln. 15 – p. 43 ln. 19 (attached hereto as Tab 7).

16. The Hasbro-Mikohn agreements contained an "illegality" clause (which Hasbro imported from its WMS agreement), providing that should it be illegal for Mikohn to pay Hasbro, then Mikohn would hold onto Hasbro royalties until it was lawful for Mikohn to pay, or Mikohn and Hasbro would negotiate an alternate, legal royalty agreement. Jane Ritson-Parsons Depo. Tr. Exs. B and C (attached hereto as Tab 10 and 11). The language of this clause came word for word from the Hasbro-WMS license agreement. P. Schmidt Depo. Tr., Ex. B, Ex. E (Tab 10) at HA 9295 (attached hereto as Tab 2).

17. With each payment Mikohn sent Hasbro a royalty report. K. LeBreche Depo. Tr. at 41 ln. 9-14 (attached hereto as Tab 15).

18. In each royalty report, Mikohn provided information specific to a particular class of licensed game, such as Yahtzee video slot machines. The report provided casino specific data, such as the number of machines in operation in any particular casino, the number

of machine days at the casino, the total revenue to Mikohn from all the machines at the casino during the reporting period, and the average daily revenue per machine to Mikohn. The royalty reports provided no information concerning any specific machine, either on a daily basis, or on a monthly basis. The royalty reports concluded by providing cumulative figures from all casinos and applying the Gross Revenue Interpretation to calculate royalties owed. See royalty reports (attached hereto as Tab 35).

19. In the Mikohn "Yahtzee Video July 15 to August 14, 2000" royalty report submitted to Hasbro, "Mikohn Share Period," $566,054.20 is Mikohn's gross revenue for the period. "Av per day" is the gross revenue divided by 17,777, the "Number of Machine Days." From the license agreement royalty schedule, 31.04 earned a $4.00 royalty. The "Hasbro Share," $71,106, results from multiplying the $4.00 royalty by the Number of Machine Days. See Royalty Reports (attached hereto as Tab 35).

20. Hasbro has admitted that by undertaking mathematical calculations the data contained in the royalty reports would lead to the conclusion that royalties were being calculated according to the Gross Revenue method. Plaintiff's Response to Defendant's Request for Admission (April 7, 2006), Response No. 19 (attached hereto as Tab 16).

21. Hasbro's Financial Analyst, Kristie Lebreche, who was "hired to make sure payments were made correctly," testified that Hasbro requested royalty reports "to see if [Mikohn] were reporting the correct royalty rate on the sales number." Lebreche Tr. at 17 ln. 22, and 39 ln. 5-7 (attached hereto as Tab 15).

22. In addition, Hasbro had a computer system it used "to verify the royalty rate reported on [Mikohn's] … reports matche[d] the royalty rate per the contract, and the royalty due

is calculated correctly from the royalty rate." Lebreche Tr. at 59 ln. 7 (attached hereto as Tab 15).

23. If there were a problem with Mikohn's royalty payment, Hasbro would inform Mikohn. Lebreche Tr. at 22 ln. 25 (attached hereto as Tab 15).

24. Kristie Lebreche is also known as Kristie Madonna. Lebreche Tr. at 3 ln. 13-16 (attached hereto as Tab 15).

25. In October, 2001, Hasbro audited Mikohn. P. Kehoe Depo. Tr., Ex. G (attached hereto as Tab 8).

26. The auditors were on the premises for the better part of four days. During that time they reviewed all records they asked to see, and were provided all information they asked to know, respecting the period under audit – the 4th Quarter 1999 through the 2nd Quarter 2001. P. Kehoe Depo. Tr. at 18 (attached hereto as Tab 14).

