UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| HASBRO, INC., et al.<br>Plaintiffs<br><br>v.<br><br>MIKOHN GAMING CORP.,<br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-0106/S |

**DEFENDANT MIKOHN GAMING CORPORATION'S REPLY MEMORANDUM IN SUPPORT OF <u>MIKOHN'S MOTION FOR SUMMARY JUDGMENT</u>**

Hasbro "doth protest too much" its supposed lack of sophistication in gaming and the regulation of gaming. Hasbro admits elsewhere that it was involved in the gaming industry before entering into the Hasbro-Mikohn license agreements, and that it knew there was no guarantee that Nevada gaming authorities would approve the "tiered structure" of the royalty provisions. Hasbro Statement of Disputed and Undisputed Facts, Nos. 3, 15.

Hasbro also admits elsewhere that its auditors read through the Hasbro-Mikohn license agreements and royalty reports, talked to Hasbro's Account Manager for Mikohn about the calculation of payments that were due Hasbro, and "determine[d] ... that all royalty payments had been made in the proper amounts." <u>Id</u>., Nos. 27, 28.

So, all posturing aside, there was little if anything that Hasbro did not know, or could have known if it had wanted to, about the Hasbro-Mikohn relationship.

## I. ILLEGALITY

### A. Hasbro Fails to Show "Approval" of the Royalty Provisions.

Hasbro has abandoned the contention that the Nevada Gaming Control Board, as a Board, approved the Hasbro-Mikohn royalty provisions. Instead, Hasbro now maintains, without ever

directly saying so, that the NGCB Corporate Securities Division approved the provision, and deems this Board approval.

There are at least two problems with Hasbro's new tack. First, administrative boards like the NGCB are creatures of statute. An administrative board is composed solely of the members to whom the legislature delegates authority, and a board ordinarily may not subdelegate assigned functions to its employees where a statute entrusts the specified functions to the board. Schade v. Texas Workers Compensation Commission, 150 S.W.3d 542, 548-49 (Tex. App. 2004). Delegation of duties to agency staff is permissible only where permitted by statute, Earth Island Institute v. Pengilly, 376 F.Supp.2d 994, 1009(E.D.Cal. 2005), and an agency is not bound by the actions of its staff if the agency has not endorsed those actions. Vernal Enterprises, Inc. v. Federal Communications Commission, 355 F.3d 650, 660(D.C.Cir. 2004).

Here, Hasbro fails to cite a single Nevada statute, or NGCB regulation or order that makes any action by the NGCB Corporate Securities Division the action of the NGCB itself. The Wilson March 7, 2002 memorandum, on which Hasbro relies heavily, makes it clear that if anyone reviewed the Hasbro-Mikohn royalty provisions, it was agent Lombardi and possibly Corporate Securities Division Chief Sloan. Their actions are not the actions of the NGCB.

Second, Hasbro asserts that NGCB Member Scott Scherer did not have "the authority to unilaterally withdraw the Board's approval." Of course, that is not what happened, but the assertion points to a deeper flaw in Hasbro's argument. If, as Hasbro would have it, NGCB Member Scherer, acting at the direction and suggestion of NGCB Chairman Dennis Neilander, does not have the "unilateral authority" to declare a royalty provision illegal, how does a single staff member, even a staff Division Chief, have the "unilateral authority" to declare a royalty provision legal in the first place?

The question answers itself. There is simply no basis to Hasbro's claim that the NGCB approved the Hasbro-Mikohn royalty provision.

**B. The Royalty Provision Does Not Operate as "A Fixed Sum Determined in Advance on a Bona Fide Basis."**

Hasbro calls the royalty schedule a fixed sum determined in advance, but all it shows are percentages within a revenue range that, of necessity, vary slightly. These are distinctions without a difference.

The Streshley analysis shows the royalty to Hasbro is essentially 29.5% before costs are recovered and 38.8% after costs are recovered. For all of its calculations, Hasbro refuses to address and answer the two crucial questions that determine the legality of the royalty provision:

1. How was this royalty provision devised if not by "first ... calculating an agreed on percentage of gaming revenue?" This is the central question posed by the Wilson memorandum. SUF, ¶ 42. Hasbro has no answer to this question.
2. What is the "bona fide basis" on which the royalty rates were determined? This is the central question posed by NRS §463.162. Hasbro has no answer to this question.

Hasbro admits that Charles McCrea told Hasbro that it could not participate on a percentage basis of gaming revenues and that McCrea believed, but could not guarantee the "tiered" structure would be approved by Nevada gaming regulators. See, Hasbro Statement of Disputed and Undisputed Facts, Response No.15. Obviously, Hasbro knew an agreed on percentage formed the basis of the agreement. So, how can Hasbro complain when Deputy Attorney General Wilson and analyst Streshley recognize that "[t]he voice is the voice of Jacob,

yet the hands are the hands of Esau;" viz., the agreements appear to speak in terms of dollar amount royalties, but the handiwork of the agreements is an illegal percentage royalty.

Hasbro's discussion of what "advance" in NRS §463.162 means is difficult to credit. If, as Hasbro argues, "in advance" means an " 'advance determination' before Hasbro is to be paid," (Hasbro Obj. at 9) the word "advance" has no purpose in the statute. What Hasbro is to be paid would always have to be determined before Hasbro is paid. How else could the payment be made? Even Hasbro's expert DuCharme refuses to go along with Hasbro's attempt to twist the phrase "in advance." In his deposition testimony, DuCharme conceded:

> Q: When they say determined in advance, what does that mean to you?
>
> A: That it is a fixed amount agreed upon prior.
>
> Q: Prior to what?
>
> A: Prior to implementation of the or putting the device on the floor deploying it for play.
>
> Q: The parties have to understand before the device goes on the floor who is going to be paid what, correct?
>
> A: Correct.
>
> Q: Both sides have to know exactly what that number is going to be?
>
> A: Correct.

