UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HASBRO, INC., and HASBRO INTERNATIONAL, INC., Plaintiffs, v. MIKOHN GAMING CORPORATION, Defendant. | C.A. No. 05-106 S |

**MEMORANDUM AND DECISION**

WILLIAM E. SMITH, United States District Judge.

This case involves a dispute between Hasbro, Inc. and Hasbro International, Inc. (collectively, "Hasbro"), a toy and game manufacturer, and Mikohn Gaming Corporation, a provider of gambling products and machinery. Before the Court are the parties' cross-motions for summary judgment. The pertinent facts and history are presented in this Court's opinion denying Mikohn's motion to dismiss and, for convenience, are also briefly summarized below. See Hasbro, Inc. v. Mikohn Gaming Corp., 2006 WL 2035501 (D.R.I. July 18, 2006).

I. Procedural History

Hasbro entered into several license agreements ("agreements") with Defendant Mikohn. Under each agreement, Hasbro granted Mikohn a license to use one of its games in Mikohn's "gaming goods" or products, including slot machines. The agreements that governed

the use of Hasbro's Battleship, Yahtzee, and Clue[1] games each contained a royalty payment provision that required Mikohn to pay a royalty to Hasbro based upon the revenue Mikohn generated from the sale or lease of the licensed game, on a per game, per day basis. Hasbro maintains that Mikohn did not compensate it according to the terms of the Battleship and Yahtzee agreements, resulting in a shortfall in excess of six million dollars.

On March 7, 2005, Hasbro filed a three count Complaint, sounding in breach of contract, unjust enrichment, and fraud and misrepresentation. This Court took jurisdiction pursuant to 28 U.S.C. § 1332: Hasbro, Inc. and Hasbro, International, Inc. have their principal places of business in Rhode Island; Mikohn's principle place of business is Nevada; and the amount in controversy exceeds $75,000. By stipulation of the parties, disputes arising from the license agreements are governed by Rhode Island law.

In lieu of an answer, Mikohn moved to dismiss Hasbro's claims, arguing primarily that the agreements were illegal and therefore could not be enforced. Also, at oral argument, Mikohn asserted that count three of the Complaint, captioned fraud and misrepresentation, was not pled with the requisite particularity.

---

[1] Although this Court is concerned only with the Yahtzee and Battleship agreements, the Clue agreement is relevant because it contained the same royalty payment provision as the Yahtzee and Battleship agreements.

See Fed. R. Civ. P. 9(b). From the bench, the Court invited Hasbro to file an amended complaint revising the fraud and misrepresentation count, and Hasbro did so on February 16, 2006.

On July 18, 2006, the Court - "accept[ing] the well-pleaded facts as true and indulg[ing] all reasonable inferences therefrom" in Hasbro's favor, see Jorge v. Rumsfeld, 404 F.3d 556, 559 (1st Cir. 2005), ruled that all three counts of the amended complaint survived Mikohn's motion to dismiss. Hasbro, 2006 WL 2035501, at *9.

## II. Background

Hasbro makes children's and family entertainment products, including games and toys. Mikohn is a provider of gambling products, including branded slot machines. Hasbro and Mikohn entered into several agreements between the fall of 1998 and 2000, including agreements governing the use of themes derived from Hasbro's Yahtzee, Battleship, and Clue games. All three agreements contained the same royalty payment provision and remained in effect until April of 2000.

Hasbro's royalty payment was based on "a percentage of gross revenue to Mikohn generated from the sale or lease of the games."[2]

---

[2] Although the agreements refer to Mikohn's revenue "generated from the sale or lease," the list of amounts for Hasbro's "royalty per game per day" is contingent on lease revenue, without any mention of sales revenue.

