Q. Is that one of the reasons?
A. Certainly could be.
Q. What were some of the other reasons?
A. Excess stock, excess manufacturing, defective product.
Q. Was there excess stock in the hand-held computer game? Hand-held poker game?
A. I don't know.
Q. Was there excess -- was there an excess in defective products in this game?
A. I don't know.
Q. How many cases have you testified in which the issue you were retained for was the lost profits in the toy industry?
A. I have not been retained to calculate lost profits in the toy industry.
Q. Is this the first time you've been retained to do so?
A. This is not the first time I've been retained to compute lost profits with some other damage measured, but this is the first case that I can recall in the toy industry, yes.
Q. And I want to focus on your background in the toy industry.
What other type of work have you done as

an accountant dealing with the toy industry?

A. None that I can recall.

Q. Do you know the reasonable license rates that are utilized in the toy industry?

A. What type of rates are we talking about?

Q. Licensing for intellectual property.

A. There are a variety of rules of thumb used to compute those royalty rates. So in general, yes. I'm familiar with them.

Q. In the toy industry?

A. Not specifically in the toy industry, no.

Q. Do you know how the toy industry generally computes the royalty rates it owes -- it is obligated to pay for the use of intellectual property?

MR. MAGRATTEN: Objection.

You can answer.

THE WITNESS: Repeat your question, please.

MR. WHITE: Can you read the question back, please.

(Record read.)

THE WITNESS: Generally, it's dependent upon the license agreement in the contract.

BY MR. WHITE:

Q. I'm asking you if you know the general parameters of what is paid out in the toy industry for intellectual property use.
A. No.
Q. Are you aware of any time in the toy industry that any company paid out 10 percent for the use of intellectual property? Do you know any time that's occurred?
A. Yes. I do.
Q. Give me an example.
A. It is the contract that I used applied in this particular case. The contract between Mikohn and T.D.C. Games.
Q. Okay. What did T.D.C. Games produce?
A. T.D.C. Games produced primarily board games and other what they characterize as zany games on their website.
Q. What was the T.D.C. game it produced in which it utilized a Mikohn -- Mikohn's intellectual property?
A. I believe it's a home-based Caribbean stud game.
Q. And from your expert report, you say that Mikohn received 10 percent for the use of its intellectual property from T.D.C. Games; correct?

THE WITNESS: I would not agree with that, no.

BY MR. WHITE:

Q. Well, you told me that T.D.C. Games made a board game about Caribbean Stud Poker; correct?

A. Correct.

Q. That is the one game in the T.D.C. Game itself; right?

A. As I understand it, yes.

Q. And you told me that the hand-held poker game -- that Hasbro distributed had two or three different games, as far as you knew?

A. It may have, yes.

Q. Okay. So --

A. It may have just been one game.

Q. Do you know?

A. I don't recall.

Q. So right now I've made a projection on what the royalty rate that Hasbro should pay Mikohn, and you don't even know how many -- what percentage of the hand-held poker game Mikohn's intellectual property comprises, do you?

A. Without looking at the game. And there's a game in my office. I do not recall.

Q. But you're providing expert testimony

under oath today?

A. Yes, sir.

Q. And you've written a report in which you say that Hasbro should pay Mikohn 10 percent as a royalty rate?

A. That's correct.

Q. And yet you don't know -- you don't know how many -- what portion of the hand-held computer game Mikohn's intellectual property comprises, do you?

A. I cannot recall if there are multiple games, no.

Q. And you also don't know how vast Hasbro's distribution network is, do you?

A. Not specifically, no.

Q. And you also don't know how Hasbro's distribution network compares to T.D.C. Games, do you?

A. I do not.

Q. Yet you think they're absolutely comparable without knowing any of that information?

MR. MAGRATTEN: Objection.

THE WITNESS: I believe they're comparable, yes.

BY MR. WHITE:

computer game?

A. I did not go beyond the documents that were produced in this case, no.

Q. Did you speak to anybody in the toy industry to find out what the general profit margin is for a hand-held computer game?

A. No.

Q. Did you try to speak to anybody in the toy industry about that?

MR. MAGRATTEN: Objection.

THE WITNESS: I have not.

BY MR. WHITE:

Q. Is it your belief as an expert accountant here today that Hasbro's company wide profit margin has any bearing on the actual profit margin of this particular product?

A. In my opinion, it is a factor to be considered.

Q. How big a factor?

MR. MAGRATTEN: Objection.

THE WITNESS: I believe it's an important factor to consider.

BY MR. WHITE:

Q. Okay. And I'm trying to understand what that means.

Q. Did you review any information from any entity in what would generally be considered the hand-held computer game industry?

MR. MAGRATTEN: Objection.

THE WITNESS: Not when this report was drafted, no.

BY MR. WHITE:

Q. Did you speak to any representatives of any of those industries I've mentioned in making your conclusions?

A. No, I didn't.

Q. Did you have any prior experience in any of those industries that factored into making your report?

A. No.

Q. You've included on page 9 of 10 Hasbro's sales summary information; correct?

A. Correct.

Q. And in Hasbro's sales summary information that you received, it indicates that the gross sales amount that Hasbro had for this particular product was $385,793; correct?

A. Correct.

Q. And if I remember your earlier testimony, you have no reason to disagree with this figure

itself; is that right?
A. From a factual basis?
Q. Yes.
A. That's correct.
Q. You're just disagreeing with the reason Hasbro discounted these units; right?
A. Yes.
Q. So although you know that Hasbro's gross sales amount for this particular unit is $385,793, it is your position that Hasbro should pay Mikohn $310,888; right?
A. That is correct.
Q. Do you have any concerns about the fact that your expert opinion is that Hasbro should pay Mikohn almost 80 percent of what its gross sales were for this particular unit?
MR. MAGRATTEN: Could you read that question back.
(Record read.)
MR. MAGRATTEN: Objection.
THE WITNESS: I don't.
BY MR. WHITE:
Q. And that would be -- even though the product in question only utilized a Mikohn-protected piece of intellectual property in one half of its