UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| HASBRO, INC., et al., | ) | |
| Plaintiffs | ) | C.A. No. 05-0106/S |
| | ) | |
| v. | ) | |
| | ) | |
| MIKOHN GAMING CORP., | ) | |
| Defendant | ) | |

**MEMORANDUM IN SUPPORT OF MIKOHN'S OBJECTION TO HASBRO'S MOTION TO PRECLUDE AND/OR REQUEST A DAUBERT HEARING**

Defendant Mikohn Gaming Corp.[1] objects to plaintiff Hasbro Inc./Hasbro International, Inc.'s ("Hasbro") motion to preclude expert testimony of L. Ralph Piercy and Michael Rosten. The gravamen of Hasbro's argument is that Mr. Piercy and Mr. Rosten lack qualifications to offer their expert opinions. Mikohn respectfully submits that Mr. Piercy and Mr. Rosten are eminently qualified and that Hasbro's objections go the weight, rather than the admissibility of the experts' testimony.

## I. THE STANDARD FOR ADMISSIBILITY

Fed. R. Evid. 702 governs the admissibility of expert testimony. Rule 702 "imposes an important gatekeeper function on judges by requiring them to ensure[, among other things,] that the expert is qualified to testify by knowledge, skill, experience, training, or education." Correa v. Cruisers, a Div. of KCS Intern., Inc., 298 F.3d 13, 24-25 (1st Cir. 2002). "Under Rule 702, a witness may be qualified as an expert by virtue of any one such factor, or upon a combination of any of the five factors." Suter v. General Acc. Ins. Co. of America, 424 F.Supp.2d 781,

[1] Mikohn Gaming Corporation has since changed its name to Progressive Gaming International, Inc., but for purpose of this motion, shall be referred to as "Mikohn."

794 (D.N.J. 2006) (quoting GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 702.2 (5th ed.2001)).

The testifying expert '"should have achieved a meaningful threshold of expertise' in the given area." Levin v. Dalva Brothers, Inc., 459 F.3d 68, 78 (1st Cir. 2006) (quoting Prado Alvarez v. R.J. Reynolds Tobacco Co., Inc., 405 F.3d 36, 40 (1st Cir. 2005)). In determining whether that "meaningful threshold" has been met, "[l]iberality and flexibility … should be the rule; the proposed expert 'should not be required to satisfy an overly narrow test of his qualifications.'" Suter, 424 F.Supp.2d at 794 (quoting GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 702.2). Consistent with this liberal and flexible evaluation, it has been deemed an

> abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the *best* qualified or because the proposed expert does not have the specialization that the court considers *most* appropriate. If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility.

Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 809 (3d Cir.1997) (emphasis added) (internal citations omitted).

Moreover, Rule 702 recognizes that a qualified expert is capable of applying his or her knowledge, skill, experience, training or education to analyze previously un-encountered issues. The expert "need not have had first-hand dealings with the precise type of event that is at issue." Microfinancial, Inc. v. Premier Holidays Intern., Inc., 385 F.3d 72, 80 (1st Cir. 2004). "Rule 702 is not so wooden as to demand an intimate level of familiarity with every component of a transaction … as a prerequisite to offering expert testimony." Id.

## II. MR. ROSTEN IS QUALIFIED TO TESTIFY ABOUT A REASONABLE ROYALTY FOR HASBRO'S ADMITTED INFRINGEMENT

Hasbro challenges Mr. Rosten's qualifications to offer an expert opinion about a reasonable royalty to be awarded for Hasbro's admitted infringement.[2] Mr. Rosten has an extensive professional background that leaves him well qualified to testify about a reasonable royalty. See Exhibit A. From an education and training perspective, his credentials are laudable. Mr. Rosten has been a Certified Public Accountant for approximately 20 years. Additionally, Mr. Rosten is a Certified Valuation Analyst ("CVA"), an honor that the National Association of Certified Valuation Analysts ("NACVA") bestowed on him after hours of post-graduate coursework, successful testing, and completion of a rigorous case study that was subjected to evaluation by a member of the NACVA grading panel. Valuation analysis involves the evaluation and valuation of businesses and intangible assets, including trademarks. Mr. Rosten's CVA training on valuation Fundamentals, Techniques & Theory addressed topics such as identification of types and characteristics of intangible assets, as well as factors and approaches for intangible asset valuation. That coursework, coupled with Mr. Rosten's experience and his research using accepted publications[3] provide a firm foundation for determining a reasonable royalty for Hasbro's infringement. Mr. Rosten also is a Certified Fraud Examiner, another distinction requiring extensive post graduate coursework and experience scouring through corporate financial records to verify and track book entries and anomalies, such as those detected in Hasbro's documentation in this case. See note 8, infra.

