16522



VOLUME: I 11:58:00
PAGES: 1-191

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

C.A. 05-0106 S

HASBRO, INC., ET AL, )
Plaintiffs, )
)
vs. )
)
MIKOHN GAMING CORP., )
Defendant. )

DEPOSITION OF LLOYD MINTZ, a witness called on behalf of the Defendant, pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Jill Shepherd, Registered Professional Reporter, CLR and Notary Public, in and for the Commonwealth of Massachusetts, at the offices of Tobin, Sullivan, Fay & Greenbaum, on Friday, September 14, 2007, commencing at 12:00 p.m.

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030



APPEARANCES:

16522

10

Q. When did you speak with Ms. Schmidt? 12:22:22
A. We had lunch a couple of weeks ago. It was just an informal lunch of a couple of old friends. It wasn't really a business lunch per se. 12:22:25 12:22:29 12:22:32 12:22:35
Q. That was after your conversation with Todd White? 12:22:35 12:22:42
A. It was after my conversation, but prior to my meeting. 12:22:50 12:22:52
Q. After your conversation with Todd White, you had lunch with Ms. Schmidt? 12:22:53 12:23:00
A. Yes. 12:23:02
Q. After your lunch with Ms. Schmidt, you met with Todd White? 12:23:02 12:23:06
A. Correct. And to be clear, I met with Todd White on the morning of August 31st. 12:23:07 12:23:10
Q. Have you had any other meetings with Todd White? 12:23:16 12:23:27
A. No. 12:23:27
Q. Have you had any other phone calls with Todd White? 12:23:28 12:23:32
A. Briefly, yes. 12:23:32
Q. How many phone calls? 12:23:33
A. Maybe three or so. 12:23:34

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030

11

Q. Do you recall the dates of those phone calls? 12:23:40

A. No, they were all rather brief to make sure I 12:23:47
understood where I needed to be and when and 12:23:52
what was happening. 12:23:54
Q. Have you reviewed any documents to prepare 12:23:55
for this deposition? 12:24:26
A. About a half dozen. 12:24:28
Q. What documents? 12:24:29
A. They are not in my possession. Mr. White 12:24:35
shared them with me, so I don't know exactly 12:24:40
what they were all called. One was the 12:24:42
contract. 12:24:44
Q. Do you remember the subject matter of the 12:24:44
other documents? 12:24:54
A. They were correspondence. I think they all 12:24:55
related to the licensing agreement with 12:24:59
Mikohn. I don't remember the title of each 12:25:03
document. 12:25:06
Q. Who selected the documents that you looked 12:25:07
at? 12:25:09
A. Mr. White. 12:25:10
Q. Did he ask for your input in selecting 12:25:11
documents? 12:25:19
A. No. 12:25:20





Q. Who else was at the meeting with you and Todd 12:25:20
White? 12:25:37
A. No one. 12:25:37
Q. Other than Todd White and Pat Schmidt, have 12:25:38

16522



are the main four. 12:36:03
Q. Are there possibly other individuals from Hasbro you have spoken with since the summer of 2004? 12:36:05 12:36:08 12:36:10
A. Oh, Matt Zwieka, Z-W-I-E-K-A. 12:36:11
Q. Is it possible that you have spoken with additional people from Hasbro since the summer of 2004? 12:36:20 12:36:24 12:36:25
A. Yes, it's possible. 12:36:26
Q. Let's talk about Tom Klusaritz. 12:36:28
What is his position at Hasbro? 12:36:53
A. I don't know his title actually. 12:36:55
Q. Generally, what does he do for Hasbro? 12:37:00
A. I think he runs day-to-day licensing. 12:37:03
Q. Would that be outgoing licenses? 12:37:06
A. Correct. 12:37:18
Q. And that means licenses that Hasbro would issue -- intellectual property licenses that Hasbro would issue to outside companies? 12:37:19 12:37:23 12:37:26
A. Correct. 12:37:29
Q. Do you know if Mr. Klusaritz is an executive at Hasbro? 12:37:30 12:37:37
A. I do not. 12:37:38
Q. Without -- strike that. 12:37:39





Do you know where he may fall on the 12:37:49

corporate ranks? 12:37:52
A. Roughly, but not definitely. 12:37:58
Q. Would you please describe roughly where he would fall within the corporate ranks. 12:38:03 12:38:06
A. The head of the entire division is Jayne Ritson-Parson. Brioni [phonetic] Boyer reports to her. Sorry, I don't have the spelling on that one. And Tom reports to Brioni. 12:38:09 12:38:14 12:38:25 12:38:26 12:38:30
Q. Since the summer of 2004, how many times have you spoken with Tom Klusaritz? 12:38:31 12:38:45
A. I don't recall. 12:38:47
Q. More than 10? 12:38:50
A. Yes. 12:38:52
Q. More than 20? 12:38:54
A. Yes. 12:38:59
Q. More than 50? 12:38:59
A. I doubt it. 12:39:00
Q. What were you speaking with Tom Klusaritz about? 12:39:02 12:39:10
A. (No audible response.)
Q. Generally, what was the nature of your communications? 12:39:13 12:39:15





A. Sometimes they were just social calls, and others they were to discuss potential business. 12:39:15 12:39:18 12:39:21
Q. Would Mr. Klusaritz ever call you? 12:39:21