27. Before the Hasbro audit team traveled to Mikohn, they obtained and reviewed the Yahtzee and Battleship license agreements, collected and assessed all royalty statements Mikohn sent to Hasbro showing how Mikohn calculated royalty payments to Hasbro, and spoke with various managers, including the Hasbro Licensing Department's Account Manager for the Mikohn relationship. P. Kehoe Depo. Tr. at 25 ln. 22-25, 27 ln. 4-11, 33 ln. 22-25, 44 ln. 14 – 45 ln. 1, (attached hereto as Tab 14); See also P. Kehoe Tr., Ex. D (attached hereto as Tab 18).

28. Hasbro Vice President of Internal Audit Paul Alexander stated that the purpose of the audit was to "determine whether there had been material violations of the licensing agreements … and that all royalty payments had been made in the proper amounts." P. Kehoe Depo. Tr., Ex. B at 8058 (attached hereto as Tab 19).

29. Hasbro's Audit Strategy Memo stated that:

> Hasbro is entitled to a share of the slot machine profits based on the cash received by Mikohn for each licensed product. **For example, if the average cash receipts for "Yahtzee Video" machines is between $0 and $40 per machine day (number of machines times the number of days of use)** Hasbro receives a share of $4 per machine day for that licensed product. Mikohn sends a separate royalty statement each period for each Hasbro licensed product, which includes both participation and lease contracts.

P. Kehoe Depo. Tr., Ex. H at 8105 (attached hereto as Tab 20).

30. During the on-site Mikohn audit, the Hasbro audit team conducted detailed tests of Mikohn's books and records according to Hasbro's "Royalty Review Program." Fifteen participation contracts between Mikohn and casinos using the Hasbro branded slots were randomly selected. For each test selection, the audit team recalculated Mikohn's share of the net win from the casino games, and recalculated Hasbro's share of Mikohn's share, to verify the royalties Mikohn reported and paid to Hasbro. P. Kehoe Depo. Tr. at 30 ln. 17-24 (attached hereto as Tab 14); P. Kehoe Depo. Tr., Ex. H at (attached hereto as Tab 18); P. Kehoe Depo Tr., Ex. J at HA 8333 (attached hereto as Tab 33).

31. Hasbro's audit report stated that:

> Based on the audit procedures performed, we conclude, except for the comments noted herein, it appears the **Licensee [Mikohn] has complied with the terms and conditions of the license agreements and royalties have been properly reported and remitted to Hasbro**.

P. Kehoe Depo. Tr., Ex. C at HA 8046 (attached hereto as Tab 21).

32. Hasbro's audit report was signed by the audit team and Vice President of Internal Audit, Paul Alexander. P. Kehoe Depo. Tr., Ex. C at HA 8046 (attached hereto as Tab 21).

33. In February 2002, the Mikohn Audit Report, signed by the audit team and the Vice President of Internal Audit, was distributed for comment to at least seven Hasbro executives, including the head of the Royalty Department, the Chief Financial Officer, and the General Counsel, among others. P. Kehoe Depo. Tr. at 25 ln. 4-21 (attached hereto as Tab 14).

34. Hasbro's Vice President of Internal Audit, Paul Alexander, wrote Mikohn a letter, dated March 10, 2002, which stated "As you are aware the primary purpose of our visit was to verify that royalties have been properly computed, reported and remitted to Hasbro." P. Kehoe Depo. Tr., Ex. B at 8058 (attached hereto as Tab 19).

35. The March 11, 2002 letter from Paul Alexander to Mikohn stated that, out of approximately $2.5 million, Mikohn's royalty payments were off by $13,532. P. Kehoe Depo. Tr., Ex. B at 8059 (attached hereto as Tab 19).

36. The March 10, 2002 letter from Paul Alexander to Mikohn did not object to Mikohn's use of the Gross Revenue method of calculating royalties as a result of the 2001 audit. See generally P. Kehoe Depo. Tr., Ex. B (attached hereto as Tab 19).