SSUF, ¶ 56.

"In advance" must mean in advance of slot machine earnings, because the statute is intended to require a gaming license for any entity having an interest in how much slot machines earn. To give "in advance" the meaning Hasbro proposes would eviscerate the statute.

**C. Hasbro's Analysis, Not Scherer's, is Flawed.**

Hasbro faults former NGCB Member Scherer for accepting the Streshley percentage analysis "even though [Streshley eliminated the under $40 tier] on which 99.9% of the payments [were] made to Hasbro." Hasbro Obj. at 10. From this, Hasbro concludes the "ten (10)" over $40 tiers "were not material 'to the overall payment being made to Hasbro.'" Hasbro Obj. at 11.

Hasbro's argument shies away from one glaring fact: all of the money Hasbro seeks to recover in this suit, 100%, falls somewhere within the royalty tiers Streshley shows are essentially 29.5% and 38.8% royalties before and after cost recovery. Streshley did not devise a relationship between royalty rates that increased in uniform percentage steps – that was a given from the Hasbro-Mikohn license agreements, and something Hasbro was warned about specifically by McCrea.

So, too, Hasbro's argument that "Scherer's logic" makes the amended Hasbro-Mikohn license agreement illegal stretches the facts beyond the breaking point. Under the amended license agreements, royalties to Hasbro were unit-based: Hasbro received a royalty based on the number of "game units" in operation and generating recurring revenue to Mikohn at reporting time. The royalty to Hasbro for any game unit to be "placed on the floor" is readily determined from the amended agreement before the game unit arrives at the casino. This is exactly what cannot be determined under the original license agreements until after gross revenue from the machines is determined.

**D. Scott Scherer's Opinion Deserves No Discount and Steve DuCharme's Opinion Deserves No Credence.**

Hasbro attacks Scott Scherer's credibility on the basis of a claimed bias for Mikohn. Whatever Mr. Scherer's previous dealings with Mikohn, one thing can be said about his opinion that cannot be said about any other expert in this case: when Scott Scherer arrived at the opinion

he offers – that, in light of the information revealed in the Deputy Attorney General's March 7, 2002 memorandum, the Hasbro-Mikohn royalty provisions are illegal – the only interest he was serving was the interest of the State of Nevada.

In contrast, the opinion offered by Steve DuCharme – "this sliding scale would have been approved because it was approved" – is based on a misreading of the March 7, 2002 memorandum and an assumption without any support in either DuCharme's recollection or in NGCB documents. Hasbro Exhibit R, p.46:15-20. Hasbro refers the court to the entirety of the DuCharme report, and in point of fact DuCharme's report is telling. On the first page of the report, DuCharme claims that "[t]he Board reviewed the Licensing Agreement between Mikohn and Hasbro and the royalty provisions contained in a sliding scale. The Board deemed this provision suitable and not inconsistent with the provisions of NRS 463.162."

As detailed in Mikohn's principal memorandum, Mikohn Mem. at 20-24, DuCharme's entire statement is fiction.

- DuCharme has no recollection of reviewing the Hasbro-Mikohn license agreements while he was a member or Chairman of the NGCB. SSUF, ¶ 25.

- DuCharme has not seen any written evidence that the NGCB reviewed or approved the royalty provisions in the Hasbro-Mikohn license agreements. SSUF, ¶ 21.

- DuCharme is not aware of any formal written analysis of the Hasbro-Mikohn license agreements by NGCB staff. SSUF, ¶ 22.

- DuCharme has not talked with any current or former NGCB member who recalled reviewing or approving the royalty provisions in the Hasbro-Mikohn license agreements. SSUF, ¶ 23.

- DuCharme is not aware of any communication by NGCB or the Nevada Gaming Commission to Hasbro stating that any Hasbro-Mikohn license agreement either complied with or violated the Nevada gaming statutes. SSUF, ¶ 24.

- DuCharme maintains the Hasbro-Mikohn license agreements are for a "fixed sum determined in advance", but cannot explain why SSUF, ¶ 29.

DuCharme's opinion on legality has no support in fact. If credibility is a deciding factor in this motion, Scott Scherer's credibility prevails.

**E. The License Agreements are Illegal for All Purposes, Including a Claim for Royalties Based on Revenue from Flat Fee Leases.**

Citing no legal authority, Hasbro argues that even if the license agreements are illegal, Hasbro is still entitled to recover royalties based on revenue from non-Nevada slot machines. This argument confronts legal hurdles it cannot surmount.

First, NRS 463.162 makes it a criminal offense for Hasbro to contract for the royalties specified in the Hasbro-Mikohn license agreements. See U.S. v. DeLuna, 763 F.2d 897, 907 (8th Cir. 1984). The royalty provisions are essential terms of the license agreements and, under law, cannot be enforced even partially. Sheehan v. Richardson, 315 B.R. 226, 240 (D.R.I. 2004); Restatement (Second) of Contracts, §§ 181, 184 (1981). If the law were to allow even partial recovery in this circumstance, it would frustrate the purpose of NRS 463.162 by giving with one hand what it forbids with the other. See, e.g., Solomon v. Gilmore, 731 A.2d 280, 293 (Conn. 1999)( following the "well-established rule" that if a licensing statute is intended to regulate business, and not merely raise revenue, a contract within the scope of the regulated business will not be enforced).

Second, Hasbro received payments based on earnings from slot machines throughout the period from 1999 through 2002. Thus, it has already pocketed that which NRS 463.162 says it was illegal to receive.