Agreements § 2. The dollar amount Hasbro was entitled to was determined by a tripartite formula: (1) if Mikohn's lease revenue was less than forty dollars per day, then Hasbro's "royalty per game per day" was set at a minimum amount; (2) if Mikohn's lease revenue was between forty dollars and one hundred thirty nine dollars per day, then Hasbro's "royalty per game per day" was set at one of ten specified amounts, predicated on Mikohn's actual per diem lease revenue; and (3) if Mikohn's lease revenue was greater than one hundred forty dollars per game per day, then Hasbro's "royalty per game per day" was set at a maximum amount.[3] Id. After the agreements were executed and slot machines were placed in casinos, Mikohn began making royalty payments to Hasbro under the Yahtzee and Battleship agreements.

In addition to setting forth the royalty payment provisions, the agreements required Mikohn to furnish Hasbro with "complete and accurate statements" of the royalties due to Hasbro. Id. at § 2(c). Mikohn was also required "to keep accurate books of account and records" regarding Hasbro's royalty payments, and to keep these books for at least two years after the termination of the agreements. Id. at § 11.

Hasbro and its authorized certified public accountants retained the right to inspect Mikohn's books once per calendar year. Id. If an inspection revealed a royalty payment discrepancy

---

[3] The royalty payment provision is set forth in detail below.

of five percent or more, then Mikohn was required to pay the unpaid royalties, plus a specified interest rate, and reimburse Hasbro for the cost the examination, up to four thousand dollars per inspection. Id.

On March 20, 2002, Mikohn's associate general counsel, Mike Dreitzer, received a one page letter, dated March 20, 2002, from Scott Scherer ("the Scherer Letter"), a member of the State of Nevada Gaming Control Board ("NGCB"). The NGCB is a three member board, see N.R.S. 463.030, that "investigates and prosecutes violations of the gaming laws." Romano v. Bible, 169 F.3d 1182, 1184 (9th Cir. 1999). The NGCB's powers and duties include examining premises where gaming is conducted, reviewing books and records of licensees, and investigating suspected criminal violations of N.R.S. chapter 463. See N.R.S. 463.140. After an investigation, if the NGCB is satisfied that a "prior approval by the [Nevada gaming commission] of any transaction for which the approval was required or permitted . . . should be limited, conditioned, suspended or revoked, [then the NGCB] shall initiate a hearing before the [Nevada gaming commission]." N.R.S. 463.310(2). To initiate the hearing, the NGCB files "a complaint with the [Nevada gaming commission] . . . and transmit[s] therewith a summary of evidence in its possession bearing on the matter and the transcript of testimony at any investigative hearing conducted by or on behalf of the board." Id.

The Scherer Letter explained that a recently received letter from Assistant Chief Deputy Attorney General Mike Wilson "determined that the payments contemplated in the Mikohn-Hasbro [Clue] licensing agreement are not 'a fixed sum determined in advance on a bona fide basis,' because the increments in the agreement essentially mimic a percentage of revenue." The Scherer Letter instructed Mikohn that it "may not make any payments to Hasbro" under the Clue licensing agreement, or any "similar licensing agreements covering other game themes."[4]

Shortly thereafter, Mikohn's general counsel, Charles H. McCrea, Jr., transmitted a one page facsimile cover sheet (the "cover sheet") and the Scherer Letter to Pat Schmidt at Hasbro. In the cover sheet, McCrea noted the recent receipt of the Scherer Letter, commented that the Scherer Letter "represents a departure from past policy of the Board," and said that Mikohn was confident it "can structure a royalty that places Hasbro in essentially the same position economically as it is in now."

On March 22, 2002, McCrea wrote to Schmidt, outlining a new proposed royalty structure. This new royalty structure was "unit-based," meaning that Hasbro would receive increased revenue when an increased number of games were installed. Specifically, Hasbro was to receive a minimum specified amount if 500 games or fewer were

---

[4] The Clue licensing agreement contained the same tripartite royalty payment formula as the Yahtzee and Battleship agreements.

installed, a maximum specified amount if over 2000 games were installed, and if there were between 501 and 2000 games installed, then Hasbro received proportional increases. The proposed rates were later adopted as amendments to the agreements, effective April 1, 2002.