---

[2] Hasbro does not challenge the introduction of Mr. Rosten's testimony about Hasbro's profits from its infringing activities.

[3] Such publications include: Glick et als., Intellectual Property Damages – Guidelines and Analysis; and Weil et als., Litigation Services Handbook – The Role of the Financial Expert.

With these certifications verifying his capabilities, scores of clients have hired Mr. Rosten to perform in-depth audits and valuation/damages analyses and services across the country. He has provided litigation support on a myriad of damages issues, including lost profits, fraud, and contract damages. Mr. Rosten has served as an expert witness for both plaintiffs and defendants in courtrooms, arbitration proceedings and in depositions.

In his spare time, Mr. Rosten is actively engaged in professional organizations, including the American Institute of Certified Public Accountants ("AICPA"). Significantly, he is an active member of the AICPA's Business Valuation and Forensic & Litigation Services Section, which literally "wrote the book" on Calculating Intellectual Property Infringement Damages – a publication that specifically addresses appropriate professional approaches to establishing royalty rates for trademark infringement.[4]

Mr. Rosten's background, education and experiences make him a prototypical "royalty expert." It is well recognized that accountants are commonly used to establish royalty rates in intellectual property cases. Karen Vogel Wiel, et als, Establishing Reasonable Royalty Damages, Patents, Copyrights, Trademarks, and Literary Property Course Handbook Series, PLI Order No. 9001, 875 PLI/Pat 665, 679 (2006). Moreover, the United States Court of Appeals for the Federal Circuit has recently recognized that a Certified Valuation Analyst, such as Mr. Rosten, is qualified to offer an expert opinion about a reasonable royalty that should be awarded for infringement. Monsanto Co. v. McFarling, 488 F.3d 973, 981 (Fed. Cir. 2007) (affirming admissibility of expert testimony concerning reasonable royalty because the expert was a Certified Valuation Analyst).

[4] Mr. Rosten's royalty determination is consistent with the "rule of thumb" described in this publication, i.e., that a royalty rate should be set between 25 and 33 percent of net profit.

Hasbro's attacks on Mr. Rosten's qualifications are unfounded. Hasbro complains that Mr. Rosten has not provided accounting services or lost profit analyses for the toy industry. This fact is insignificant. There is no evidence (and Hasbro makes no effort to provide such evidence) that royalty rates in the toy industry should be calculated differently than in the several other manufacturing and gaming industries in which Mr. Rosten has worked. Mr. Rosten is prepared to testify to this point. Moreover, as the First Circuit has recognized, a testifying expert "need not have had first-hand dealings with the precise type of event that is at issue." Microfinancial, 385 F.3d at 80. Therefore, whether Hasbro wants to characterize their infringement to have been associated with the toy industry, the gaming industry, or any other industry, Mr. Rosten is qualified to offer his opinion of a reasonable royalty rate. Any lack of experience in the toy industry may be explored by Hasbro on cross-examination.[5]

Hasbro also appears to take issue with Mr. Rosten's "method of calculation" of a final royalty amount, i.e., a final dollar figure, as distinguished from a reasonable royalty rate of 10% of gross profit. Specifically, Hasbro claims that "Mr. Rosten went so far as to opine that although Plaintiffs' gross sales of the handheld casino game totaled $385,793.00, [Hasbro] should be required to pay Mikohn $310,888.00 (or 80% of "gross" sales) for its trademark infringement." See Hasbro Motion at 4. Hasbro is mistaken; Mr. Rosten did not testify that $310,888 is a reasonable royalty. Rather, that amount represents Hasbro's estimated net profit[6]

---

[5] Hasbro also attempts to make hay out of Mr. Rosten's memory lapse during his deposition concerning the number of games that Hasbro's infringing device offers. Mr. Rosten reviewed the game before issuing his report and before his deposition. Hasbro's device infringed upon two trademarks – Mikohn's CARIBBEAN STUD® mark and Shuffle Master's LET IT RIDE® mark. Hasbro's infringing device offers two variations of the two the two games (either two or four games, depending on who is counting). Mr. Rosten is not the first witness to have a memory lapse during a deposition, nor will he be the last. This certainly is not a basis for excluding expert testimony – particularly when the temporarily forgotten point concerns an undisputed point.