16522

A. Yes. 12:39:28
Q. How often did he call you, generally? 12:39:28
A. Two or three times a year. 12:39:40
Q. How would he get in touch with you? 12:39:42
A. By phone. 12:39:50
Q. Which of the three phone numbers that you gave? 12:39:52 12:39:54
A. Office. 12:39:54
Q. Did you ever have any correspondence with Mr. Klusaritz? 12:39:55 12:40:05
A. Other than e-mail? 12:40:08
Q. Both. 12:40:11
A. Principally e-mail. 12:40:12
Q. How frequently would you be in e-mail communications with Mr. Klusaritz? 12:40:18 12:40:21
A. Irregularly. 12:40:22
Q. Would Mr. Klusaritz e-mail you? 12:40:26
A. No. 12:40:37
Q. Would you e-mail Mr. Klusaritz? 12:40:39
A. Yes. 12:40:41





Q. Why wouldn't he e-mail you; do you know? 12:40:41
A. He doesn't like e-mail. 12:40:46
Q. In your time working for Hasbro, did you become familiar with the intellectual property licensing department where Mr. Klusaritz works? 12:40:57 12:41:01 12:41:05 12:41:07
A. While I was at Hasbro? 12:41:08
Q. Yes. 12:41:13

A. Yes. 12:41:14
Q. How would you describe the flow of 12:41:15
information between somebody in 12:41:16
Mr. Klusaritz's position and 12:41:18
Ms. Ritson-Parson's position? 12:41:21
MR. WHITE: Objection. 12:41:24
You can answer. 12:41:25
A. That would be pure speculation on my part, 12:41:26
because they were both there after I left. 12:41:30
Q. Just talking generally about the people who 12:41:31
held those positions while you were there, 12:41:33
how would you describe -- 12:41:37
MR. WHITE: Objection. 12:41:39
A. The structure was actually created after I 12:41:39
left, so, again, it would be pure 12:41:43
speculation. I don't know how the 12:41:46





communication works. 12:41:48
Q. Do you believe that Mr. Klusaritz would have 12:41:48
had conversations with Ms. Briar [sic]? 12:42:02
A. Boyer. 12:42:05
MR. WHITE: Objection. 12:42:07
Q. I will start over. 12:42:07
Do you believe that Mr. Klusaritz 12:42:11
would have had conversations with Ms. Boyer 12:42:13
about any of the topics that you were 12:42:16
involved with? 12:42:20
MR. WHITE: Objection. 12:42:20

16522

A. I have no idea. 12:42:21
Q. Do you believe that Mr. Klusaritz would have 12:42:22
had conversations with Ms. Ritson-Parson 12:42:33
about any of the communications you had? 12:42:35
MR. WHITE: Objection. 12:42:37
A. I don't know. 12:42:38
Q. You mentioned that you have also been in 12:42:39
conversations with Lynda Connell? 12:42:56
A. C-O-N-N-E-L-L. Lynda with a Y. 12:42:59
Q. What is Ms. Connell's positions at Hasbro? 12:43:07
A. I don't know her title, but she's an account 12:43:10
manager over certain license categories. 12:43:18
Q. Where would Mr. Connell fall within the 12:43:25





corporate ranks at Hasbro? 12:43:35
MR. WHITE: Objection. 12:43:37
A. I don't know exactly, but she reports to Tom. 12:43:38
I don't know if it's either directly or 12:43:45
indirectly. 12:43:47
Q. How frequently have you spoken with 12:43:48
Ms. Connell since the summer of 2004? 12:43:56
A. Fairly irregularly. 12:44:06
Q. Approximately how many times have you spoken 12:44:09
with her since the summer of 2004? 12:44:13
A. A dozen. 12:44:15
Q. What was the subject of your conversations 12:44:32
with Ms. Connell generally during those 12:44:34
conversations? 12:44:37
A. To discuss business opportunities. 12:44:38

16522

meetings with Ms. Connell since the summer of 12:47:55
2004; is that correct? 12:47:59





A. Correct. 12:48:00
Q. What was the subject of those meetings? 12:48:01
A. Business opportunities on behalf of clients. 12:48:04
Q. About how long did those meetings last? 12:48:08
A. An hour. 12:48:12
Q. Each one of those meetings? 12:48:15
A. Approximately. 12:48:17
Q. Was there anybody else at the meetings? 12:48:17
A. One of them. 12:48:23
Q. Who else was at the meeting? 12:48:26
A. Mr. Klusaritz and Matt Zwieka. 12:48:28
Q. Do you know why they were at that meeting and 12:48:41
not at the others? 12:48:43
A. Actually, that meeting involved more them 12:48:44
than her; she happened to sit in on it at the 12:48:50
very end. 12:48:52
Q. Why were you meeting with Mr. Klusaritz and 12:48:53
Mr. Zwieka? 12:49:07
A. To try to generate some business for my 12:49:12
clients. 12:49:14
Q. Have you met with either Mr. Klusaritz or 12:49:15
Mr. Zwieka other than that one meeting? 12:49:22
A. Yes. 12:49:24
Q. About how many times have you met with 12:49:24