37. Following the audit, Mikohn continued to send Hasbro royalty reports which showed that Mikohn was using the Gross Revenue Information to calculate royalties. Lebreche Tr. at 41 ln. 9-17 (attached hereto as Tab 15). Mikohn performed this royalty calculation, and showed this calculation on its royalty reports to Hasbro, without exception, each time it paid royalties to Hasbro until the royalty provisions were amended in mid-2002. Plf.'s Response to Request to Admit 1, Def. Second Request for Admissions at 19 (attached hereto as Tab 16).

38. While the license agreements were in effect, Mikohn provided Hasbro with royalty projections for upcoming years. In a 2000 royalty projection for 2001, Charles McCrea specifically informed Hasbro that "[t]he current royalty rate ... is based on actual receipts that

average less than $40 per day per unit in Mikohn revenue." P. Schmidt Tr., ex. G at MIK 0001173 (attached hereto as Tab 26).

39. In or about December, 2001 Mikohn petitioned the NGCB to approve the Hasbro name "Clue" for use with slot machines. In a December 6, 2001 hearing before the NGCB Board Chairman Dennis Neilander and Board Member Scott Sherer questioned Mikohn Associate General Counsel Dreitzer about whether Hasbro was receiving a percentage of gaming review and would therefore need to be licensed. Scherer Aff., Ex. B (attached hereto as Tab 13).

40. Following that hearing NGCB Chairman Neilander asked Board Member Scherer to work with the Attorney General's office to determine whether the royalty provisions of the Hasbro-Mikohn Clue agreement violate the terms of NRS 463.162. Scherer Affidavit, Ex. B (attached hereto as Tab 13); see also Scherer Depo. Tr. at 47 ln. 15-20 (attached hereto as Tab 12).

41. Mr. Scherer provided the Clue agreement to the Nevada Attorney General and requested his opinion as to whether the royalty provision violated NRS 463.162. Scherer Affidavit, Ex. B (attached hereto as Tab 13).

42. Attached to the Scherer Affidavit as Exhibit A is the full and complete text of a March 7, 2007 memorandum provided by Assistant Chief Deputy Attorney General Mike Wilson. Scherer Affidavit, ex. D (attached hereto as Tab 13).

43. Hasbro's expert DuCharme states the phrase "determined in advance" means "a fixed sum [is] agreed upon prior to . . . putting the device on the floor, deploying it for play." DuCharme Depo. Tr. at 42 ln. 19 – 43 ln. 3. (attached hereto as Tab 24).

44. As a result of the Wilson memorandum, NGCB Member Scherer wrote Mikohn's Mike Dreitzer on March 20, 2002 declaring that Mikohn "may not make any payments

to Hasbro under the licensing agreement[s] until Hasbro is found suitable or the agreement is amended to comply with NRS 463.162(a)." Member Scherer's letter also notified Mikohn that the Attorney General's memorandum opinion "would be equally applicable to other licensing agreements utilizing substantially similar payment provisions." Scherer Aff. Tr. Ex. E (attached hereto as Tab 13).

45. Member Scherer's March 20, 2002 letter was an official NGCB position. After the Clue hearing, NGCB Chairman Neilander directed Member Scherer to deal with the Hasbro-Mikohn royalty issue. Copies of the March 20, 2002 letter were sent to Member Siller, the third member of the NGCB, Deputy Attorney General Mike Wilson, and Marc McDermott, head of the NGCB Electronic Services Division. Scherer Depo. Tr. at 45 ln. 23 – 48 ln. 19 (attached hereto as Tab 12).

46. On at least three occasions, the NGCB analyzed tiered payment provisions between a licensor and a licensee for a slot machine. In each case the NGCB's conclusion was that the licensor had to apply for a gaming license or amend the agreement. Scherer Depo. Tr. at 38 ln. 19 – 40 ln. 24 (attached hereto as Tab 12).

47. The Scherer letter caused Mikohn and Hasbro to rework their license agreements by amendments signed by Hasbro on August 5, 2002. The amended agreements called for royalties based on the number of slot machines in the field, rather than the gross revenues to Mikohn realized from the machines. Scherer Aff. Ex. E (attached hereto as Tab 13).