Moreover, Hasbro's request that this Court to enforce the unlawful payment provision for flat-fee leases outside Nevada is in direct contravention of the terms of the license agreements.

When the payment provisions were deemed illegal it was handled in accordance with §2(d) of the agreements, which provided specifically for the possibility of illegality due to Hasbro's status as an unlicensed party. Section 2(d) was drafted by Hasbro.[1] That section gave Hasbro the option of 1) having Mikohn hold the payments until Hasbro could lawfully be paid, **or** 2) the renegotiation of a new royalty structure. Hasbro chose the latter. When Hasbro opted to renegotiate it did not reform the agreements to continue use of the illegal payment provision in jurisdictions mandating flat fee agreements. Hasbro abandoned the illegal provision entirely.

The license agreements state further at §24 that "[i]n the event that any provision(s) of this Agreement is adjudicated by a court of competent jurisdiction to be unlawful… that provision(s) shall be deemed severed from this Agreement…." Hasbro Mem. Ex. 1 at p. 23. Section 24 of the agreements was also drafted by Hasbro. It unambiguously mandates that, if this Court deems the payment provisions unlawful, the payment provisions must be severed from the remainder of the agreements. The clause does not contemplate the reformation of the payment provisions by this Court. It does not contemplate partial enforcement of the payment provisions by this Court. It contemplates the parties striking out the unlawful provisions entirely, leaving the remainder of the agreements untouched.

Hasbro's problem here is that the provisions which would be "adjudicated by [this Court] to be unlawful" are precisely what Hasbro asks this Court to partially enforce. However, by the very terms of the license agreements the unlawful payment provisions must "be deemed severed" and there is simply no part left to enforce.

## II. DAMAGES

Hasbro also attempts to frustrate summary judgment by claiming the validity of its Damages Interpretation is a disputed question of fact. Specifically, Hasbro hangs its hat on the

[1] This same language appears, word-for-word, in Hasbro's agreement with WMS.

fact that it has an expert who will apply a mathematical formula. When the undisputed facts reveal that damages can never be established with an appropriate level of certainty, however, summary judgment is appropriate. See The Upper Deck Co., LLC v. Breakey Int'l, BV, 390 F. Supp. 2d 355, 361 (S.D.N.Y. 2005); ProfiTel Group, LLC v. PolyOne Corp., 2006 WL 1734271, *12 (N.D. Ga. 2006). Upper Deck is particularly instructive on this point and succinctly refutes Hasbro's objection.

In Upper Deck, the plaintiff and defendant were involved in a licensing agreement under which defendant was to be paid royalties. After the court concluded the plaintiff had breached the contract, the plaintiff moved for summary judgment based on the plaintiff's inability to quantify damages. The defendant responded by offering that it had an expert who could supposedly calculate royalties allegedly owed. Upper Deck, 390 F. Supp. at 359.

The court began by noting that "[b]oth the ***existence*** and the ***amount*** of lost profits damages must be established with reasonable certainty, and although such damages 'need not be proven with 'mathematical precision,' they must be 'capable of measurement based upon known reliable factors without undue speculation.'" Id. at 358 (quoting Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000)). Although the defendant offered an expert who claimed to be able to mathematically calculate allegedly lost profits, the court held that "'[a]n expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case.'" Id. at 361 (citing Virgin Atlantic Airways Ltd. v. British Airways PLC, 69 F.Supp.2d 571, 579 (S.D.N.Y. 1999)). The court ultimately concluded that the expert's formula was based on "unsupportable assumptions" and unsubstantiated facts. Therefore, as to those damages that were predicated on the expert's formula, summary judgment was appropriate. Id. at 359-62.

Here, Hasbro's reliance on its expert, Michael Tousignant, and its Damages Interpretation is equally faulty. Because neither Hasbro's expert, nor its Damages Interpretation, account for the actual machine performance, Hasbro can do nothing more than assume that its Damages Interpretation bears any relationship to its alleged actual damages. For purposes of summary judgment, Mikohn accepts that:

- each of the "damages charts" depicted in Hasbro's Objection at p. 21-22 portrays a possible revenue scenario for a slot machine;
- there may "be instances where the 'Litigation' calculation inures to Mikohn's benefit just as there will be instances where the 'Litigation' calculation inures to Hasbro's benefit," Has. Obj. at 22;
- Hasbro's Damages Interpretation is a "practical alternative" to calculating its alleged actual damages, Tousignant Report, Hasbro Ex. CC at § 3;
- "it is common" in accounting and auditing practices "to use the best available information to evaluate transactions," id.

These facts, however, do not negate the inherently speculative nature of Hasbro's Damages Interpretation. As Hasbro's damages charts correctly illustrate, the degree of difference between royalties due under Hasbro's Litigation Interpretation and its Damages Interpretations depends entirely on daily fluctuations in machine performance. There are an infinite number of scenarios that could bring royalties under these formulas either closer together, or further apart. Hasbro's reliance on the Damages Interpretation fails because it makes **no** effort (through expert evidence or otherwise) to even estimate actual past machine performance, which Hasbro recognizes is the key factor affecting the difference between the Damages and Litigation Interpretations. As such, there is no basis for claiming the Damages Interpretation will provide a reasonable approximation of actual damages.

Further, contrary to Hasbro's claim, its expert, Michael Tousignant, **has not** "verified that Hasbro's damages can be calculated with the application of normal auditing and/or accounting

practices." Hasbro Obj. at 19. The fact that Tousignant blessed Hasbro's Damages Interpretation as a "practical alternative" to calculating actual damages and states that accountants and auditors "use the best available information to evaluate transactions" is a far cry from stating that the Damages Interpretation results in a reasonable estimation of actual damages.