In late 2004, Hasbro began to suspect that Mikohn had miscalculated its royalty payments under the agreements that were in effect until April of 2002.[5] Pursuant to section 11 of the agreements, Hasbro audited Mikohn's books and records pertaining to several games, including Yahtzee and Battleship. According to Hasbro, the audit revealed that Mikohn had in fact underpaid Hasbro on the Battleship and Yahtzee agreements. In total, the royalties and contractually specified interest for the two games equaled more than six million dollars.

Hasbro maintains that Mikohn knowingly utilized an incorrect formula to determine Hasbro's royalty payments under the agreements in effect until April 2002 and also utilized that incorrect formula as a basis for the "unit-based" rates in the amendments. Seeking to recover its royalties, interest, and other relief, Hasbro filed suit in this Court.

---

[5] If this allegation proves true, then Hasbro agreed to a lower rate when it signed the amendments, because the new structure would have been based on incorrect figures. <u>See</u> Am. Compl. ¶¶ 25, 29, 31, 35, 39, 52 & 53.

III. Standard of Review

Mikohn now moves for summary judgment on all three counts of Hasbro's amended complaint. Also, Hasbro moves for partial summary judgment on the issue of Mikohn's liability under the licensing agreements.[6]

When evaluating a summary judgment motion, the "critical inquiry is whether a genuine issue of material fact exists." Crawford v. Cooper/T. Smith Stevedoring Co., Inc., 14 F. Supp. 2d 202, 208 (D.R.I. 1998). The Court must view the record in the light most favorable to the nonmovant, and "give that party the benefit of all reasonable inferences in its favor." Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006). "At the summary judgment stage, there is 'no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood.'" Crawford, 14 F. Supp. 2d at 208 (quoting Greenburg v. Puerto Rico Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987)).

---

[6] "Because the amount in controversy is an issue of fact," acknowledges Hasbro, the plaintiffs do not seek to resolve the calculation of damages on this motion. See Pl's Mot. for Partial Summ. J.

IV. <u>Cross Motions for Summary Judgment as to Breach of Contract</u>

Both parties move for summary judgment as to Count I (breach of contract). Hasbro's breach of contract claim alleges that Mikohn failed to pay Hasbro in full under the agreements in effect until April 2002, and that Mikohn further used that underpayment to negotiate amendments to the agreements. <u>See</u> Am. Compl. ¶¶ 30-33. In its motion to dismiss, Mikohn argued that the agreements were illegal under Nevada law, and thus that Hasbro could not recover on a breach of contract theory under Rhode Island law. <u>See</u> <u>Hasbro</u>, 2006 WL 2035501 at *6. Mikohn reasserts that argument here. Additionally, the parties each contend that the plain language of the agreements compels summary judgment in favor of their interpretation; or, barring this, that the extrinsic evidence - including the parties' course of conduct - establishes the superiority of their respective interpretations. The Court will address each of these issues in turn.

Under Rhode Island law, the determination of whether or not an agreement is in violation of a statute is a question of law. <u>Power v. City of Providence</u>, 582 A.2d 895, 900 (R.I. 1990). In its earlier ruling on Mikohn's motion to dismiss, this Court determined that although the parties' agreements were indeed "based on Mikohn's earnings or profits from slot machines" and thus appeared to violate subsection (c) of N.R.S. 463.162(1), the payments nevertheless "fell within the exemption set forth in N.R.S.

463.162(2)(a) because they set forth fixed (not variable) sums."[7] Hasbro, 2006 WL 2035501 at *7. The Court held that the royalty payment provisions were not illegal under the Nevada statute. Id. at *8.