[6] This $310,888 net profit figure is predicated on the assumption that Hasbro would not pay Mikohn a reasonable royalty for its unauthorized use of Mikohn's trademark. Alternatively, Mr. Rosten noted in his Report that if it is found that Mikohn is owed a reasonable royalty, the $310,888 would be reduced by the computed $66,147

(which should be disgorged) on gross sales of $661,463.[7] Moreover, the $385,793 gross sales figure is in dispute. That amount represents the gross sales reported on Hasbro's shipment reports, which, according to Hasbro's other documentation, incorrectly omit around 60,000 units that were sold to TARGET® stores, Fred Meyer Stores, Inc. and Meijer, Inc.[8] Discrepancies and errors in Hasbro's gross sales figures derived from its incomplete documentation are a basis for resolving doubts against Hasbro, not for limiting or excluding Mr. Rosten's testimony.

Further, Hasbro states that Mr. Rosten testified that Hasbro's company wide profit margin would be an important factor to consider in determining a reasonable royalty rate on a device like Hasbro's infringing handheld casino poker game. This totally mischaracterizes Mr. Rosten's testimony, which was that the Hasbro company wide profit margin would be an important factor in assessing and confirming the reasonability of a profit percentage on the game, not necessarily for identifying a reasonable royalty rate in the first instance.

Hasbro's Motion to Preclude does not display a grasp of the breadth of Mr. Rosten's expertise, or of the crux of his testimony. As described above, Mr. Rosten is well qualified to testify about a reasonable royalty and Hasbro's motion should be denied.

---

reasonable royalty to account for an additional production cost to Hasbro, yielding a Hasbro net profit of $244,741 ($310,888 - $61,147).

[7] The $661,463 figure is based on the assumption that Hasbro artificially deflated the sales price of over 75,000 units (and consequently its gross revenue) in response to concerns over liability for infringement. To account for this apparent "fire sale," Mr. Rosten recalculated Hasbro's gross sales by applying the average selling price before the suspicious "fire sale" to the 75,000 thousand fire sale units. Mr. Rosten is prepared to re-calculate Hasbro's estimated profit figures based on Hasbro's claim that they dumped the product in the normal course of business. The recalculation would follow the identical methodology discussed in Mr. Rosten's report and deposition and use the same data provided by Hasbro.

[8] Mr. Rosten also is prepared to re-calculate Hasbro's profits to account for these unaccounted-for units. Because Hasbro's documentation does not disclose the price at which these units were sold, the re-calculation would assume an average sales price of $5.49/unit – the same hypothetical sales price discussed in Mr. Rosten's report and deposition.

## III. MR. PIERCY IS QUALIFIED TO TESTIFY ABOUT INDUSTRY KNOWLEDGE AND TRADE USAGE

Hasbro challenges Mr. Piercy's testimony about trade usages of terms appearing in the licensing agreements. Hasbro begins by claiming that Mr. Piercy is not a Certified Public Accountant. Again, Hasbro is mistaken. Mr. Piercy is a registered CPA in Nevada, California, Mississippi and Kansas.[9] This was fully disclosed to Hasbro in Mr. Piercy's expert report, see Exhibit B at p. 12,[10] as well as in ¶61 of Mikohn's Statement of Undisputed Facts submitted in connection with its summary judgment motion.

With respect to Hasbro's concerns about Mr. Piercy's qualifications to offering his opinion about the meaning of the licensing agreement, Mikohn agrees that it is improper for any witness to offer his or her ultimate interpretation of disputed contract language. Neither Hasbro, nor Mikohn, should be permitted to introduce testimony telling the jury what an ambiguous (as previously determined by this Court) contract actually means. See, e.g., Sault Ste. Marie Tribe of Chippewa Indians v. Engler, 146 F.3d 367, 373 (6th Cir. 1998) ("Witnesses may properly testify to facts respecting the surroundings and situation of the parties, but may not interpret the contract."); TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 549 (6th Cir.1981) (absent any need to clarify or define terms of art, science or trade, expert opinion testimony to interpret contract language is not admissible); Energy Oils, Inc. v. Montana Power Co., 626 F.2d 731, 737 (9th Cir.1980) (witness should not have been permitted to testify as to legal effect of written agreements); Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509 (2nd Cir. 1977) (recognizing that, except in the narrowest of circumstances, "opinions as to the meaning of … contract terms" are inadmissible) (cited favorably in Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir.

---

[9] Hasbro's representation that Mr. Piercy is not a CPA is curious in light of its recognition that Mr. Piercy holds a bachelor's degree in Business Administration from the University of Nevada, Las Vegas. Mr. Piercy's CPA certifications are listed on the same page of his expert report that identifies his alma mater. See Exhibit B at p. 12

[10] Mr. Piercy's expert report inadvertently omitted his CPA certification in Kansas.