Mr. Klusaritz?
A. A few.
Q. More than five?
A. From 2004 to now?
Q. Yes.
A. I would estimate around that.
Q. All these communications you've had with Mr. Klusaritz -- strike that.
You've described several communications that you've had with Mr. Klusaritz since the summer of 2004, correct?
A. Yes.
Q. Has your communication with him been consistent from the summer of 2004 until now?
A. I'm not sure I understand.
Q. Okay. Without going through and asking all of the questions again, I want to pick a different beginning point rather than the summer of 2004. I want to go with March of 2005, okay? Can we use that as a beginning reference point?
A. Okay.
Q. Have you had generally consistent





communications with him since March of 2005

16522

as well? 12:51:28
MR. WHITE: Objection. 12:51:28
A. I don't think it changes that much from one season to the next. 12:51:29 12:51:35
Q. Okay. And that would be true as well with Ms. Connell? 12:51:36 12:51:40
A. Yes. 12:51:41
Q. You said that you have also been in contact with Mr. Provost; is that correct? 12:51:42 12:51:47
A. Yes. 12:51:49
Q. Let's start with the new time frame here. Let's start with March of 2005. 12:51:50 12:52:00
A. Okay. 12:52:03
Q. How many times have you spoken with Mr. Provost since March of 2005? 12:52:03 12:52:05
A. Mr. Provost and I talk a couple of times a year and have lunch once a year. 12:52:07 12:52:14
Q. What's Mr. Provost's position at Hasbro? 12:52:19
A. Again, I don't know his title, but he is involved in the creative side. 12:52:32 12:52:35
Q. Would that be within Hasbro's licensing group? 12:52:37 12:52:44
A. Correct. 12:52:44





Q. Do you know where Mr. Provost would fall within the corporate ranks at Hasbro? 12:52:45 12:52:47
A. No. 12:52:49
Q. Do you know who Mr. Provost reports to at 12:52:49

16522

Hasbro? 12:52:53
A. No. 12:52:53
Q. When was the last time you had lunch with Mr. Provost? 12:52:59 12:53:01
A. Christmas 2006. 12:53:02
Q. Was that lunch work-related or personal-related? 12:53:07 12:53:24
A. Personal. 12:53:25
Q. Is Mr. Provost a personal friend of yours? 12:53:31
A. Business acquaintance. 12:53:34
Q. Would you communicate with Mr. Provost other than those lunches that you would have? 12:53:42 12:53:45
A. Seldom. 12:53:50
Q. Would you talk to him by telephone? 12:53:51
A. Seldom. 12:53:53
Q. Would he ever call you by telephone? 12:53:54
A. Seldom. 12:53:56
Q. But he did? 12:53:57
A. Seldom. 12:53:59
Q. Would that be yes, he has called you by 12:54:00





telephone? 12:54:03
A. Yes, at some point in time. 12:54:04
Q. Since March 2005, Mr. Provost has called you on the telephone? 12:54:06 12:54:09
A. Yes. 12:54:09
Q. Have you called Mr. Provost on the telephone in that time frame? 12:54:10 12:54:12
A. Yes. 12:54:13

Q. Have you had e-mail communication with Mr. Provost since March of 2005? 12:54:13 12:54:17
A. Yes. 12:54:20
Q. Has he e-mailed you during that time period? 12:54:20
A. Yes. 12:54:23
Q. Have you e-mailed him during that time period? 12:54:24 12:54:26
A. Yes. 12:54:26
Q. Generally, what was the nature of the communications with Mr. Provost? 12:54:27 12:54:32
A. Setting up our lunch date. 12:54:33
Q. Any other purposes? 12:54:39
A. Not really. 12:54:41
Q. Okay. You mentioned you've also been in touch with Ms. Lucci? 12:54:42 12:54:48
A. Yes. 12:54:50





Q. Would that be since March of 2005 as well? 12:54:50
A. Yes, but each less frequently. 12:54:53
Q. What's Ms. Lucci's position at Hasbro? 12:54:56
A. I don't know her title. 12:55:00
Q. Do you know generally what her responsibilities are at Hasbro? 12:55:02 12:55:05
A. Not in great detail. 12:55:06
Q. Do you know in little detail what her responsibilities are? 12:55:10 12:55:16
A. She's somehow involved in the approvals of submissions by licensees. 12:55:16 12:55:20

16522

Q. Do you know where Ms. Lucci would fall within Hasbro's corporate structure? 12:55:21 12:55:25

MR. WHITE: Objection. 12:55:27

A. No. 12:55:28

Q. Do you know who Ms. Lucci reports to for work? 12:55:29 12:55:32

A. No, I do not. 12:55:32

Q. Since March of 2005, how many times have you spoken with Ms. Lucci? 12:55:34 12:55:41

A. Very few. 12:55:42

Q. More than five? 12:55:48

A. I doubt it. 12:55:54

Q. Around five? 12:55:55





A. Probably less. 12:55:57

Q. More than two? 12:55:59

A. Probably once a year. 12:56:03

Q. Once a year. So once a year, since March 2005, you have spoken with Ms. Lucci? 12:56:05 12:56:11

A. Approximately. Give or take. 12:56:15

Q. So that may put us at about two times you've spoken with Ms. Lucci since March of 2005? 12:56:18 12:56:22

A. Over the phone or at any point in time? 12:56:25

Q. Let's stick with over the phone. 12:56:28

A. Yes, once or twice. 12:56:30

Q. How many times have you spoken with her other than on the telephone? 12:56:34 12:56:40

A. Probably about -- approximately once a year, again. 12:56:41 12:56:45

Q. What's the reason for those communications? 12:56:45
A. Typically, just to say hello. 12:56:50
Q. Would you call Ms. Lucci? 12:56:54
A. Yes. 12:56:55
Q. Would Ms. Lucci call you? 12:56:55
A. Seldom. 12:56:58
Q. But she would call you? 12:56:59
A. I can't recall a time that she did, but that doesn't mean that she never did. 12:57:02 12:57:06