48. As former Nevada Gaming Control Board member Scott Scherer has observed, no one suggests that Hasbro or Mikohn are fronts for nefarious interests, and Mikohn would be justified, in 1999, in believing the Hasbro-Mikohn royalty provision was acceptable to the NGCB. Scherer Depo. Tr. at 37 ln. 17-21 (attached hereto as Tab 12). The Nevada statutes

and regulations must be applied equally to "major corporations like Hasbro, on one end of the spectrum, and to lesser-known businesses with questionable backgrounds or sources of funding, on the other end of the spectrum." Scherer Affidavit Ex. B (attached hereto as Tab 13).

49. The "sliding scale" component of the Hasbro-Mikohn royalty structure is, in economic reality, a percentage royalty that, as Member Scherer's Report concludes, violate[d] N.R.S. 463.162. Scherer Affidavit, ex B at 6 (attached hereto as Tab 13).

50. Hasbro's expert Steve DuCharme admitted at his deposition that he could not identify any portion of the Scherer Report with which he disagreed. DuCharme Depo. Tr. at 64 ln. 20-23 (attached hereto as Tab 24).

51. An analysis of the royalty increases in the Hasbro-Mikohn license agreements, in dollar and percentage terms, shows:

| **Lease Revenue to Mikohn** | **Royalty** | **Increase** | **Percentage** |
|---|---|---|---|
| $40.00-$49.00 per day ($10 increase) | $6.95 | $2.95 | 29.50% |
| $50.00-$59.00 per day ($10) | $9.90 | $2.95 | 29.50% |
| $60.00-$69.00 per day ($10) | $12.85 | $2.95 | 29.50% |
| $70.00-$79.00 per day ($10) | $15.80 | $2.95 | 29.50% |
| $80.00-89.00 per day ($10) | $18.85 | $3.05 | 30.50% |
| $90.00-$99.00 per day ($10) | $21.70 | $2.85 | 28.50% |
| $100.00-$109.00 per day ($10) | $24.65 | $2.95 | 29.50% |
| $110.00-$119.00 per day ($10) | $27.60 | $2.95 | 29.50% |
| $120.00-$129.00 per day ($10) | $30.55 | $2.95 | 29.50% |
| $130.00-$139.00 per day ($10) | $33.50 | $2.95 | 29.50% |

After costs recovered:

| **Lease Revenue to Mikohn** | **Royalty** | **Increase** | **Percentage** |
|---|---|---|---|
| $40.00-$49.00 per day ($10 increase) | $7.88 | $3.88 | 38.80% |
| $50.00-$5.00 per day ($10) | $11.76 | $3.88 | 38.80% |
| $60.00-$69.00 per day ($10) | $15.64 | $3.88 | 38.80% |
| $70.00-$79.00 per day ($10) | $19.52 | $3.88 | 38.80% |
| $80.00-89.00 per day ($10) | $23.40 | $3.88 | 38.80% |
| $90.00-$99.00 per day ($10) | $27.28 | $3.88 | 38.80% |
| $100.00-$109.00 per day ($10) | $31.16 | $3.88 | 38.80% |

| | | | |
|---|---|---|---|
| $110.00-$119.00 per day ($10) | $35.04 | $3.88 | 38.80% |
| $120.00-$129.00 per day ($10) | $38.92 | $3.88 | 38.80% |
| $130.00-$139.00 per day ($10) | $42.80 | $3.88 | 38.80% |
| Over $140.00 per day ($10) | $46.66 | $3.88 | 38.60% |

Scherer Affidavit, ex. D (attached hereto as Tab 23)

52. Hasbro's expert, Steve DuCharme, concedes that even if an unlicensed entity is receiving a percentage of gaming revenue only as one component of consideration, that entity should still be licensed. DuCharme Depo. Tr. at 44 ln. 12-17 (attached hereto as Tab 24).