Even if Tousignant had in fact "verified" that the Damages Interpretation was an appropriate formula to approximate actual damages, such opinion is not based on any facts. As illustrated by Hasbro's charts, without accounting for daily fluctuations in machine performance, the Damages Interpretation is inherently speculative. There is no question that it is ***possible*** that the application of the Damages Interpretation and Litigation Interpretation could yield similar royalties. See e.g., Chart 2, id. at p. 21. It is also ***possible*** that application of the Damages Interpretation could result in Hasbro receiving royalty payments far higher or lower that what even it claims would be required under its Litigation Interpretation. Without any competent evidence to establish (or at least estimate with reasonable certainty) actual, daily fluctuations in machine profitability, Hasbro can only speculate whether its Damages Interpretation will net a damages figure remotely close to its actual damages if its Litigation Interpretation were accepted.

Moreover, Hasbro appears to argue that it can prove "that casinos maintain reports of the daily transactions of each slot machine." Hasbro Obj. at 19; see also id. at 40 (stating that casinos "apparently" could "provide a sheet that listed how each machine performed on each specific day in a month"). Nevertheless, Hasbro has made no effort to obtain daily, machine specific data necessary to apply its Litigation Interpretation. Hasbro has not issued subpoenas to any casinos. Not a single casino representative has been deposed. Nor has Hasbro provided any expert evidence to estimate actual machine performance during the relevant time period in this case – 1999 to 2002. In short, despite bearing the burden of establishing its actual damages with

reasonable certainty, National Chain Co. v. Campbell, 487 A.2d 132, 134-35 (R.I. 1985), Hasbro elects to rely on a "practical alternative" that, at best, can provide a speculative calculation of damages.

Finally, Hasbro's contention that the certainty requirement relates to the *existence* of damages, rather than *amount* of damages, is simply a misunderstanding of Rhode Island law. Hasbro bears the burden of proving, "by competent evidence, the **amount** of damages that it suffered because of defendant's failure to perform." Id. (emphasis added). In this case, accepting everything that Tousignant says and its damages charts reveal, Hasbro will never have competent evidence to establish reasonably certain damages because it has no evidence concerning the actual or expected daily performance of the slot machines.

## III. HASBRO'S FRAUD CLAIM FAILS AS A MATTER OF LAW

Hasbro to tries shroud its inadequate fraud claim in a cloud of irrelevant and misleading "facts" to avoid summary judgment.

Fraud requires: 1) a false representation, 2) intent that the plaintiff rely on that misrepresentation, 3) justifiable reliance on the part of the plaintiff on that representation, and 4) resultant damages. See Travers v. Spindell, 682 A.2d 471, 472-3 (R.I. 1996). Therefore, to survive summary judgment Hasbro must adduce sufficient facts that are material to each of those elements such that a reasonable fact finder could decide in Hasbro's favor. The facts cited by Hasbro establish none of these elements.

### A. There is no False Representation

The alleged misrepresentation on which Hasbro hinges its entire fraud claim is a June 3, 1998 letter sent from Mikohn's former general counsel and principal negotiator Charles McCrea to Hasbro's principal negotiator Lloyd Mintz early in the negotiation of the agreements. Hasbro

Obj. at 16-17. Hasbro states that as a result of the June 3 letter, Hasbro believed the term "gross revenue" had some special meaning specific to the gaming industry. Id.

That letter was not the only communication between McCrea and Mintz during negotiations. On September 18, 1998, a few weeks prior to Hasbro executing the agreements, McCrea sent the following e-mail to Mintz:

> **For the purposes of this agreement, "Gross Revenue" means all revenue generated by Licensee ... through its use of the Name ... as determined by generally accepted accounting principles consistently applied, including, without limitation, all revenues through sales, leases revenue participation agreements or permitted sublicenses.**

SSUF exhibit M at MIK 000935-36 (emphasis added).

Whatever interpretation Hasbro seeks to impose on the June 3 letter is irrelevant. It is clear from the September 18 e-mail that when the agreements were executed Mikohn was speaking in terms of the Gross Revenue Interpretation. Thus, Hasbro's claim that it relied on its interpretation of the June 3 letter (reasonably or otherwise) in executing the agreements is purely a contrivance.

Hasbro contends in its own motion for summary judgment that the June 3 letter must be interpreted according to its Litigation Interpretation to support that interpretation. Hasbro Mem. at 10. This circular logic is the hallmark of Hasbro's case. Hasbro's misrepresentation argument asks this Court to interpret the agreements according to its Litigation Interpretation by interpreting the June 3 letter according to its Litigation Interpretation. In all events, the June 3 letter is no support for Hasbro's position. See, page 23 infra.

Significantly, Hasbro has not produced Lloyd Mintz to explain how he understood the June 3 letter, nor what he believed "gross revenue" meant throughout negotiations. In fact, no witness for Hasbro has testified that they ever saw this letter before it was produced in discovery.

However, McCrea, who was the only other person active in negotiations, testified that the Gross Revenue Interpretation was the only interpretation contemplated by the parties. SSUF ¶3.

Hasbro has not supported its argument that the term "gross revenue" was represented to mean anything other than its plain meaning – revenue from all games governed by an agreement totaled.

**B. There was no Intent to Mislead**

"Intentional misrepresentation or fraud must be proved by showing that the representation was made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing another person to rely on the representation." Univ. Sys. of N.H. v. U.S. Gypsum Co., 765 F. Supp. 640, 650 (D.N.H. 1991). Rhode Island law accords with this principal. See McGovern v. Crossley, 477 A.2d 101, 103 (R.I. 1984) ("[In an action for deceit, Plaintiffs] were required to prove that defendants, in making their statements, knew they were false intending to deceive plaintiffs.").