Mikohn now puts forth additional evidence that, it argues, would allow the Court to find that the royalty payment provisions were illegal under the Nevada statute. Specifically, Mikohn proffers Scherer's testimony that he believes that his letter in March 2002 was an official NGCB act and, therefore, determinative on the question of illegality. This evidence, however, is plainly insufficient to merit reconsideration of the prior holding. While the point seems so obvious as to not need stating, the opinion of one member of a three-person board to the effect that he believed his letter was an official act of the board is meaningless. Governmental entities, such as boards and commissions do not take official actions through the unilateral acts of their individual members in this way, particularly where the authorizing statute provides a rubric for NGCB investigation and prosecution. See N.R.S. 463.140. Due process requires more than this. There has

---

[7] The Court further explained: "[w]hile it is no doubt true that the payment provisions in the agreements set forth multiple 'fixed sums' for Hasbro's payments, the fact that the scale was sliding, rather than static, did not convert the arrangement into one that would appear to lend itself to the type of fraud or misconduct that the statute seems designed to prevent. The actual amount Hasbro should have received per game per day is a matter for trial." Hasbro, 2006 WL 2035501 at *7.

been no persuasive showing that the Nevada Gaming Commission, the official body charged with judicial power and authority, see Hasbro, 2006 WL 2035501 at *5, has ruled, after appropriate investigation and a hearing, see N.R.S. 463.310(2), supra, that the agreements are illegal. So, contrary to Mikohn's protestations, sometimes a letter is just a letter. That is the case here, and consequently, Mikohn has not established that, as a matter of law, the agreements are illegal.

The issue of illegality dispatched, the case is appropriately reduced to what it always has been: a contract dispute. Each party asserts that the plain language of the licensing agreements is clear and unambiguous; however, because each party moves for summary judgment on this issue, their interpretations of the agreement reflect widely disparate views of what the contracts supposedly say.

At the crux of the parties' disagreement is the "Terms of Payment" clause, which provides for payment to Hasbro that is based on "Lease Revenue to [Mikohn]," and which is calculated as a "Royalty Per Game Per Day." See Agreements § 2. Mikohn urges that "[t]he only way to give full effect to the entire payment provision is to calculate royalties based on the average revenues generated by the licensed machines." See Def.'s Mot. at 37 (emphasis added). Hasbro, on the other hand, argues that the "per game per day" calculation is "not [based on] the total revenue of all slot

machines collectively," but rather refers to "the total revenue Mikohn earns per each slot machine per day." See Pls.' Mot. at 10.

"Contract interpretation presents, in the first instance, a question of law, and is therefore the court's responsibility." Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989). The language of an agreement is ambiguous if its "terms are inconsistent on their face" or if "the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken." See id.

In support of its aggregative interpretation, Mikohn relies heavily on language stating that the "Royalty Rate" will be "calculated as a percentage of gross revenue to Mikohn generated from the sale or lease of the games." See Def.'s Mot. at 36-39. However, Hasbro argues - and Mikohn conceded at oral argument - that the "as a percentage" terminology was mistakenly imported into the licensing agreements from a different contract previously executed between the parties.[8] Thus, the inadvertent addition of "as a percentage" lends little potency to Mikohn's argument that an

[8] Charles McCrea, the principal drafter of the licensing agreements on Mikohn's behalf, wrote in spring of 2003 to Mikohn's Board of Directors that the "language '[as] a percentage of' is a misnomer, an inadvertent carry-over from the Hasbro table game license agreements where we agreed to pay a percentage of gross revenue as a royalty." See Pls.' Obj. to Def.'s Mot. at 25; Tr. of Oral Argument at 21. It appears that percentage payments on the proceeds of table games, unlike slot machines, do not offend the Nevada statute that has been put in issue in this case.

aggregate calculation should be favored over an individualized analysis.

Mikohn also argues that it would be "impossible" to calculate royalties based on the daily earnings of each specific slot machine, and that the plain - "per game per day" - language of the agreement thus cannot support such a reading. By way of illustration, Mikohn proposes a scenario in which the individualized calculation of royalty payments for machines of only one brand (e.g. "Battleship"), during only one reporting period, would require a 26,000-step mathematical exercise. In fact, both parties agree that the casinos did not supply data in a format that would support such calculations.[9] See Def.'s Mot. at 40; Pls.' Mot. at 40. Hasbro instead points out that Mikohn's own revenues were based on "each individual slot machine's averaged daily performance at [a particular] casino over a month." See Pls.' Mot. at 40 (emphasis added). Hasbro's royalties, however, were calculated not according to Mikohn's own per-machine revenue structure, but instead on the basis of an aggregated monthly average that included the lower proceeds of "casinos in less-frequented areas." Id. at 41. Both proposed revenue reporting structures are accurately described by the phrase "per machine per day," and their co-existence was not hypothetical, but actual.