1997)); First Nat'l Bank of Evanston v. Sousanes, 422 N.E.2d 188, 194 (Ill. App. 1981) (real estate broker could not express opinion on whether landlord breached lease agreement).

Mikohn does not intend to present Mr. Piercy simply to tell the jury what the parties agreed to. Rather, the focus of his testimony is on industry knowledge and trade usage – key categories of extrinsic evidence. See Superior Boiler Works, Inc. v. R.J. Sanders, Inc., 711 A.2d 628, 636 (R.I. 1998) (recognizing the relevance of "usages of trade"). Specifically, Mr. Piercy is prepared to testify to two broad categories of information: 1) trade usage, i.e., that within the gaming industry, the term "game" may refer to a brand of slot machines and the phrase "per game per day" is a metric used to refer to a class of machines; and 2) industry knowledge, i.e., that within the gaming industry, it was well known that casinos do not disclose daily, machine specific, performance data, which would be necessary to apply Hasbro's Litigation Interpretation.[11]

Hasbro does not challenge the introduction of Mr. Piercy's testimony about industry knowledge. Rather, it focuses its challenge to Mr. Piercy's proposed testimony about trade usage. Specifically, Hasbro takes the position that Mr. Piercy should not be able to tell the jury about how the gaming industry uses the phrase "per game per day" and how a participant in the gaming industry would interpret the term "game" as it is used in the licensing agreements. First, according to Hasbro, Mr. Piercy has not "assessed a case involving a licensor's (such as Hasbro) interpretation of per game per day." See Hasbro's motion at 4. Secondly, according to Hasbro, Mr. Piercy's testimony about the trade usage of these terms contradicts language in the licensing agreements and statements made by Mikohn's former general counsel, Charles McCrea and by Mikohn's former CFO, Don Stevens.

---

[11] This industry-wide knowledge shows that it was inconceivable for the parties to have agreed to calculate royalties using Hasbro's Litigation Interpretation.

With respect to Hasbro's complaint that Mr. Piercy does not have prior experience assessing cases "involving a licensor's … interpretation of per game per day," Mikohn submits that it does not intend to present Mr. Piercy to testify about how Hasbro or any other licensor may have subjectively interpreted the phrase "per game per day." He is, however, amply suited to testify about how a typical participant in the gaming industry would objectively interpret that phrase. Mr. Piercy is able to offer his insight based largely on his professional accounting engagements where he has had to interpret the financial provisions of numerous contracts related to the gaming industry from 1974 to the present. Having spent decades steeped in the gaming industry, Mr. Piercy is exceedingly familiar with how royalty arrangements work in the gaming industry – a point that Hasbro does not appear to contest.[12] The fact that he does not have prior experience assessing cases "involving a licensor's … interpretation of per game per day" is not a basis for excluding his testimony; he does not intend to say what Hasbro subjectively believed. Moreover, as discussed above a testifying expert "need not have had first-hand dealings with the precise type of event that is at issue." Microfinancial, Inc., 385 F.3d at 80.

As for Hasbro's claim of contradictions between Mr. Piercy's testimony and other pieces of evidence, Hasbro's concerns fall flat. From a legal perspective, any perceived contradictions go to the weight to be afforded to his testimony, not to its admissibility. The fact that one piece of extrinsic evidence may be inconsistent with another piece of evidence does not justify exclusion. A contrary rule would militate in favor of exclusion of any evidence that contradicts

---

[12] Mr. Piercy's extensive experience in the gaming industry stands in stark contrast to the experience of Hasbro's purported expert, Michael Tousignant. Mr. Tousignant's personal involvement with the gaming industry has been limited to two video lottery terminal financial projections for Lincoln Park, the most recent provided four years ago, and perhaps ten to twenty hours per year providing "technical oversight" of his firm's work for Newport Grand. He has also overseen "the staffing, scheduling and compliance" of one "financial controls" project for Mohegan Sun, but has never conducted an audit like Hasbro's audit of Mikohn. Tousignant tr. at 4:4 – 11:18, 55:4-18. Unlike Mr. Piercy who has over 30 years of daily experience with gaming industry clients, Mr. Tousignant has no experience with the gaming industry, let alone with the issues presented in this case.

Hasbro's 2001 audit papers and report, where Hasbro confirms that the Gross Revenue Interpretation is correct and that Hasbro has received all royalties to which it is entitled.