Q. Would you e-mail Ms. Lucci? 12:57:08
A. Seldom. 12:57:13
Q. But you did e-mail Ms. Lucci? 12:57:14
A. Probably at some point, yes. 12:57:18
Q. Has Ms. Lucci e-mailed you since March 2005? 12:57:20
A. Probably. 12:57:24
Q. Did you say that you had met with Ms. Lucci since March of 2005? I don't remember. Well, strike that. 12:57:25 12:57:37 12:57:42
Have you met with Ms. Lucci personally since March of 2005? 12:57:43 12:57:45
A. Define "meet with." 12:57:46
Q. Seen her? 12:57:50
A. Yes. 12:57:51
Q. Spoken with her in person? 12:57:52
A. Yes. 12:57:53
Q. Approximately how many times since March 2005 have you spoken with Ms. Lucci? 12:57:54 12:57:56

A. Once, probably twice a year. 12:57:58
Q. In person? 12:58:01
A. Yes. 12:58:02
Q. What would be the purpose of those 12:58:03
communications with her? 12:58:07
A. Mostly just to say hello. 12:58:08





Q. For the purpose of generating business? 12:58:11
A. No. 12:58:14
Q. Personal reasons? 12:58:15
A. Just to say hello. 12:58:17
Q. You also mentioned Matt Zwieka. 12:58:20
A. Yes. 12:58:27
Q. What's Mr. Zwieka's position at Hasbro? 12:58:28
A. I believe he's an account manager also. 12:58:31
Q. Account manager within Hasbro's licensing 12:58:40
department? 12:58:48
A. Yes. 12:58:49
Q. Do you know where Mr. Zwieka would fall 12:58:49
within Hasbro's corporate chain? 12:58:56
A. No. 12:58:58
Q. Do you know who Mr. Zwieka would report to? 12:58:59
A. No. 12:59:01
Q. How many times have you had telephone 12:59:06
communication with Mr. Zwieka since March 12:59:09
2005? 12:59:11
A. 10 to 20 approximately. 12:59:11
Q. Would Mr. Zwieka call you on the telephone? 12:59:32
A. Yes, occasionally. 12:59:34

Q. Would you call Mr. Zwieka on the telephone? 12:59:36
A. Yes. 12:59:38





Q. Have you had e-mail communications with Mr. Zwieka since March of 2005? 12:59:38 12:59:42
A. Yes. 12:59:43
Q. Would you e-mail Mr. Zwieka? 12:59:44
A. Yes. 12:59:46
Q. Would Mr. Zwieka e-mail you? 12:59:47
A. Yes. 12:59:49
Q. Have you seen Mr. Zwieka personally since March 2005? 12:59:49 12:59:57
A. Yes. 12:59:57
Q. How many times? 12:59:58
A. A few. 12:59:59
Q. More than five? 01:00:04
A. Probably right around there. 01:00:07
Q. I just want to backtrack. I want to ask one quick question about each of these people. 01:00:09 01:00:34
When was the last time you spoke with Mr. Klusaritz? 01:00:36 01:00:38
A. I don't recall. 01:00:39
Q. Approximately. 01:00:39
A. June. 01:00:44
Q. June of this year? 01:00:45
A. Yes. 01:00:47
Q. Do you recall when before that you had spoken 01:00:48

with Mr. Klusaritz? 01:00:59
A. No. 01:01:00
Q. When is the last time you've spoken with Ms. Connell? 01:01:01 01:01:06
A. Around June. Early July maybe. 01:01:06
Q. When was the last time you had any communication with Mr. Provost? 01:01:19 01:01:31
A. June. 01:01:32
Q. Of this year? 01:01:35
A. Yes. 01:01:37
Q. When was the time before that? 01:01:38
A. To the best of my recollection, the Christmas lunch. 01:01:42 01:01:50
Q. When was the last time you had any communication with Ms. Lucci? 01:01:50 01:01:55
A. I believe it was also June. 01:01:56
Q. When was the time before that? 01:02:09
A. I don't recall. 01:02:11
Q. When is the last time you've had any communication with Mr. Zwieka? 01:02:14 01:02:18
A. June. 01:02:19
Q. When was the time before that? 01:02:20
A. I don't recall. 01:02:24
Q. Every time you just said "June," did you mean 01:02:29





June of 2007? 01:02:39

began about 10 months before the licensing show, approximately how frequently would you have communications with Hasbro with that proposal? 01:05:45 01:05:47 01:05:53 01:05:59