53. According to former Member Scherer, the statute says "a fixed sum determined in advance" and "if you have a flat fee plus a percentage, you still have a percentage. That has to be determined in advance, not by looking backwards." Scherer Depo. Tr. at 79 ln. 16 – 80 ln. 16 (attached hereto as Tab 12).

54. Over time, royalty payments came to mimic, and actually operate as, payments of a percentage of gaming revenue without a license. Scherer Affidavit, ex. B (attached hereto as Tab 13).

55. According to former NGCB member Scherer, under the Hasbro-Mikohn license agreements Hasbro had a direct stake in the financial performance of slot machines. Scherer Affidavit, ex. B (attached hereto as Tab 13).

56. Hasbro's expert DuCharme states "determined in advance" means "a fixed sum [is] agreed upon prior to . . . putting the device on the floor, deploying it for play." DuCharme Depo. Tr. at 42 ln. 21-24 (attached hereto as Tab 24).

57. According to Hasbro's Rule 30(b)(6) designee, the President of Hasbro's Properties Group, Mikohn's fraudulent conduct consisted solely of calculating and paying royalties based on the "averaging of gross revenues rather than the actual gross revenues per

game per day . . . . They had been paying an average not an actual." Jane Ritson-Parson Tr. at 30 ln. 6-17 (attached hereto as Tab 9).

58. Hasbro's Rule 30(b)(6) deponent does not identify a single statement that Mikohn made to Hasbro that Hasbro believes was false. See generally id. at 27 ln. 5 – 33 ln. 2 (attached hereto as Tab 9).

59. As of mid-2002, when the Hasbro-Mikohn license agreements were amended to provide for unit-based royalties:

A. Hasbro had signed not just the Battleship and Yahtzee agreements involved in this suit, but additional license agreements with Mikohn using the same per game per day language Hasbro says controls the proper calculation of royalties. Yet, Hasbro made not a peep about receiving royalties under the Gross Revenue Interpretation. P. Schmidt Tr. at 56 ln. 2-8 (attached hereto as Tab 3).

B. Hasbro had received from Mikohn at least thirty-eight separate monthly royalty reports for Battleship, Yahtzee Video and Yahtzee Stepper, showing how Mikohn calculated Hasbro's royalty using the Gross Revenue Interpretation, what Hasbro claims is the "intentional miscalculation." SUF, ¶91.

C. The monthly royalty accountings showed revenues from all casinos, and showed Mikohn's "miscalculation" of Hasbro's royalty on the last page of each accounting. SUF, ¶37.

D. In October 2000, Mikohn told Hasbro's account manager for Mikohn that "[t]he current royalty rate of $4 per unit per day is based on actual receipts that average less than $40.00 per day per unit in Mikohn revenue." SUF, ¶38.

E. Nearly a year before the Second Amended License Agreement was negotiated, Hasbro had audited Mikohn for compliance with the License Agreement. SUF, ¶25.

F. The Hasbro auditor, in his "Audit Strategy Memorandum," reviewed by Hasbro's Vice President of Internal Audits, stated:

> Hasbro is entitled to a share of slot machine profits based on the cash received by Mikohn for each licensed product.

> **For example, if the average cash receipts for "Yahtzee Video" machines is between $0 and $40 per machine day (number of machines times the number of days of use)** Hasbro receives a share of $4 per machine day for that licensed product. Mikohn sends a separate royalty statement each period for each Hasbro licensed product, which includes both participation contracts and lease contracts. SUF, ¶29. (Emphasis added).

G. Hasbro's Vice President of Internal Audit issued a report of the 2001 audit, stating: Based on the audit procedures performed, we conclude, except for the comments noted herein, it appears the Licensee [Mikohn] has complied with the terms and conditions of the License Agreements and royalties have been properly reported and remitted to Hasbro. SUF, ¶31.