There is no suggestion that McCrea intended to deceive Hasbro as to the meaning of "gross revenue." McCrea's 2003 statements to Mikohn's Board, Hasbro's Statement of Undisputed Fact, Ex. II at 5-6, his September 18, 1998 e-mail to Lloyd Mintz, SSUF Ex M at MIK 000935-36, and his October 20, 2000 letter to Pat Schmidt, SUF tab 26 at MIK0001173, all indicate an unwavering belief that royalties should be calculated according to the Gross Revenue Interpretation.

Primarily, Hasbro argues that Mikohn intended to mislead Hasbro because it did not tell Hasbro that John Garner once questioned the Gross Revenue Interpretation after the agreements had already been executed. Hasbro Obj. at 18. But Garner was not a party to negotiations, was not copied the September 18, 1998 e-mail to Lloyd Mintz, and there is no indication he ever saw

that e-mail. Garner's interpretation is based only on his reading of the agreements and is thus irrelevant to divining the actual meaning of the agreements.

Nothing in the case law, which Hasbro studiously avoids, imposes a duty to explain potential alternative interpretations of a contract to the other party. Nor would such a duty make sense. Taking Hasbro's fraud argument to its logical conclusion, every time a party conceives of a potentially new interpretation of an agreement – even one as implausible as Hasbro's Litigation Interpretation – that party would be required to "bring this to [the other party's] attention" or would be deemed to have "intentionally deceived" that party. Hasbro Obj. at 18.

Secondarily, Hasbro relies on Tom Haas's speculation that he believed Mikohn didn't interpret the agreements according to the Litigation Interpretation because he believed Mikohn could not afford to pay under that interpretation. Hasbro Obj. at 18. Haas relied on nothing more than the amount of cash he believed Mikohn had on hand in forming his belief. Hasbro's SUF Ex LL at 33 l. 1-13. Haas, like Garner, was not involved in the negotiation of the agreements and was not copied on the September 18, 1998 e-mail. SSUF ¶¶4, 16. Like Garner, Haas based his interpretation of the agreements on nothing more than his reading of them.

Finally, Hasbro struggles fitfully against the fact that McCrea explained that the Gross Revenue Interpretation was being used to calculate royalties, not only in the September 18, 1998 e-mail to Lloyd Mintz, but also during the term of the agreements. On October 20, 2000, McCrea wrote to Hasbro's Pat Schmidt to explain how royalties were being calculated and projecting additional royalties he anticipated would be generated in the future.

In describing how royalties were already being calculated, McCrea wrote "The current royalty rate of $4 is based on actual receipts that average less than $40.00." SUF tab 26 at MIK0001173. Hasbro only quotes the word "average", asserting that "Mr. McCrea used the

term 'average' in the context of projected earnings." Hasbro Obj. at 18-19. The October 20, 2000 document, on its face, shows that this is plainly not the case.

McCrea's explanation is not a projection. It is a plain statement of how the "current royalty rate" was already being calculated. Nothing in this sentence speaks of the future. While McCrea was projecting a future increase to the $6.95 step, the royalty rate had been and was at this point "based on actual receipts that average less than $40.00."

There is no twisting of words, as Hasbro claims. Hasbro Obj. at 19. McCrea's statement is a point blank explanation that royalties were being calculated according to the Gross Revenue Interpretation. There was no intent to deceive – indeed there was no deception – either before the agreements were executed or while they were in effect. Every statement made to Hasbro uniformly evidenced a belief that the Gross Revenue Interpretation was proper. Without proof of intent to deceive Hasbro's fraud claim must fail. See McGovern, 477 A.2d at 103.

**C. There was no Reasonable Reliance**

Hasbro urges this Court to disregard Stanley Weiss Assoc., LLC v. Energy Management Inc., 2004 WL 877540 (R.I. Super. 2004) (reliance on an alleged misstatement may be unreasonable as a matter of law). Hasbro Obj. at 16 n. 4. Hasbro suggests that Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1031 (Mass. 2004), conflicts with this rule. It does not.

In the sentence immediately following that quoted by Hasbro, the Marram Court stated "In some circumstances a plaintiff's reliance or oral statements in light of contrary written statements is unreasonable as a matter of law." Id. The Marram court continued "'[w]hen a person acts in a way contrary to his own acknowledged understanding of the facts, his acts must be deemed unreasonable as a matter of law.... Confronted by such conflict a reasonable person

investigates matters further; he receives assurances or clarification before relying.'" Id. (quoting Trifiro v. New York Life Ins. Co., 845 F.2d 30, 33 (1st Cir. 1988)). Whether the rule applied is that of Stanley Weiss or Marram or Trifiro, it all comes down to this: Hasbro's alleged reliance is unreasonable and its fraud claim beckons summary judgment.

First, Hasbro asserts that it reasonably and justifiably relied on the alleged misrepresentation – that gross revenue had some special industry meaning of gross revenue from an individual machine (whatever that means) – because it was new to the gaming industry, and Mikohn was experienced in the gaming industry. Hasbro Obj. at 16-17. As mentioned above, McCrea's September 18, 1998 e-mail, written just before the agreements were signed, belies any assertion that Hasbro reasonably relied on its interpretation of the June 3, 1998 letter, written at the seminal stages of negotiations.

Second, even if Hasbro was misled into believing that gross revenue meant something different than the combined revenue from all of the games when it entered the agreements, its continued reliance for years while receiving statements, accepting royalties, auditing and questioning Mikohn was plainly unreasonable. Mikohn Mem. at 43-48.

Although Hasbro might like to disclaim the fact, its size and sophistication are relevant to the reasonableness of its behavior. Hasbro is no naïve ingénue. It admits it was a participant in the gaming industry. Hasbro Statement of Disputed and Undisputed Facts, Responses 3. It has an entire department dedicated to the licensing of its brands and a team of trained attorneys, accountants, employees and auditors to make sure it has been paid properly.