[9] Hasbro, however, notes testimony in which Mikohn's 30(b)(6) designee suggests that the casinos could provide such data as a function of their own record-keeping procedures.

Each of the proffered interpretations, therefore, is reasonable on the face of the contract.

Consequently, the parties seek to support their respective interpretations with extrinsic evidence. See Fashion House, 892 F.2d at 1083 (holding that where a contract is found to be ambiguous, a court may further consider extrinsic evidence in determining whether uncertainty exists). Mikohn suggests that the parties' negotiations reflect a clear understanding that royalties would be calculated using the aggregative model. See Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 4 & n.3 (1st Cir. 1999) (relevant extrinsic information may include: evidence of the parties' contract negotiations; their course of performance under the contract; their prior course of dealing in other matters, and; trade usage in the relevant industry). But Mikohn itself chronicles the ambivalent evolution of the contract language, thereby diminishing their reliance on the parties' negotiations as support for their interpretation. Moreover, the contested "revenue per game per day" clause was actually added to replace the phrase "gross revenue,"[10] which - had it been allowed to remain in the contract - would more clearly have reflected a "gross revenue" approach to royalty calculations.

---

[10] In turn, "gross revenue" was added during the course of negotiations to replace the original phrase, "revenue generation."

Mikohn also argues, somewhat more convincingly, that the parties' course of performance - that is, Hasbro's ongoing acceptance of payment under the aggregative approach - weighs in favor of a finding that the parties intended at the outset that the "gross revenue" model be used as the basis for royalty calculations. Indeed, Hasbro's first audit of Mikohn's books produced demands by Hasbro for corrected payments, but no dispute about the structure of the royalty provisions themselves. Although Hasbro's course of conduct may appear to have "communicated approval of Mikohn's method of calculating royalties," Hasbro presents evidence that suggests it misunderstood the information it received from Mikohn,[11] and contends that its "acceptance of payment is not evidence that Hasbro expressly accepted Mikohn's incorrect computation methods." This reveals an issue of fact sufficient to defeat the parties' motions for summary judgment. Bourque v. F.D.I.C., 42 F.3d 704, 708 (1st Cir. 1994) (summary judgment is appropriate only when "the extrinsic evidence about the parties' meaning is 'so one-sided that no reasonable person could decide the contrary.'") (internal citation omitted).

---

[11] For example, Kristie LeBreche, a financial analyst for Hasbro, testified that Mikohn submitted royalty spreadsheets, rather than using Hasbro's standard reporting forms, that she was not trained on how Mikohn should have been calculating royalties, and that the accounting system Hasbro was using would not have allowed her to analyze a licensee's methodology of royalty rate computation. Pls.' Mot. at 29.

Because the licensing agreement is susceptible, at the very least, to either of the parties' competing possible interpretations, its language is ambiguous and cannot sustain either party's motion for summary judgment.

V. Mikohn's Motion for Summary Judgment as to Unjust Enrichment

In its earlier decision, the Court denied Mikohn's motion to dismiss Hasbro's claim for unjust enrichment, finding that, at the preliminary stage of the proceedings, Hasbro could pursue alternate theories of breach of contract and unjust enrichment. See Hasbro, 2006 WL 2035501, at *8-*9. Mikohn reasserts its argument here that where an express contract covers the dispute, a party may not pursue a theory of unjust enrichment.