From a factual perspective, Hasbro's claimed contradictions are actually nonexistent, or, at best, inconsequential. Beginning with Hasbro's representation that Mr. Piercy's testimony conflicts with the contract language, Mikohn would refer to the license agreements as a whole. There is nothing in these agreements to prevent the jury from considering industry knowledge to interpret the term "game" and the phrase "per game per day."[13] Indeed, this Court already has deemed the agreements to be ambiguous, thereby rendering the consideration of extrinsic evidence (including trade usage) indispensable.

Next, with respect to a claimed contradiction between Mr. Piercy's and Mr. McCrea's definition of the term "game," Hasbro does not even identify the document that it contends conflicts with Mr. Piercy's opinion. In any event, McCrea has testified that the word "game" could refer to a class of slot machines. See McCrea Test. at 108, attached as Exhibit C. And ultimately, Mr. McCrea specifically confirmed that the agreements were entered with the assumption that royalties would be calculated based on the average performance of all licensed machines. See Exhibit C at 144. Thus, it is apparent that Mr. McCrea's and Mr. Piercy's statements are consistent.

Finally, Hasbro's reliance on Mr. Stevens' testimony as a basis for excluding Mr. Piercy's testimony is unfounded. According to Hasbro, Mr. Stevens "testified that 'game' in this agreement meant slot machine." See Hasbro Motion at 5. However, a review of Mr. Stevens' deposition transcript reveals that he testified that "the phrase the games would either be slot

[13] In reality, the phrase "per game per day" is not the operative phrase in dispute. See Mikohn's Objection to Hasbro's Motion for Summary Judgment, at p. 6-7. There is no question that under the Gross Revenue Interpretation, Hasbro already has received a royalty "per game per day." What Hasbro really contends is that Mikohn should have identified the actual (rather than average), daily "Lease Revenue to [Mikohn]" from each individual machine and paid a separate, machine specific "Royalty Per Game Per Day" on that basis. See id.

machines or table games of the Yahtzee theme." Stevens Test. at 67, attached as Exhibit D. This is completely consistent with Mr. Piercy's testimony that a gaming industry participant would interpret the term "game" as used in the agreements at issue here to mean "the entire brand 'Yahtzee' or the entire brand 'Battleship.'" See Hasbro Motion at 5. Regardless, Mr. Stevens did not participate in the negotiation of the agreements. He has not been designated an expert in this case. Ultimately, his personal interpretation of the term "game" is irrelevant and inadmissible. Therefore, nothing that Mr. Stevens says justifies exclusion of Mr. Piercy's testimony.

**CONCLUSION**

For the reasons set forth herein, Mikohn respectfully requests that Hasbro's motion to preclude expert testimony of Mr. Rosten and Mr. Piercy be denied.

Respectfully submitted,

/s/ Michael J. Daly

Brooks R. Magratten, Esq., No. 3585
Gordon P. Cleary, Esq., No. 1948
Michael J. Daly, Esq., No. 6729
VETTER & WHITE
Attorneys for Defendant
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060
(401) 272-6803 FAX
bmagratten@vetterandwhite.com
gcleary@vetterandwhite.com
mdaly@vetterandwhite.com

Dated: September 7, 2007

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| HASBRO, INC., et al., Plaintiffs | ) | C.A. No. 05-0106/S |
| v. | ) | |
| MIKOHN GAMING CORP., Defendant | ) | |

**MIKOHN'S OBJECTION TO HASBRO'S MOTION TO**
**PRECLUDE AND/OR REQUEST A DAUBERT HEARING**

Defendant Mikohn Gaming Corp. hereby objects to plaintiff Hasbro Inc./Hasbro International, Inc.'s ("Hasbro") motion exclude expert testimony of L. Ralph Piercy and Michael Rosten. Mikohn submits herewith a supporting memorandum of law.

Respectfully submitted,

/s/ Michael J. Daly

Brooks R. Magratten, Esq., No. 3585
Gordon P. Cleary, Esq., No. 1948
Michael J. Daly, Esq., No. 6729
VETTER & WHITE
Attorneys for Defendant
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060
(401) 272-6803 FAX
bmagratten@vetterandwhite.com
gcleary@vetterandwhite.com
mdaly@vetterandwhite.com

Dated: September 7, 2007

CERTIFICATE OF SERVICE

To:

Todd D. White, Esq.
Adler, Pollock & Sheehan, P.C.
One Citizens Plaza - 8th Floor
Providence, RI 02903

I hereby certify that I electronically filed this Objection and Supporting Memorandum on September 7, 2007, both of which are available for viewing and downloading from the Court's Electronic Case Filing System. Service on the above-identified counsel has been effectuated by electronic means.

/s/ Michael J. Daly