MR. WHITE: Objection. 01:05:59

A. Not that often. 01:06:00

Q. Once a month? 01:06:15

A. Maybe once or twice. 01:06:19

Q. Once or twice a month? 01:06:23

A. Right. 01:06:24

Q. So 10 months before June of 2007? 01:06:25

A. Correct. 01:06:31

Q. So that would be August of 2006? 01:06:32

A. Correct. 01:06:36

Q. Since August of 2006, is it fair to say that you have been in contact with Hasbro twice a 01:06:37 01:06:40





month? 01:06:43

A. Not necessarily. 01:06:43

Q. On average, twice a month? 01:06:45

A. No. 01:06:48

Q. Since June of 2006, how many times would you be in touch with Hasbro on average per month? 01:06:52 01:06:57

A. There's a flurry of activity and then it dies off, and then there's a flurry of activity and it dies off. So I can't tell you on a monthly basis how much it was. 01:07:00 01:07:03 01:07:06 01:07:09

Q. Within that time frame of June of 2006 until 01:07:11

16522

now, you've had multiple flurries of activity, we'll call them? 01:07:14 01:07:19

MR. WHITE: Objection. 01:07:23

You can answer. 01:07:25

A. Yes, I guess so. 01:07:31

Q. Okay. And would those flurries of activities involve Mr. Zwieka and Ms. Connell? 01:07:33 01:07:39

A. Yes. 01:07:42

Q. That negotiation that began in June of 2006 -- 01:07:42 01:07:58

A. No, August of 2006. 01:07:58

Q. Okay. Thank you. August of 2006, has that -- strike that. 01:07:59 01:08:06





Negotiations that began in 2006, have they completed? 01:08:09 01:08:11

A. Yes. 01:08:12

Q. What was the result? 01:08:13

A. A licensing agreement between my client and Hasbro. 01:08:17 01:08:21

Q. When was that agreement reached? 01:08:22

A. Define "reached." 01:08:25

Q. Are there different ways to define "reach an agreement"? 01:08:29 01:08:42

A. Yes, there is. 01:08:42

Q. How many different ways? 01:08:44

A. To reach an agreement in principle, when you have a deal sheet, when you have the first draft of a contract, when you actually have a 01:08:45 01:08:46 01:08:48

contract signed and executed. It's a 01:08:51
multistage process. 01:08:56
Q. When did those negotiations reach an 01:08:58
agreement in principle? 01:09:02
A. November. 01:09:05
Q. November of 2006? 01:09:05
A. Correct. 01:09:07
Q. When did those negotiations result in a deal 01:09:10
sheet? 01:09:13





A. I think it was December of 2006, or it might 01:09:14
have been January 2007. 01:09:29
Q. When did those negotiations result in a 01:09:30
contract draft between Hasbro and your 01:09:34
client? 01:09:37
A. Right around that same time also. 01:09:37
Q. When was that contract executed? 01:09:44
A. I believe in February or March of 2007. 01:09:52
Q. What was the intellectual property that 01:09:57
Hasbro licensed under that agreement? 01:10:12
A. Multiple game properties. 01:10:14
Q. What game properties? 01:10:18
A. I cannot recall the list. 01:10:20
Q. What were the game properties going to be 01:10:21
used for? 01:10:23
A. I'd rather not get into the specifics of how 01:10:24
they are deploying those assets. 01:10:38
Q. Was your client a manufacturer? 01:10:43

A. Yes. 01:10:44

Q. Who was going to be manufacturing products incorporating Hasbro's game products? 01:10:45 01:10:48

A. Yes. 01:10:51

Q. Let's talk about the other negotiations that began in June of 2007; is that correct? 01:10:51 01:10:55





A. I wouldn't call it a negotiation. 01:10:59

Q. What would you call it? 01:11:02

A. An introduction. 01:11:03

Q. Okay. The introduction in 2007 -- June of 2007? 01:11:05 01:11:12

A. Correct. 01:11:12

Q. Who made the introduction? 01:11:13

A. I did. 01:11:17

Q. You joined your client with Hasbro? 01:11:18

A. Correct. 01:11:21

Q. What's the status of those negotiations? 01:11:21

A. In limbo. 01:11:32

Q. Have you reached a deal in principle? 01:11:44

A. No. 01:11:50

Q. Do you have any reason to believe that there's an agreement in principle on the horizon? 01:11:50 01:11:52 01:11:56

A. No. 01:11:56

Q. Do you have any reason to believe that there's not an agreement in principle on the horizon? 01:11:57 01:11:59 01:12:05

A. Just from a timing perspective, it becomes 01:12:05

that as 5, if you would. 02:47:25
(Exhibit No. 5 marked.) 02:47:27
Q. Mr. Mintz, I'm showing you what has been marked as Exhibit 5. 02:48:22 02:48:25
Do you recognize that document? 02:48:27
A. No, but upon reviewing it, it's clearly directed to me. 02:48:29 02:48:38
Q. Do you have any reason to believe that you didn't receive it? 02:48:39 02:48:42
A. No. 02:48:43
Q. Actually, let me just turn back to Exhibit 2A. 02:48:45 02:48:48
Is that one of the documents you reviewed with Todd White? 02:48:49 02:48:51
A. Can I see it again? 02:48:52
Q. Sure. 02:48:54
A. I don't remember this. 02:49:04
MR. DALY: I assume, Todd, you will correct me if you have actually shown him a document that he doesn't recall, and I would ask that only because we're so late in the day. If this were during discovery, we would be able to send out a document request asking for documents that you reviewed with him. 02:49:07 02:49:09 02:49:12 02:49:14 02:49:16 02:49:18 02:49:20