60. Under his formula, Tousignant would identify the average daily revenue earned by all machines at a particular casino during each reporting period. Tousignant report at Attachment A, ¶3 (attached hereto as Tab 29).

61. L. Ralph Piercy is a certified public accountant with extensive experience in the gaming industry. Piercy Affidavit, Ex. A (attached hereto as Tab 31).

62. The interpretation of the royalty provisions consistent with gaming industry practices is that the royalty rate was to be determined based on the average revenue of the licensed slot machines; i.e., the Gross Revenue Interpretation. Piercy Affidavit, Ex. A at 5 (Tab 31).

63. The phrase "per game per day" is a frequently used metric in the gaming industry. It means to measure the performance of a particular type of game or device for a particular period of time. Piercy Affidavit, Ex. A at 5 ¶ 3a (Tab 31).

64. Within the gaming industry, the term "game" typically refers to a class of game, rather than a specific slot machine. Piercy Tr. at 15 ln. 5-7 (Tab 32).

65. Revenue-sharing arrangements within the gaming industry are based on an average result for some period of time. Piercy Tr. at 14 ln. 9-13 (Tab 32).

66. The method Mikohn used to calculate royalties was entirely in line with industry standard. Parente Tr. 62 ln. 18-25 (Tab 1).

67. "What was well accepted for all operators was that on a monthly basis they would provide us the average of those games. Typically as a bank of games. And they would calculate that average based on those – that net win performance. And that's a standard across the industry, even today for participation games." Parente Tr. 63 ln. 1-6 (Tab 1).

68. It was common knowledge that casinos typically did not provide reporting with that level of detail at the time the agreements were entered. Percy Tr. 46 ln. 3-13 (Tab 32).

69. Casinos typically would report only the average monthly income of leased machines. Of the 150 casinos that reported to Mikohn, only two provided income data on a daily basis. Piercy Tr. 45 In. 25-46 ln. 1 (Tab 31).

70. When Parente attempted to obtain daily casino reports on Yahtzee and Battleship for marketing purposes he was rebuked. Parente Tr. 46 ln. 2-11 (Tab 1).

71. Casinos "hold very close to the vest any sort of information correlated to individual event processes because of confidentiality and competitiveness with other casinos on any given day or any given promotion." Parente Tr. 45 ln. 8-12 (Tab 1).

72. Hasbro's Damages Interpretation fails to account for several factors bearing on individual slot machine performance. <u>See</u> Piercy Aff. Ex. A at 7, ¶¶C(7) and (8) (attached hereto as Tab 31).

73. Hasbro's Damages Interpretation does not account for days when a specific machine would earn no revenue or have negative earnings. After analyzing six days of slot

machine data from one casino, Mikohn's expert, Ralph Piercy, found that "[e]ach day approximately 20% to 23% of the devices reflected a loss." Affidavit Ex. A at 4, ¶2(d) (attached hereto as Tab 31).

74. Piercy "expect[s] that a significant number of devices [licensed under the Hasbro-Mikohn agreements] incurred a loss (no, or negative, revenue)." Aff. Ex. A at 4, ¶2(d) (attached hereto as Tab 31).

75. The Damages Interpretation does not account for the fact that, on average, slot machines earn more money on weekends, holidays and during vacation periods. Parente Depo. Tr. at 46 ln. 23 – 48 ln. 3 (attached hereto as Tab 1); Tousignant report at Exhibit A, ¶2 (attached hereto as Tab 29).

76. There are 1,565 machines in operation and identified in the January 31, 2001 Battleship and Yahtzee reports (YAHS 23; YAHV 44; BATT 6) (attached hereto as Tab 35).

77. The overwhelming majority of casinos that reported slot machine earnings to Mikohn disclosed only the average earnings of each machine over a given period of time. Piercy Depo. Tr. at 45 ln. 25 – 46 ln. 1 (attached hereto as Tab 32); Parente Depo. Tr. at 54 ln. 20-23, 62 ln. 18 – 63 ln. 7 (attached hereto as Tab 1). See also e.g., Royalty Reports at HA 835-838 (attached hereto as Tab 35).