Hasbro asks this Court not to hold the October, 2001 audit against it because it suggests

Hasbro's auditors were "baffled" by Mikohn.[2] Hasbro Obj. at 17. But Hasbro points to no conduct by Mikohn toward Hasbro that would have baffled it. Instead Hasbro states that Ruhe "felt like he was being instructed to baffle the Hasbro auditors," Id., and that Don Stevens told Ruhe:

> [C]ooperate with [Hasbro's auditors], show them all the details and **show them the operational parts of the audit as to how we calculated royalties** and any other information they wanted, but [Ruhe] should not attempt to interpret the contract, that if there was any clause in the contract that needed interpretation, that that would be done by the legal staff.

Hasbro's SUF ex. D at 62 l. 9-15 (cited by Hasbro Obj. at 17).

Stevens' own comments indicate that he instructed Ruhe to show the auditors how Mikohn was calculating royalties. Moreover, Stevens acknowledges that he couldn't specifically recall ever meeting the auditors, and there is certainly no suggestion that he "baffled" them in any way. For his part, Ruhe testified that he "supplied [Hasbro's auditors] with everything they requested."

Thus, Hasbro supports its claim that it reasonably relied on Mikohn's alleged misrepresentation that it was calculating royalties based on the Litigation Interpretation by pointing to: 1) Ruhe's undisclosed feelings – feelings which had no effect on Ruhe's conduct toward Hasbro's auditors, and 2) an undisclosed conversation with a man Hasbro's auditors may never have even met, in which he instructed Ruhe to "show them … how we calculated royalties." How Hasbro could claim that these assertions rendered Hasbro's behavior reasonable is a mystery.

---

[2] Ruhe never used the word "baffle." This word was introduced by Hasbro counsel. When asked if he was instructed to baffle Hasbro's auditors, Ruhe replied (Hasbro Obj. Ex. Z at 108 l.21-25):

> I felt that [Stevens] was basically asking me to focus on the operational performance and not the specifics of the license agreement; but once again, I supplied Hasbro everything they requested.

Nothing Mikohn said or did supports Hasbro's baseless charge that "Mikohn's personnel intentionally shadowed the truth from Hasbro." Hasbro Obj. at 17. Hasbro does not and cannot indicate any conduct or words by anyone at Mikohn that "shadowed" the formula by which it was calculating royalties. Anyway, Hasbro's audit strategy memo reveals that Hasbro contemplated using the Gross Revenue Interpretation before it even arrived in Nevada.

"'When [Hasbro acted] in a way contrary to [its] own acknowledged understanding of the facts," as it did throughout the agreements by accepting royalties and auditing those royalty payments according to the Gross Revenue Interpretation, "[Hasbro's] acts must be deemed unreasonable as a matter of law…. Confronted by such conflict a reasonable [multi-billion dollar corporation] investigates matters further; [it] receives assurances or clarification before relying.'" See Marram, 809 N.E.2d at 1031 (quoting Trifiro, 845 F.2d 30, 33).

Nothing in Hasbro's objection raises a genuine issue of material fact as to any element of its fraud claim – much less all of them.

## IV. COURSE OF PERFORMANCE IS NOT WAIVER

Hasbro has tried to recast course of performance as an issue of waiver so that it may hide behind a non-waiver clause. This the law does not permit. Waiver cannot be an issue until the contract is interpreted. Therefore, regardless of the non-waiver clause, Hasbro's conduct is relevant to the logically antecedent question of contract interpretation. In other words, "the issue is not whether [Hasbro] has waived any rights under the contract but what those rights are." See Southern Cal. Edison Co. v. Superior Court, 44 Cal. Rptr.2d 227, 234 (Cal. App. 1995). If Hasbro never had the contractual right to receive payments based on its Litigation Interpretation (as indicated in part by its course of performance), there is nothing for Hasbro to waive.

Throughout discovery one fact remained untouched. Before October 2004, when Greg Venturi sold Hasbro the information that set this litigation in motion, no document written by any Hasbro employee, no statement made by any Hasbro employee, and no word or action by any Hasbro employee to Mikohn ever indicated a belief that royalties should be calculated pursuant to Hasbro's Litigation Interpretation.

Hasbro marshals not a single fact – from the time that the agreements were executed until Venturi's appearance on the scene in 2004 – that would indicate that it or its agents believed the agreements anticipated Hasbro's new and more profitable interpretation. Hasbro has not produced a single internal or external communication predating 2004 indicating that Hasbro believed royalties should be calculated according to the Litigation Interpretation. There is simply nothing in Hasbro's course of performance to evidence it believed in the interpretation it now advances.

The law recognizes course of performance as highly probative of the intended meaning of the agreements. Hasbro's performance under the agreements is both directly relevant to their intended meaning, and singularly damaging to Hasbro's Litigation Interpretation. Elena Carcieri Trust-1988 v. Enterprise Rent-A-Car Co., 2004 WL 603498 *2 (R.I. Super. 2004) ("any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." (citing Restatement (Second) Contracts § 202)); Navarro-Ayala v. Hernandez-Colon, 951 F.2d 1325,1354 (1st Cir. 1991) (Cyr, J. concurring in part, dissenting in part) ("Through the performance rendered by the parties, the court gains invaluable insight into the practical interpretation mutually intended by the contract language.").