After reconsidering Mikohn's claim in light of the augmented record, the Court agrees that Hasbro is unable to pursue its theory of unjust enrichment. Unjust enrichment, like other quasi-contractual remedies, is a vehicle for equitable recovery where no rights on an enforceable contract exist. See 26 Richard A. Lord, Williston on Contracts § 68:5 (4th ed. 2004) ("Where the plaintiff has no alternative right on an enforceable contract, the basis of the plaintiff's recovery is the unjust enrichment of the contract."). The keylog here, and the main factor supporting Mikohn's motion for summary judgment, is that Hasbro's theory of unjust enrichment is premised solely on Mikohn's miscalculation of

royalty payments under the contract and nothing more. See Am. Compl. ¶ 35. In other words, Hasbro's claim is based on a disputed term in the contract, and not on an allegation or evidence that the contract is in some way unenforceable (a claim that could support recovery under unjust enrichment). This fact is fatal for Hasbro because it means that the claim is unavoidably a contract claim, premised as it is on the dispute over the terms of the contract. See Café La France, Inc. v. Schneider Sec., Inc., 281 F.Supp.2d 361, 375 (D.R.I. 2003) (holding that under Rhode Island law, unjust enrichment is available only "in the absence of an enforceable contract"). It is of course true that parties are allowed to pursue alternative, even inconsistent, claims; but in order to survive at the summary judgment stage, the nonmovant must establish the existence of at least one fact issue which is both "genuine" and "material." See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). Here, Hasbro has simply failed to meet this burden in demonstrating that its claim for unjust enrichment rests on anything other than the disputed contractual provision.[12]

---

[12] It might appear to be the case that the possible illegality of the contract could support Hasbro's claim. But Rhode Island law makes clear that a party to an illegal contract cannot avoid the illegality simply by seeking relief in equity. See New England Retail Properties, Inc. v. Commerce Park Assoc. 11, LLC, 824 A.2d 504, 508 (R.I. 2003); Chambers Bros. v. Joseph Church & Co., 14 R.I. 398 (1884).

VI. Mikohn's Motion for Summary Judgment as to Fraud

Hasbro complains that "Mikohn intentionally miscalculated the royalty payments owed to Hasbro/International by utilizing a formula that [Mikohn] knew was not set forth or contemplated in any of the respective [1998] agreements governing the royalty payments and then utilizing that as a basis upon which [Mikohn] negotiated an amended rate" in the 2002 agreements. See Am. Compl. 6 ¶ 39. In response, Mikohn concedes that its "gross revenue" approach generated substantially lower royalty payments than Hasbro would have received under an individualized per game/per day scheme; however, Mikohn argues that notwithstanding this fact, there is no evidence supporting the claim that the "gross revenue" approach was an "intentional miscalculation" under the terms of the licensing agreements.

To establish a prima facie case for fraud under Rhode Island law, a plaintiff must prove that: "1)the defendant made a false representation; 2)the defendant intended to induce the plaintiff to rely on that representation; and 3)the plaintiff justifiably relied on the representation to his or her detriment." Fraioli v. Lemcke, 328 F. Supp. 2d 250, 268 (D.R.I. 2004) (citing Women's Dev. Corp. v. City of Central Falls, 764 A.2d 151, 160 (R.I. 2001); Travers v. Spidell, 682 A.2d 471, 472-73 (R.I. 1996)). In order to avoid summary judgment, the burden is on Hasbro to put forth evidence establishing that a genuine issue of a material fact exists as to

whether Mikohn made a false representation intending to induce Hasbro to rely on that misrepresentation. Hasbro must also establish that a genuine issue exists as to whether it relied on the misrepresentation to its detriment. Cf. Cliftex Clothing Co. v. Di Santo, 148 A.2d 273, 275-76 (R.I. 1959).