MR. WHITE: It's a discovery 02:49:24

16522

deposition of a witness. I'm just going to protect Hasbro's interests. That's what I'm here for. I'm not here to do any more than that. Whatever his answers are, are his answers. I can't change that. It is, as you know, he's the guy that Brooks Magratten talked to before I talked to -- 02:49:28 02:49:32 02:49:35 02:49:37 02:49:40 02:49:43 02:49:46

MR. DALY: We can try to get through this very quick question. 02:49:46 02:49:48

Are you going to tell me the documents that you showed to him? 02:49:49 02:49:51

MR. WHITE: Of course not. I'm not deposed. He's deposed. 02:49:52 02:49:54

MR. DALY: Okay. That's fine. I understand. 02:49:56 02:49:58

Q. Okay. Exhibit 5, is that one of the documents you reviewed with Todd White? 02:49:59 02:50:05

A. I don't recall this one. 02:50:07

Q. Okay. The column heading on page one of this exhibit, it says "Revenue Per Day Per Game." 02:50:13 02:50:21

A. Yes. 02:50:26

Q. Who's that referring to, revenue to whom? 02:50:27

MR. WHITE: Objection. 02:50:32





A. I don't recall. Well, the sentence right below it says, "These models are based on a royalty to Hasbro." 02:50:33 02:50:37 02:50:41

Q. Okay. If you flip to the second page of this 02:50:43

16522

maximizes profits more than Mikohn's 03:04:14
interpretation? 03:04:17
MR. WHITE: Objection. 03:04:19
A. You are talking about in hindsight? 03:04:19
Q. Yes. 03:04:21
A. Yes. 03:04:22
MR. WHITE: I'd just like to put on 03:04:26
the record, you know this is unit-based, this 03:04:27
is not performance-based at all. Okay? 03:04:29
Because there was an assumption of how the 03:04:32
games did in one of your questions. And 03:04:34
these are on the numbers that are out there. 03:04:36
MR. DALY: We're trying to get 03:04:38





through this, Todd. I understand if you want 03:04:40
to try and clarify. 03:04:41
MR. WHITE: Well, you had a 03:04:41
predicate that wasn't exactly correct. But 03:04:42
go ahead. 03:04:44
MR. DALY: Would you mark that as 03:04:55
No. 6, please. 03:04:57
A. Do you want this back? 03:04:59
Q. Sure. 03:05:01
(Exhibit No. 6 marked.) 03:05:02
Q. I'm showing you what has been marked as 03:05:45
Exhibit No. 6. 03:05:48
Do you recognize this document? 03:05:51
A. No, but in reading it it's clearly from me to 03:05:52
Sunny Gordon. 03:06:01

Q. Is this a document you wrote while working for Hasbro? 03:06:03 03:06:06
A. Yes. 03:06:06
Q. And you would have written that June 23, 1998; is that correct? 03:06:07 03:06:11
A. It would appear to be. 03:06:11
Q. Who's Sunny Gordon? 03:06:13
A. He used to be the vice chairman of the Hasbro, I believe. 03:06:15 03:06:20





Q. And who's John Gilday? 03:06:20
A. John Gilday was, at the time, the president of licensing and my boss. 03:06:23 03:06:28
Q. So the purpose of writing this document was to tell them the status of your discussions with Charlie McCrea as of that point; is that correct? 03:06:30 03:06:32 03:06:34 03:06:37
A. I haven't gotten through the document yet, but -- 03:06:37 03:06:39
Q. Take your time. 03:06:39
A. (Witness reviewing document.) Okay. 03:07:15
Q. Now, having read that document, do you agree, this is a document that you wrote? 03:07:17 03:07:23
A. Yes. 03:07:24
Q. And the purpose of this document was to tell Sunny Gordon and John Gilday about the status of your discussions with Mikohn at that point? 03:07:25 03:07:31 03:07:35 03:07:37

McCrea about this language? 03:33:42
A. Which language? 03:33:44
Q. In 2.3. 03:33:45
A. I don't know what you are asking. 03:33:50
Q. Paragraph 2.3 reads, "Royalty" -- 03:33:51
A. Yeah.
Q. -- "throughout the term of the license agreements, Mikohn Sigma shall pay royalty to Hasbro calculated as a percentage of gross revenue to Mikohn Sigma generated from the sale or lease of the game as follows." 03:33:55 03:33:57 03:34:02 03:34:06 03:34:11
A. And you are asking if I talked to Charlie about this? 03:34:17 03:34:20
Q. Yes. 03:34:20
A. I don't recall. 03:34:21
Q. Okay. You don't remember Charlie telling you anything as to how this language would be applied in these agreements? 03:34:21 03:34:31 03:34:33
A. I don't remember ever talking about that. 03:34:34
Q. Do you ever remember asking him how this language would be applied in the agreements? 03:34:36 03:34:41
A. No, I don't recall. 03:34:43
Q. When it says here, "Calculated as a percentage of gross revenue" -- 03:34:46 03:34:49