78. Piercy's review of 150 casinos that reported to Mikohn revealed only two that provided machine specific data on a daily basis. Piercy Depo. Tr. at 45 ln. 25 – 46 ln. 1. (attached hereto as Tab 32).

79. During its 2001 audit of Mikohn, Hasbro reviewed reports that Mikohn received from casinos to "ensure the accuracy of the information included [by Mikohn] on the royalty schedule … ." HA 8333 (attached hereto as Tab 33). P. Kehoe, Depo. at HA 8333.

80. In 2001, the exemplar casino reports attached to Hasbro's "Participation tie-out" report indicate that Mikohn did not receive daily, machine-specific data. See Royalty Reports at HA 835-838 (attached hereto as Tab 35).

81. The Hasbro-Mikohn license agreements were executed with the expectation that a thousand or more machines would be operated. McCrea Tr. at 129 ln. 13 – 130 ln. 8 (attached hereto as Tab 7), and McCrea Tr., ex. 4 (attached hereto as Tab 30).

82. Section 2(c) of the license agreements requires Mikohn to provide Hasbro with "periodic statements" using a form prescribed by Hasbro. Jane Ritson-Parson Tr., ex B and C at MIK 000120 and MIK 000--- (attached hereto as Tabs 10 and 11).

83. Hasbro's form asks about the country in which the Game was sold and all units sold in a given country, but not each individual machine. Jane Ritson-Parson Tr., ex B and C at MIK 000140 (attached hereto as Tab 10).

84. The Hasbro form provides for the calculation of the "Gross Sales" and the "Royalty Amount" based on the number of "Units Sold." Id.

85. By Section 2(c) of the license agreements, Hasbro had the right to obtain a:

> detailed statement by an independent certified public accountant or an officer of [Mikohn] showing the number, country in which manufactured, country in which sold or to which shipped and description of the Licensed Articles distributed and/or sold or otherwise provided by [Mikohn] and, where the royalty described in the [Royalty Provision] applies, the applicable gross revenue received by [Mikohn] and deductible fees paid to third parties…."

Jane Ritson-Parson Tr., ex B at MIK 000120 (attached hereto as Tabs 10 ).

86. Pursuant to § 1(c)(1) of the Hasbro-Mikohn license agreements, whether the games were deemed "economically feasible" depended on the average earnings of the machines,

during the testing period, equal to "gross revenue of approximately thirty dollars per day per Licensed Article." Jane Ritson-Parson Tr. ex. B --- and MIK 000---. (attached hereto as Tab 10).

87. Hasbro's Rule 30(b)(6) deponent confirms Hasbro is unable to describe the substance of the Yahtzee and Battleship negotiations. Jane Ritson Parson Tr. at 11 ln. 20 – 12 ln.1 (attached hereto as Tab 9).

88. In June 1998, McCrea sent Mintz a non-binding Term Sheet that stated:

> "Revenue Generation" means the gross revenue per game received by MIKN/SIGMA from leases, revenue participation agreements or similar arrangements with casino operators of the Games.

and that

> "Royalty" means percentage of gross revenue received by MIKN/SIGMA from leases, revenue participation agreements or similar arrangements with casino operators of the Games.

McCrea Tr., ex C (attached hereto as Tab 6).

89. A later draft changed the term from "Revenue Generation" to "Gross Revenue", but the definition remained the same. McCrea Tr. at 93 ln. 3-14 (attached hereto as Tab 7).

90. In a letter from McCrea to Mintz, the term "Gross Revenue" was replaced with the term "Revenue Per Game Per Day." The letter contained projections showing gross revenues of all machines, and that Hasbro's per game per day royalty was calculated according to the average game-day. McCrea Tr., ex 3 (attached hereto as Tab 36).