## V. IF THIS COURT FINDS THE PAYMENT PROVISION AMBIGUOUS, HASBRO HAS PROFERRED NO EVIDENCE THAT COULD RESOLVE THAT AMBIGUITY IN HASBRO'S FAVOR

What Hasbro erroneously dubs "extrinsic evidence" has no bearing on the parties' intent at the time of the agreements and thus lends no support to its Litigation Interpretation. The law acknowledges three categories of extrinsic evidence relevant to interpreting a contract: (1) negotiations; (2) course of performance; and, (3) trade usage. Lanier Professional Services, Inc. v. Ricci, 192 F.3d 1,4 (1st Cir. 1999).

### A. Charles McCrea does not support Hasbro's Litigation Interpretation

The McCrea testimony and statements cited in Hasbro's objection relate in no way to negotiations, course of performance or trade usage. Further, Hasbro's claim that the Gross Revenue Interpretation is a "recent contrivance" is silly. Mikohn for years paid royalties under this "recent contrivance" and Hasbro audited Mikohn under this "recent contrivance" in October, 2001. The very definition of the Gross Revenue Interpretation contained in Mikohn's motion for summary judgment comes from Hasbro's 2001 audit. Mikohn Mem. at 3.

Hasbro harps pointlessly on the language "as a percentage of."[3] Hasbro Obj. at 25. The phrase "gross revenue to Mikohn" is the key issue. This is what McCrea cited to Mikohn's Board in 2003:

> Under the slot game license agreements at issue here, the intent was ... to pay royalties based on gross revenue.... The agreement clearly provides that the applicable royalty rate was to be determined by reference to "gross revenue" not by reference to revenue that was specific to each game. If one accepted the [Litigation Interpretation], the term "gross revenue" would be rendered meaningless. Once gross revenue for any period of time was established, the "Per

---

[3] Hasbro is not permitted to rely on McCrea's statements if the agreements are unambiguous, as Hasbro contends that they are. Thus Hasbro cannot use McCrea's statements to explain away the clear and unambiguous meaning of "as a percentage of gross revenue to Mikohn" and in the same breath claim that the agreements must be read unambiguously in its favor. To the extent that Hasbro appears to concede that the phrase "as a percentage of gross revenue to Mikohn" clearly and unambiguously supports the Gross Revenue Interpretation, Mikohn agrees.

> Game Per Day" royalty rate could easily be determined by dividing the number of days in the period into the gross revenue.

Hasbro's SUF Ex. II at 5-6.

In the absence of any statement by McCrea that would support its Litigation Interpretation, Hasbro tries to ascribe meaning to what he does not say. Hasbro Obj. at 25. What follows is a series of vaporous allegations and ephemeral insinuations, none of which have any relevance to the intent of the agreements.

For instance Hasbro states that McCrea did not tell the board of directors that Hasbro actually knew how royalties were being calculated. McCrea stated "[Mikohn] commenced paying royalties by reference to 'gross revenue'. Hasbro has never questioned those payments or suggested they were being calculated improperly.... I understand that [Hasbro's] auditors were given all the information they requested and were satisfied that [Mikohn] was fully compliant with the terms of the license agreements." Hasbro's SUF Ex. II at 6

Hasbro asserts that McCrea's failure to mention that per game per day was a common phrase in the gaming industry, meaning the average revenue from a group of slot machines, suggests that he didn't believe that was the case in 2003. Hasbro also asserts that Mikohn's accounting personnel did not recognize "per game per day" as a common phrase in the gaming industry. In their depositions both McCrea and disgruntled former Mikohn CFO John Garner, upon whose testimony Hasbro relies heavily, stated that "per game per day" in the gaming industry contemplates the average revenue of a group of machines. Mikohn Continued SSUF, ¶ 35.

**B. The June 3, 1998 Letter Does Not Support Hasbro's Litigation Interpretation**

Finally, Hasbro retreats once again to McCrea's June 3, 1998 letter, which it claims supports the Litigation Interpretation. McCrea's September 18, 1998 e-mail reveals that the

Gross Revenue Interpretation was contemplated at the time the agreements were executed. Its statement that:

> **For the purposes of this agreement, "Gross Revenue" means <u>all revenue generated by Licensee ... through its use of the Name</u> ... as determined by generally accepted accounting principles consistently applied, including, without limitation, all revenues through sales, leases revenue participation agreements or permitted sublicenses.**

is closer in time to the agreements and plainly supercedes any contrary proposition from the June 3 letter. Thus nothing McCrea said – or didn't say – supports Hasbro's Litigation Interpretation.

Moreover, Hasbro's interpretation of "game" as "a slot machine" in the June 3, 1998 letter is strained at best. Hasbro Obj. at 26-27. The letter reads at § 1.3 "[Mikohn] must introduce the Game in certain geographic areas within specified dates [Australia, 24 months; South America, 36 months; Europe, 36 months….]" Hasbro Obj. Ex. FF. Does Hasbro suggest that a single individual slot machine would service all of Australia, South America, Europe and the other "geographic areas"? Plainly "Game" means class of games here. At §§ 1.3, 1.4 and 2.2 the letter speaks of "approval of the Game by the Nevada Gaming Commission." Does Hasbro suggest that each individual slot machine had to be individually approved by the Nevada Gaming Commission? Plainly "Game" means class of games here. At §2.2 the letter provides "[Mikohn] shall provide written notice to HASBRO that the Game is deemed economically feasible…." Does Hasbro suggest that each individual slot machine would have to be individually deemed economically feasible? Does Hasbro suggest that written notice regarding the individual feasibility determination of each individual gaming device was required? If Hasbro thought so, why didn't it demand such notice before each of the several thousand games were placed on the floor? Plainly "Game" means class of games here and plainly Hasbro knew it.