Here, Hasbro has failed to establish that Mikohn's consistent use of a "gross revenue" formula to calculate royalties was a false representation. Hasbro's main allegation comes from deposition testimony of several Mikohn employees who questioned the "gross revenue" formula for calculating royalties. At best, however, this evidence supports the Court's conclusion that the licensing agreements are fairly susceptible to competing interpretations. There is entirely no link between these former employees' purported interpretation of the contract language and Mikohn's communications with Hasbro about the effect of the agreements. For example, although Mikohn's former Director of Gaming Operations, Larry Ruhe, believed that the "gross revenue" scheme "was inconsistent with [his] understanding of the subject license agreements,"[13] he also also acknowledged that Hasbro's interpretation would have made it "impossible to do the [royalty] calculation" precisely "[b]ecause the casinos do not report [machine revenues] on a per day per machine basis." Mr. Ruhe's conflicted interpretation may weigh in

---

[13] Mr. Ruhe repeated this instruction to Dennis van Hook, Mikohn's former Controller, when van Hook also questioned Mikohn's application of the "gross revenue" approach.

favor of a finding of textual ambiguity in the licensing agreements, but it does not suggest fraud on the part of Mikohn. Cf. Lum v. Bank of Am., 361 F.3d 217, 226 (3rd Cir. 2004) (holding it was "unreasonable to infer that defendants' use of [an] equivocal term . . . was reasonably calculated to deceive persons of ordinary prudence and comprehension," and that the "disagreement [did] not rise to the level of fraud; at most, it allege[d] a contract dispute"); see also Smith v. Rhode Island Co., 98 A. 1, 9 (R.I. 1916) ("[T]he expression of a mistaken opinion, honestly entertained, as to a matter open to differences of opinion does not constitute fraud.").

Hasbro's additional support falls similarly short of establishing an issue of fact as to whether Mikohn made a false representation. For instance, Mikohn's Chief Financial Officer, John Garner stated that the "gross revenue" formula had the potential to "put Mikohn at a risk if Hasbro ever challenged it." This is surely true, for the "gross revenue" approach is indeed more favorable to Mikohn than is the competing interpretation.[14] However, Mr. Garner also testified that he declined to "mak[e] an interpretation as to whether [Mikohn's "gross revenue" approach] was wrong," opting instead to do his "duty" to the company by identifying a potential source of liability, and then deferring to

[14] Indeed, Mikohn's former Director of Finance claimed that Mikohn would not have had the financial ability to pay royalties at the much higher rate now urged by Hasbro.

Mikohn's legal counsel for further contractual interpretation. This internal ambivalence among the ranks at Mikohn does not constitute a "false representation" addressed to Hasbro, as would be required for Hasbro to prove the first element of a fraud claim. There is simply no evidence that at any time - including during Hasbro's own first audit of Mikohn's books in 2002 - Mikohn proffered any affirmative misrepresentation to Hasbro regarding the structure of the royalty calculations.[15] See Port Elevator Brownsville v. Gutierrez, 2006 WL 2277226 at *6 (5th Cir. 2006) (holding that a "claim certainly [did] not rise to the level of fraud" when the plaintiff did "not even claim [the defendant] made any statement to her, let alone a material representation") (emphasis in original). Thus, although the contractual ambiguities are suitable for resolution at trial, the fraud count is appropriately resolved at this stage. Mikohn's motion for summary judgment on Count Three is therefore Granted.

---

[15] The June 3, 1998 letter from Charles McCrea paints no different picture. Although Hasbro seeks to cast this letter as a clear statement that royalties would be calculated based on gross revenue from each machine, it is by no means clear that this is what the letter says. Hasbro's support for this contention relies solely on the definition, in the letter, of "Gross Revenue," which states: "'Gross Revenue' means the gross revenue per Game received by [Mikohn] . . . ." But, that "Game" means each individual game rather than the type of game (Yahtzee, Battleship, etc.) is not a foregone conclusion.

VII. Conclusion

For the foregoing reasons, the parties' cross-motions for summary judgment are DENIED as to Count One (breach of contract). Mikohn's motion for summary judgment is GRANTED as to Counts Two and Three (unjust enrichment and fraud and misrepresentation).

It is so ordered.

WESmith

William E. Smith
United States District Judge
Date: 6/12/07