A. Yes. 03:34:52

propose that 'gross revenue' be defined as 04:15:32
follows," and then it goes on. 04:15:37
What did you do when you received 04:15:41
this e-mail? 04:15:42
A. I don't know. 04:15:43
Q. Did you have any questions when you received 04:15:43
this e-mail? 04:15:50
A. I don't recall. 04:15:50
Q. Did you ever talk to Mr. McCrea about what 04:15:51
"gross revenue" would mean in the agreements? 04:15:58
A. I don't recall. 04:16:01
Q. If you look to the second page of this 04:16:01
Exhibit 18. 04:16:08
A. (Witness reviewing document.) Yes. 04:16:10
Q. Where it says here, "It's very important that 04:16:11
we sign the license agreements prior to the 04:16:14





show." 04:16:16
A. Yes. 04:16:17
Q. What show is he referring to, where he says 04:16:17
"prior to the show next week"? 04:16:28
A. I don't know. 04:16:30
Q. All right. Now, I believe you said that you 04:16:30
understood the license agreements to require 04:16:57
royalties to be calculated based on the 04:17:04
actual daily performance of every individual 04:17:08
slot machine in operation; is that correct? 04:17:14
A. Correct. 04:17:16

16522

Q. Did anybody from Mikohn ever say anything to lead you to that belief? 04:17:17 04:17:23
A. I don't recall. 04:17:25
Q. Did anybody from Mikohn ever write anything that led you to that belief? 04:17:27 04:17:31
MR. WHITE: Objection. 04:17:34
A. I don't recall. 04:17:36
Q. Was it your understanding that there would be -- that there could be 2,000 machines in operation at any given time? 04:17:36 04:17:48 04:17:55
MR. WHITE: Objection. 04:17:58
A. My memory today, or in looking at all the documents you've given me? 04:18:00 04:18:05





Q. Yes. 04:18:06
A. Yes, the latter? 04:18:09
Q. Start over. At the time you entered these agreements, would it have been reasonable to expect that there were going to be 2,000 games, slot machines, at any given time? 04:18:11 04:18:13 04:18:20 04:18:29
A. I don't recall. 04:18:33
Q. As you are reading the documents today, do you believe that it was reasonable to assume that there may have been 2,000 slot machines in operation at any given time? 04:18:33 04:18:35 04:18:38 04:18:44
MR. WHITE: Objection. 04:18:48
A. I think it was all based on Mikohn's projections and forecast. So I think 2,000 was a midpoint or conservative lift from 04:18:49 04:19:18 04:19:24

that other lawyers had been calling you; is 04:24:54
that correct? 04:24:56
A. It was probably Todd. 04:24:56
Q. Okay. 04:25:00
A. I didn't speak to him. 04:25:01
Q. Okay. Do you know if it was Todd? 04:25:02
A. I don't 100 percent know, no. 04:25:05
Q. Do you know -- strike that. 04:25:09
Have you received any calls from any 04:25:14
lawyers from that time that you spoke with 04:25:19
Brooks Magratten until you received this 04:25:26
subpoena? 04:25:31
A. No. 04:25:31
Q. Have you received any certified mail from 04:25:32
Todd White? 04:25:44
A. It's possible. 04:25:47
Q. Have you rejected any certified mail from 04:25:48
anybody within the past two years? 04:25:52
A. I don't recall. 04:25:55
Q. Have you refused any phone calls from any 04:25:56
lawyers within the past two years? 04:26:06
MR. WHITE: Objection. 04:26:10
A. Define "refused." 04:26:10





Q. Has anybody from -- strike that. 04:26:13
Have you accepted any phone calls 04:26:28
from any lawyers within the past two years? 04:26:29
A. Not that I remember. 04:26:32

16522

Q. Have you been told that there are any lawyers that want to talk to you within the past two years? 04:26:33 04:26:38 04:26:40
A. Other than the inquiries that I received that I ignored, no. 04:26:41 04:26:48
Q. And those inquiries would have been way back about two years ago? 04:26:48 04:26:52
A. At least. 04:26:53
Q. And the next time that you received inquiries would have been about a month ago? 04:26:54 04:26:59
A. Yes. 04:27:01
Q. In between, you never received any inquiries from any lawyers? 04:27:01 04:27:05
A. I don't recall any. 04:27:06
Q. Okay. Now, I understand this is a holiday, and I do want to respect that, and I do want to be able to get you home, if you need to. I'm not waiving this deposition. I'm not concluding it. I will agree to suspend it, and we can disagree about it later on, if we 04:27:08 04:27:18 04:27:20 04:27:28 04:27:31 04:27:35





need to. 04:27:40
Beyond that -- 04:27:46
A. Are there additional documents that you need to review? 04:27:50 04:27:52
Q. I have some additional areas to cover, yes. 04:27:54
MR. WHITE: I would just put on the record, and I want to be fair about the time, given the breaks and stuff, it might be right 04:28:00 04:28:02 04:28:06

Q. Okay. Did you understand that Hasbro would be receiving royalties based on actual daily performance with machines licensed under the WMS agreement? 04:36:25 04:36:29 04:36:33 04:36:37
A. I think I'd actually have to go back to what I said to Todd when he first called me, and what does the agreement say. 04:36:38 04:36:41 04:36:46
Q. Okay. 04:36:47
A. Off the top of my head, I don't recall what the agreement said. But if I read it, I would probably remember what we were doing at the time. 04:36:47 04:36:50 04:36:53 04:36:55
Q. Okay. Are you aware of any time when Hasbro has received royalties based on the actual daily performance of slot machines? 04:36:55 04:36:59 04:37:04
A. No. 04:37:09
Q. Are you aware of any company that has ever received royalties based on the actual daily performance of a slot machine? 04:37:11 04:37:16 04:37:22
MR. WHITE: Objection. Foundation. 04:37:25
A. It's proprietary information. I wouldn't have access to that. 04:37:27 04:37:31
Q. So is the answer, you are not -- I will ask 04:37:32