91. Between July 2000 and November 2002, Mikohn made, and Hasbro accepted royalty payments accompanied by at least thirty-eight reports calculating royalties using the Gross Revenue Interpretation. See Royalty Reports (attached hereto as Tab 35).

92. The body of each royalty report provided a casino-by-casino breakdown of revenue Mikohn received during the reporting period. The report listed the number of machines

leased to each casino, the number of machine days for the casino, the total amount each casino paid to Mikohn, as well as the average revenue earned by the machines in each casino. The end of the report revealed that Mikohn determined the proper royalty rate with reference to the average revenue of the machines at all casinos. See Royalty Reports (attached hereto as Tab 35).

93. The royalty reports show that Mikohn made each royalty payment based on a single royalty rate for the particular period. The royalty reports also show that machines located at some casinos outperformed machines located at other casinos. See Royalty Reports (attached hereto as Tab 35).

94. Patricia Schmidt, Hasbro's Mikohn Account Manager, admits that she received and read the October 20, 2000 fax and that she understood the "current royalty rate of $4 per unit per day" language to mean that the games were averaging less than $40 per day in Mikohn revenue, and that Hasbro's royalties were being calculated at the $4 level as a result. P Schmidt Tr. at 58 ln. 23 – 59 ln. 6 (attached hereto as Tab 3).

95. On at least one occasion, Hasbro requested that Mikohn make payment of additional money because of a perceived underpayment. In making its demand, Hasbro never claimed royalties were being paid based on a misapplication of the royalty provisions. Lebrech Tr. at 38 ln. 1-14 (attached hereto as Tab 15).

96. Hasbro conducted a second audit of Mikohn in September 2004. S. Finelli Depo. Tr. at 8 ln. 17-21 (attached hereto as Tab 37).

97. During the September 2004 audit, Hasbro reviewed Mikohn's royalty payments from the 3rd Quarter of 2001 through the 2nd Quarter of 2004. S. Finelli Depo. Tr., Ex. A (attached hereto as Tab 28).

98. At the September 3, 2004 exit conference with Mikohn representatives, the Hasbro audit team noted what they found, any concerns they had, and what the audit team's plan was. S. Finelli Depo. Tr. at 56 ln. 11-24 (attached hereto as Tab 37).

99. The Hasbro audit team did not challenge Mikohn's use of the Gross Revenue Interpretation at the exit conference. S. Finelli Depo. Tr. at 57 ln. 3 – 60 ln. 11 (attached hereto as Tab 42).

100. Venturi told members of Hasbro's in-house counsel staff that his client had information that he was "willing to share, for a finder's fee, involving millions of dollars in royalties that [Hasbro] did not receive…." Bruce Kelly Depo. Tr. Ex. 1 (attached hereto as Tab 42).

101. On or around October 1, 2004, Hasbro executed a Finder's Fee Agreement with Attorney Greg Venturi, who was acting as "Agent for an undisclosed principal ("Principal")." Bruce Kelly Depo. Tr. Ex. 30 (attached hereto as Tab 23).

/s/ Michael J. Daly .
Brooks R. Magratten, Esq., #3585
Gordon P. Cleary, Esq., #1948
Michael J. Daly, Esq., #6729
VETTER & WHITE
Attorneys for Defendant
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060
(401) 272-6803 FAX
bmagratten@vetterandwhite.com
gcleary@vetterandwhite.com
mdaly@vetterandwhite.com

Dated: October 20, 2006

CERTIFICATE OF SERVICE

To:

Todd D. White, Esq.
Adler, Pollock & Sheehan, P.C.
One Citizens Plaza - 8th Floor
Providence, RI 02903

I hereby certify that I electronically filed this Statement of Undisputed Facts on October 20, 2006. The Statement is available for viewing and downloading from the Court's Electronic Case Filing System. Service on the above-identified counsel has been effectuated by electronic means.

/s/ Michael J. Daly