**C. Hasbro Employees Kristie Lebreche, Paul Kehoe, Patricia Schmidt, Steven Finelli, And Paul Alexander Are All Irrelevant To Negotiations, And Trade Usage And The Course Of Performance Uniformly Supports The Gross Revenue Interpretation**

Hasbro looks to the deposition testimony of five employees to create an illusion of supporting extrinsic evidence. Hasbro Obj. at 29-37. None of this testimony constitutes extrinsic evidence under Lanier Professional Services, Inc., 192 F.3d at 4.

The testimony of these five Hasbro employees does not relate to negotiations. Kristie Lebreche was not involved in negotiations. Paul Kehoe was not involved in negotiations. Patricia Schmidt was not involved in negotiations. Steven Finelli was not involved in negotiations. Paul Alexander was not involved in negotiations.

Nor does the cited testimony relate to course of performance. Hasbro does not even try to claim that any of these employees ever represented to Mikohn – through words or actions – that royalties should be calculated pursuant to the Litigation Interpretation. Nor do these employees claim that anyone at Mikohn represented to them that royalties should be calculated according to the Litigation Interpretation. Nothing in the testimony of these five witnesses constitutes course of conduct which would favor Hasbro's Litigation Interpretation.

Finally, Hasbro has not designated any of its employees experts competent to testify that trade usage of any term in the agreements supports the Litigation Interpretation. As such, none of Hasbro's employees' testimony proffered as "extrinsic evidence" fall into the categories of extrinsic evidence in Lanier Professional Services, Inc., id.

**D. The Ruhe and Garner Interpretations of the Agreements Are Irrelevant**

The disgruntled former Mikohn employees are equally irrelevant to the intent of the parties when the agreements were executed. See Sault Ste. Marie Tribe of Chippewa Indians v.

Engler, 146 F.3d 367, 373 (6th Cir. 1998). Rather than repeat its argument, Mikohn refers to the argument on pages 11-15 of its objection to Hasbro's Motion to Dismiss.

**E. Lack of Evidence to Support Hasbro Warrants the Entry of Summary Judgment in Favor of Mikohn**

If this case proceeds to trial on the issue of contract interpretation, Hasbro's universe of evidence would consist solely of: 1) the contracts themselves; and 2) the June 3, 1998 letter from McCrea. As was discussed, to the extent the June 3 letter even supports Hasbro, it was superseded by McCrea's September 18, 1998 e-mail. Further, none of the former Mikohn employees or Hasbro's damages expert will be permitted to offer their legal opinion as to the meaning of the license agreements. Hasbro will present no evidence of oral communications during negotiations. There is no dispute that royalties were never paid based on Hasbro's Litigation Interpretation. No expert will testify that industry knowledge or trade usage supports Hasbro's Litigation Interpretation. In short, no extrinsic evidence supports Hasbro's Litigation Interpretation.

Based on the dearth of evidence to support Hasbro's Litigation Interpretation, the First Circuit's statements concerning the burden of production takes on added significance.

> The test for summary judgment is steeped in reality. Although the remedy must be withheld if material facts are authentically disputed, there is a burden of production: the party opposing the motion "must set forth specific facts showing that there is a genuine issue for trial....
> Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.

Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Having failed to generate any extrinsic evidence of its Litigation Interpretation, Hasbro's breach of contract claim is ripe for summary judgment.

Hasbro has failed to satisfy its burden of production. Hasbro's objection cites no "extrinsic evidence" on which a trier of fact could resolve an ambiguity in the agreements in favor of Hasbro's Litigation Interpretation. Hasbro's breach of contract claim "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." See id. Even if this Court finds the agreements ambiguous, summary judgment on Hasbro's breach of contract claim is appropriate.

## VI. HASBRO'S LITIGATION INTERPRETATION IS BARRED BY WAIVER AND/OR ESTOPPEL

Hasbro's vociferous argument that it has not waived its alleged contract rights, Hasbro Obj. at 41-45, is unresponsive to Mikohn's Motion for Summary Judgment. To the extent that this Court wishes to address the issue on summary judgment, however, there is ample evidence that Hasbro has effected such a waiver. As such, Mikohn hereby incorporates from its Objection to Hasbro's Motion for Summary Judgment (filed November 6, 2006) its arguments that: (1) Hasbro has waived its alleged rights under the Litigation Interpretation, Mikohn Obj. at 16-20; (2) the non-waiver clauses do not protect Hasbro, id. at 20-22; and, (3) notwithstanding waiver, Hasbro should be estopped from demanding a recalculation at this late hour, id. at 22-24.

## CONCLUSION

For all its storm and bluster, Hasbro's objection to Mikohn's motion for summary judgment fails to point to a material issue of fact standing in the way of judgment for Mikohn. Board approval does not save the license agreements from the taint of illegality because there was no Board approval. Hasbro was not defrauded because Mikohn made no misrepresentation on which Hasbro could justifiably rely. And Hasbro presents no legitimate extrinsic evidence that supports in any way its Litigation Interpretation, an interpretation it derived not from the

language of the license agreements, or the parties' course of performance, but from the minds of disgruntled opportunists looking to find some easy money.

Mikohn respectfully requests that its motion for summary judgment be granted in all respects.

/s/ Gordon P. Cleary
Brooks R. Magratten, Esq., #3585
Gordon P. Cleary, Esq., #1948
Michael J. Daly, Esq., #6729
VETTER & WHITE
Attorneys for Defendant
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060
(401) 272-6803 FAX
bmagratten@vetterandwhite.com
gcleary@vetterandwhite.com
mdaly@vetterandwhite.com

Date: November 21, 2006

CERTIFICATE OF SERVICE

TO:

Todd White, Esq.
Adler Pollock & Sheehan, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

I hereby certify that I electronically filed the within reply on November 21, 2006. The motion is available for viewing and downloading from the Court's Electronic Case Filing system. Service on the above-listed counsel of record has been effectuated by electronic means.

/s/ Gordon P. Cleary