it again. 04:37:36
Are you aware of any instance when any company has received royalties based on the actual daily performance of individual 04:37:37 04:37:39 04:37:42

slot machines? 04:37:49
MR. WHITE: Objection. 04:37:49
A. I'm not aware of that. 04:37:50
Q. Okay. What's your understanding of how royalties would generally be paid for slot machines? 04:37:51 04:38:11 04:38:17
MR. WHITE: Objection. Foundation. 04:38:17
A. My experience is only based on the agreements that I negotiated to Hasbro, so it wasn't a huge -- hugely diverse or extensive. It's literally based on those agreements, so I couldn't speak to an industry standard. 04:38:19 04:38:23 04:38:28 04:38:33 04:38:36
Q. Okay. 04:38:38
A. And at the time, it was very early in the leveraging of intellectual properties on a slot machine platform, so there was no huge precedent for me to even base those deals on. 04:38:40 04:38:46 04:38:50 04:38:55
Q. So you said it was very early on. 04:38:59
When did that begin? 04:39:03
A. It began with Wheel of Fortune and we were 04:39:04





second with Monopoly. 04:39:08
Q. What was the date of the Wheel of Fortune? 04:39:10
A. I don't know exactly. It was probably six to 12 months before. Somewhere in that time frame. 04:39:13 04:39:19 04:39:21
Q. You were aware of that agreement at the time you were negotiating -- 04:39:22 04:39:23
A. Aware in only that it existed, but I had no 04:39:25

knowledge of any detail of what whatsoever. 04:39:28
Q. How did you become aware of it? 04:39:30
A. I don't recall. 04:39:32
Q. Had you gone to gaming shows? 04:39:35
A. Not at that point, no. 04:39:39
Q. Not at what point? 04:39:41
A. When I first learned of the wheel of Fortune, I had not been to any gaming shows. 04:39:43 04:39:49
Q. Okay. When was the first gaming show that you would have gone to? 04:39:51 04:39:55
A. I don't recall, but based on the correspondence you have shown me, I think the one is referenced in the letters, 1997 is probably the first one I went to. 04:39:56 04:39:59 04:40:01 04:40:06
Q. When did you begin negotiating with WMS? 04:40:08
A. I don't remember. 1996. 04:40:11





Q. 1996? 04:40:14
A. I think so. 04:40:15
Q. Okay. 04:40:16
A. I'm not positive. 04:40:16
Q. And you were negotiating with them for what purpose? 04:40:17 04:40:21
A. Monopoly slot machines. 04:40:22
Q. Okay. So as of 1996, you had been in discussions with people about royalties based on slot machines? 04:40:24 04:40:30 04:40:37
A. No. 04:40:38

16522

Q. What, then, were you talking about with WMS? 04:40:39
A. Well, we weren't in discussions with people. We were in discussions with WMS. We didn't put Monopoly out for a competitive bidding proposal per se. It was a discussion with WMS. 04:40:43 04:40:48 04:40:51 04:40:54 04:40:56
Q. Okay. Did anybody at WMS ever tell you that they were paying royalties based on the actual daily performance of every individual slot machine? 04:40:57 04:41:03 04:41:07 04:41:11
MR. WHITE: Objection. 04:41:11
A. I don't recall. 04:41:12
Q. Are you aware of the word "name" being given 04:41:13





to any specific meaning in the gaming industry? 04:41:45 04:41:47
A. The word "name"? 04:41:48
Q. Yes. 04:41:52
MR. WHITE: In the gaming industry, you said? 04:41:53 04:41:54
MR. DALY: Yes. 04:41:55
MR. WHITE: Objection. 04:41:55
A. No. 04:41:56
Q. Are you aware of the word "game" being given a specific definition in the gaming industry? 04:41:56 04:42:01
A. No. 04:42:03
Q. Are you aware of the phrase "gross revenue" being given a specific definition in the gaming industry? 04:42:10 04:42:15 04:42:19

A. No. 04:42:20
Q. Are you aware of the phrase "royalty per game 04:42:21
per day" being given a special definition in 04:42:28
the gaming industry? 04:42:34
A. A special definition? No. 04:42:35
Q. Had you seen the phrase "royalty per game per 04:42:41
day" before your negotiations with Hasbro? 04:42:47
A. Mikohn? 04:42:53
Q. With Mikohn. 04:42:54





A. I don't recall. 04:42:57
MR. DALY: Would you mark this as 04:43:44
the highest number, the one higher than 04:43:45
whatever the highest number exhibit is. 04:43:48
THE WITNESS: 18 is the last one you 04:43:52
gave me. 04:43:53
MR. DALY: I believe in the 04:43:54
beginning of the deposition -- would you mark 04:43:55
this as 34, please. 04:44:00
(Exhibit No. 34 marked.) 04:44:03
Q. I'm showing you what's been marked as Exhibit 04:45:11
No. 34. 04:45:15
Do you recognize this document? 04:45:16
A. Yes. 04:45:17
Q. At the bottom of this, I believe it says, 04:45:18
"Hasbro contract number 1422 JHM." 04:45:29
A. Okay. 04:45:35
Q. Who is JHM? 04:45:35